**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS, M.F., by and through next friend, VANESSA FERNANDEZ, AMPERSAND GROUP LLC, and BRANDON CLOSSON,<br><br>*Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as the Texas Attorney General,<br><br>*Defendant*. | Civil Action No. 1:24-cv-00945 |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

# I.     PRELIMINARY STATEMENT

1.     Texas has jumped on a misguided bandwagon of recent efforts to childproof the internet by passing the Securing Children Online Through Parental Empowerment Act. 2023 Tex. Sess. Law Serv., 88th Reg. Sess., Ch. 795 ("SCOPE Act" or "Act") (attached as Ex. 1). The Act subjects *all* Texans—not just minors—to age registration as a condition of access to digital services. It requires online services to monitor their content, and depending on a service's mix, requires even more intrusive and imperfect age-verification screenings as a condition to engage in protected speech, violating established law. *See Reno v. ACLU*, 521 U.S. 844, 855-57, 881-82 (1997). And the Act goes even further, seeking to compel online intermediaries to block minors from accessing, sharing, or discussing a broad and vaguely defined range of protected subject matter based on the government's conclusion that certain ideas are too dangerous, ignoring the fact that the state lacks any "free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011).

2.     Plaintiffs are Texans and Texas-based organizations whose abilities to communicate and access information will be restricted by the Act. They include a student-run organization that promotes youth engagement in policymaking, an online content creator focusing on mental health, a company that produces social-good advertising directed toward minors, and a high-school student who uses social media to obtain news and information, build community, and listen to and share music. They bring this action to avert the deprivation of their most basic constitutional rights.

3.     They do not stand alone. Courts have already enjoined similar measures in California, Arkansas, Ohio, Mississippi, and Indiana.[1] While these efforts to protect young people

---

[1] *NetChoice LLC v. Bonta*, 692 F. Supp. 3d 924 (N.D. Cal. 2023), *aff'd in relevant part*, 2024 WL 3838423 (9th Cir. Aug. 16, 2024); *NetChoice LLC v. Griffin*, 2023 WL 5660155 (W.D.

are well-intentioned, they lack perspective.  The idea that *some* types of social network use by *some* minors under certain conditions might adversely affect *some* segment of this cohort cannot justify imposing government restrictions on *all* social network use by *all* minors.  Just as the State does not and cannot keep all libraries under lock and key, from minors and adults, because some books or information in them may be inappropriate for some children, so too it cannot lock away information online on certain topics out of concern that some ideas may be harmful.

4.      These recent legislative efforts reflect an overgeneralized reliance on social science research without acknowledging either that "different children and adolescents are affected by social media in different ways, based on their individual strengths and vulnerabilities, and based on cultural, historical, and socio-economic factors,"[2] or that "youths' psychological development may benefit from this type of online social interaction, particularly during periods of social isolation, when experiencing stress, when seeking connection to peers with similar developmental and/or health conditions, and perhaps especially for youth who experience adversity or isolation in offline environments."[3]  For the State to use the law to impose a one-size-fits-all mandate threatens to "throw[] out the baby with the bathwater."  *Bonta*, 692 F. Supp. 3d at 957.

5.      Such overreach typifies how lawmakers historically have sought to regulate new media forms in the name of protecting the young.  Whether dime novels or "penny dreadfuls" in

---

Ark. Aug. 31, 2023);  *NetChoice LLC v. Yost*, --- F. Supp. 3d ---, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024);  *NetChoice LLC v. Fitch*, --- F. Supp. 3d ---, 2024 WL 3276409 (S.D. Miss. July 1, 2024), *appeal filed*, No. 24-60341 (5th Cir. July 5, 2024); *Free Speech Coal. v. Rokita*, 2024 WL 3228197 (S.D. Ind. June 28, 2024) ), *appeal filed*, No. 24-2174, (7th Cir. July 10, 2024).

[2] DEP'T OF HEALTH & HUM. SERVS., SOCIAL MEDIA AND YOUTH MENTAL HEALTH: THE U.S. SURGEON GEN.'S ADVISORY 5 (2023), http://tinyurl.com/4wycrcpm.

[3] AM. PSYCH. ASS'N, HEALTH ADVISORY ON SOCIAL MEDIA USE IN ADOLESCENCE 3-4 (May 2023), http://tinyurl.com/4brm85e6.

the nineteenth century, moving pictures in the early twentieth century, comic books in the 1950s, or video games at the dawn of the twenty-first century, the response to these successive moral panics has been largely the same: legislatures pass vague and broadly worded speech restrictions that infringe basic First Amendment rights of both adults and minors and the courts block them. *See Brown*, 564 U.S. at 797–98.  The body of law that controls this case emerged from these successive moral panics.[4]

6.     The Act—both as applied to Plaintiffs' use of covered services and on its face—violates the First and Fourteenth Amendments, and the Commerce Clause of the United States Constitution.  Plaintiffs accordingly seek an order declaring the Act's unconstitutional provisions invalid and enjoining their enforcement.

## II.     PARTIES

7.     Plaintiff Students Engaged in Advancing Texas ("SEAT") represents a coalition of Texas students from middle-school to college who seek to increase youth visibility and participation in policymaking.  SEAT provides students with hands-on opportunities for engaging in advocacy, legislative efforts, and education on issues of importance to youths.  SEAT also uses social media accounts on Instagram, X, Facebook, and LinkedIn to share opportunities, news, and calls to action with Texas students.  According to analytics as of August 2024, over 20 percent of SEAT's Instagram audience is under 18 years old.  SEAT's mission is to promote students' agency in policymaking to ensure that youths have a voice in the legislative process, especially regarding

---

[4] *E.g.*, *Winters v. New York*, 333 U.S. 507 (1948); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952); *Butler v. Michigan*, 352 U.S. 380 (1957); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963); *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676 (1968); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989); *Reno v. ACLU*, 521 U.S. 844 (1997); *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803 (2000); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *Ashcroft v. ACLU*, 542 U.S. 656 (2004); *Brown*, 564 U.S. at 786.

decisions that directly impact them.

8.      Plaintiff M.F. is a minor resident of Texas and a junior in high school.  He participates in debate at school and is a budding musician.  He uses a variety of social media platforms, including Instagram, YouTube, and Reddit to research topics for debate, read the news, connect with friends, gain inspiration for his music creation, and learn about new products, events, and opportunities advertised to him.

9.      Plaintiff Ampersand Group LLC ("The Ampersand Group") is an Austin-based company that handles advertising and marketing for non-profits, government agencies, and local businesses.  The Ampersand Group is dedicated to using the power of online advertising for social good—working on campaigns on a wide range of social issues such as public health, gun violence prevention, bipartisan voter mobilization, services for minority communities, and sex trafficking awareness.  It places advertisements on many platforms including YouTube, Instagram, and Facebook, as well as interactive online gaming services.  The company seeks to reach teen audiences both in and outside of Texas.

10.     Plaintiff Brandon Closson is an adult resident of Texas and software engineer who uses Instagram and other social networks to share authentic and lighthearted content about bipolar disorder based on his own experience with the condition.  Closson's following includes young people under 18.  Social media users, including high schoolers, have reached out to Closson to express that his content has made them feel less isolated in their diagnosis or that it encouraged them to consult with a psychiatrist or therapist for the first time.

11.     Defendant Ken Paxton, the Texas Attorney General, is charged with enforcing the Act.  *See* Tex. Bus. & Com. Code § 509.151.

### III.      JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C §§ 1331

and 1343(a) because Plaintiffs' claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

13.     This Court has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because it presents an actual case or controversy within the Court's jurisdiction.  *See also Ex parte Young*, 209 U.S. 123, 168 (1908).

14.     Venue is proper in this District because all Defendants reside in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiffs' claims occurred in this District, 28 U.S.C. § 1391(b)(2).

## IV.     FACTUAL ALLEGATIONS

15.     The Act restricts how and about what subject matter Texans may communicate online, limiting Plaintiffs' abilities to access and disseminate a broad range of protected expression through a medium that has become essential to human communication.

### A.     Social Networks Provide a Forum for Expression and Association

16.     Social networks provide forums for communication, expression, education, and association.  The content on these networks, like other online speech, is as "'diverse as human thought.'"  *Reno*, 521 U.S. at 870 (citation omitted).  Approximately 90 percent of teenagers between ages 13-17 have at least one social network account.[5]  Social networks are integral to modern life, for both teens and adults, across human activity.

17.     ***Political expression and communication.***  Social networks provide an essential outlet for political expression.  Youth-led movements have used it to bring issues not adequately covered in traditional media to the forefront of public consciousness.  For example, the "hashtag"

---

[5] Susan Laborde, *Teenage Social Media Usage Statistics in 2023*, TECHREPORT (updated May 30, 2024), http://tinyurl.com/5727nuv8.

device has helped fuel national conversations on racial inequality.[6]  Students at Marjory Stoneman Douglas High School in Parkland, Florida, have used social networks to advocate for gun violence prevention after a school shooting there killed seventeen people.[7]  Plaintiff SEAT uses social networks to encourage Texas students to participate in school board hearings and local legislative efforts.  And Plaintiff The Ampersand Group uses social media to educate young people and their families about the importance of participating in the U.S. census, especially for minorities and other marginalized communities who often go uncounted.

18.     Politicians and lawmakers use social networks to communicate with voters, including teens approaching voting age.[8]  Social media is "near ubiquitous among members of Congress."[9]  In 2021 alone, congressional representatives published more than 477,000 Twitter (now "X") and nearly 300,000 Facebook posts.[10]  Texas Senator Ted Cruz regularly posts on social networks, including on "X" (6.4 million followers), Facebook (1.7 million followers), and Instagram (1.2 million followers).  Texas Senator John Cornyn likewise uses "X" (377,000 followers), Facebook (302,000 followers), and Instagram (42,000 followers) to discuss policy and matters of public interest.

---

[6] *See, e.g.*, Janell Ross, *How Black Lives Matter moved from a hashtag to a real political force*, WASH. POST (Aug. 19, 2015), http://tinyurl.com/kxr5h92t.

[7] Jonah E. Bromwich, *How the Parkland Students Got So Good at Social Media*, N.Y. TIMES (Mar. 7, 2018), http://tinyurl.com/msyuwnae.

[8] Laura Barron-Lopez et al., *How social media influencers are playing a role in the presidential election*, PBS News (Mar. 19, 2024), https://tinyurl.com/yxdu5uv8.

[9] Patrick Van Kessel et al., *The congressional social media landscape*, PEW RSCH. CTR. (July 16, 2020), http://tinyurl.com/5byur542.

[10] Stacy Jo Dixon, *Total number of posts per platform by U.S. Congress members 2021*, STATISTA (Dec. 13, 2023), http://tinyurl.com/yx632peu.

19.     M.F. uses social media to obtain news about politics.  For example, he found out about President Biden's decision to drop out of the presidential race on X, where President Biden initially posted the announcement.  Closson uses Reddit to read news about national and local politics in Austin, Texas.  He also uses the gaming platform Twitch to follow some creators who discuss political news.

20.     ***Education.***  Educators use social networks to promote learning and share knowledge, including to "enhance interactions between students, between students and teachers, and with people and resources outside the classroom," interactions essential to students' "sense of belonging in an educational community."[11]  Teachers also use social networks to educate adolescents in engaging ways. YouTube operates a channel called YouTube Teachers where teachers can share lessons with young people eager to learn.[12]  Teachers "Rob and Jeremy" (@mathantics) share lessons on algebra and geometry with their 3.28 million YouTube subscribers.  Science teacher and author Dave Farina (@ProfessorDaveExplains) posts study guides and lessons in high school physics and biology to his 3.19 million YouTube subscribers.  And Phillip Cook (@chemteacherphil) shares chemistry lessons with his 1.14 million YouTube subscribers.

21.     M.F. relies on the internet to research topics for debate and has found documentaries on YouTube to be particularly helpful.  He has had to research topics that are "on the mature side," such as whether marijuana use should be banned.  M.F. also consults Reddit to help him understand mathematical and scientific concepts that he is studying in school.

---

[11] Kim Ward, *How teachers can use social media to improve learning this fall*, MICH. STATE UNIV. (June 23, 2020), http://tinyurl.com/2j3k734f (last visited Aug. 15, 2024).

[12] YouTube Teachers, https://www.youtube.com/teachers.

22.     SEAT uses Instagram to educate students about local legislative attempts to ban books and their rights under the First Amendment.

23.     The Ampersand Group's leaders use various social media channels to share education about public health.  They have, for example, used social media ads in Puerto Rico for the Center for Disease Control and Prevention educating both minors and their guardians about how to prevent children from contracting dengue fever.  And they have also worked on campaigns with Facebook to advertise educational information regarding child literacy.

24.     ***News and information.***  Social networks are a principal source of news for most Americans.[13] More than half of teens access news in this manner at least a few times per week, including on Instagram, Facebook, and "X."[14]  M.F. generally learns about current events from a social media post, then finds an explanatory YouTube video or Reddit post to get further information.

25.     Discussion or "Q&A"-based social networks such as Reddit, Quora, and Goodreads provide content about topics ranging from "How-To" videos for home projects to personal finance tips to book reviews.[15]  M.F. sometimes accesses Quora for advice on things like preparing for college and his future career.  Social media is crucial for young people to learn about potential threats they might encounter in the real world, like drugs or sexual assault.  For example, M.F.

---

[13] Jeffrey Gottfried & Elisa Shearer, *News Use Across Social Media Platforms 2016*, PEW RSCH. CTR. (May 26, 2016), http://tinyurl.com/3ny9xb83.

[14] Common Sense Media, *New Survey Reveals Teens Get Their News From Social Media and YouTube* (Aug. 12, 2019), http://tinyurl.com/2dcxx9jj; *see also* Michael Boulter & Lizz Bolaji, *In the age of memes, how are young people getting their news?*, PBS NEWS HOUR (Jan. 23, 2020), http://tinyurl.com/36mdm2c4.

[15] Reddit, r/DIY, https://www.reddit.com/r/DIY/ (last visited July 22, 2024) (DIY Reddit has 24M members); Reddit, r/personalfinance, https://www.reddit.com/r/personalfinance/ (last visited July 22, 2024) (Personal Finance Reddit has 19M members).

believes it is important for his classmates to have the opportunity to independently research the risks of vapes, so they are knowledgeable and prepared if ever offered one.  Likewise, The Ampersand Group is preparing to take on more social media public health campaigns related to preventing substance abuse, such as combatting the fentanyl crisis and ensuring that youths understand the deadly risks.  The Ampersand Group has also produced and wishes to continue producing advertising campaigns on social media to help teens and young adults recognize the warning signs of sex trafficking and how to seek help when needed.

26.   ***Community and belonging.***  Social networks enable young people to find opportunities for purpose and belonging.  Research shows viewing clips on social networks has inspired most young adults to take on at least one new hobby, with an estimated four in ten young adults using social networks to share their own hobbies.[16]  Communities centered around common interests—in particular hobbies or skills—have also formed on social networks.  SEAT has utilized social media to build and grow a substantial network of civically engaged students, from middle school to college, who bond over their efforts to stand up for student rights in Texas.  Reddit subgroups for craft projects, yoga, meditation, baking, and running all have more than 1.8 million members,[17] and groups for gardening and woodworking each have more than five million

---

[16] Press Release, Samsung Mobile Press, *Social Media Fuels Rise in Alternatively Awesome Hobbies, as Gen Z Embrace Their Creativity Online* (May 23, 2022), http://tinyurl.com/2vjmx4px.

[17] Reddit, r/crafts, https://www.reddit.com/r/crafts/ (last visited July 22, 2024); Reddit, r/yoga, https://www.reddit.com/r/yoga/ (last visited July 22, 2024); Reddit, r/Meditation, https://www.reddit.com/r/Meditation/ (last visited July 22, 2024); Reddit, r/Baking, https://www.reddit.com/r/Baking/ (last visited July 22, 2024); Reddit, r/running, https://www.reddit.com/r/running/ (last visited July 22, 2024).

members.[18]  This role of social networks in fostering community and connection—what some researchers have called the development of one's social, religious, cultural, ethnic, sexual and political identities—is thus one of their most profound contributions.

27.     For example, Closson found Reddit to be an invaluable resource when he was first exploring his diagnosis of bipolar disorder in his late twenties.  He was able to read Reddit comments and questions from others in the bipolar community—relaying experiences and symptoms he could relate to, which made him feel less alone and isolated.  Closson now creates fun and humorous content on Instagram related to his bipolar experience, hoping to foster and grow the same sense of community that he originally found on Reddit.  He also wants his social media audience (including teens) to understand that, even if they are diagnosed with bipolar disorder, they can live happy and productive lives.

28.     Especially since the COVID-19 pandemic, teens increasingly have relied on social networks to connect with peers, access news and information about their communities, express themselves, and share their pursuits and lived experience.  Teens report that online spaces have provided them with valued opportunities to meet, exchange and deliberate with peers, decision makers and others who shared their interests.[19]  M.F. uses Instagram, for example, to listen to music and gain inspiration for his own music creation.

29.     In this respect, social networks are an "important venue for interaction and conversation among" American teenagers, and "plays a critical role in connecting teens to new

---

[18] Reddit, r/gardening, https://www.reddit.com/r/gardening/ (last visited July 22, 2024); Reddit, r/woodworking, https://www.reddit.com/r/woodworking/ (last visited July 22, 2024).

[19] HEALTH ADVISORY ON SOCIAL MEDIA USE IN ADOLESCENCE, *supra* note 3 at 1.

friends" by "allowing teens to learn more about new friends and get to know them better."[20] M.F., for example, regularly uses social media to connect with new and old friends alike.

30.     One recent study found teenagers who use social networks reported that they feel more connected to their friends (80%); had somewhere to express their creativity (71%); had a support network in challenging times (67%); and were more accepted (58%).[21] Overall, U.S. teenagers are more likely to report that social networks have positive rather than negative effects on their lives.[22] In fact, research suggests that the isolation that results from disconnecting teens from social networks may be more harmful to their self-esteem and wellbeing than is heavy use of the medium.[23]

31.     One key to these positive effects is the practice of recommending content and friends based on a user's interests.  Such recommendations commonly appear in curated "newsfeed," "for you," or "discovery" functions, which use algorithms, machine learning, or search-engine indexing to recommend content.

---

[20] Amanda Lenhart, *Chapter 4: Social Media and Friendships*, PEW RSCH. CTR. (Aug. 6, 2015), http://tinyurl.com/mukytfhk.

[21] Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media: Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023), http://tinyurl.com/235k9za7.

[22] *Id.*

[23] Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, SOC. SCI. COMP. REV. 41:2 (Aug. 5, 2022), http://tinyurl.com/2t8kcm73; *see also* Sarah Coyne et al., *Teaching By Example: Media and Parenting Practices that are—and are not—Related to Adolescent Mental Health*, WHEATLEY INST. (2022), http://tinyurl.com/4nhcyj9e.

## B. Social Networks Provide Particular Benefits to At-Risk Youth

32.     The profound support provided by social networks is well-documented.[24]  A study by the Pew Research Center revealed that "nearly seven-in-ten teens receive support from friends through social media during tough times."[25]

33.     Many teens in abusive situations have used social networks to seek support and, if necessary, escape to relatives, friends, or shelters.  Some individuals who flee abusive situations change their identities to prevent their abusers from locating them.  Some were not given access to their birth certificates, government identification, or social security numbers.  Many would be unable to provide a government ID to create an age-verified social network account, either because they do not have such an ID or because disclosing their identity could allow their abusers to find them.

34.     Social networks have many benefits for teens in the LGBTQ+ community. Researchers at Brigham Young University found that transgender and non-binary teens who use social networks are substantially less likely to report emotional problems than those who do not.[26] Other researchers exploring "the benefits of social media and forms of coping for LGBTQ+ youth" found that social media "helps stigmatized youth maintain critical access to emotional support, develop their identities, [and] find important information."[27]  Recognizing this potential, The

---

[24] *See generally* John A. Naslund et al., *Social Media and Mental Health: Benefits, Risks, and Opportunities for Research and Practice*, J. TECH. BEHAV. SCI. (Apr. 20, 2020), http://tinyurl.com/562f7s33.

[25] Lenhart, *supra* note 20.

[26] Coyne, *supra* note 23.

[27] Shelley L. Craig et al., *Can Social Media Participation Enhance LGBTQ+ Youth Well-Being? Development of the Social Media Benefits Scale*, SOC. MEDIA + SOC'Y 7:1 (Jan.-Mar. 2021), http://tinyurl.com/2bk5m28a.

Trevor Project, a non-profit organization dedicated to combatting LGBTQ youth suicide, has developed TrevorSpace, "[t]he world's largest safe space social networking site for LGBTQ youth."[28]  Closson, who identifies as gay, finds social media to be a valuable space for the queer community to connect and share information.  And SEAT regularly uses social media to promote opportunities for LGBTQ+ youths to form community and oppose local and state regulations affecting their safety, personhood, and expression.

35.     Access to social media is important for teens suffering from mental health problems.  Some studies suggest that "many young people who are experiencing depression— whatever the cause—are purposely and proactively using social networks and other digital tools to protect and promote their own well-being."[29]  Many mental health experts have embraced these aspects of social media, and digital and social networking services are increasingly harnessed to identify and treat mental health problems among adolescents.[30]

36.     Social media can be more approachable for minors seeking to learn about mental health than traditional channels of mental health education, like large advocacy organizations. Closson's "relatable" memes and videos about bipolar disorder have proven an accessible means for minors to understand their own symptoms, and have led some of them to seek professional treatment they otherwise may not have realized they needed.  And some of the music M.F. listens to on YouTube explores topics like substance abuse and depression, which he believes can be

---

[28] *See* The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, at 31, http://tinyurl.com/ymj5vjr4 (last visited Aug. 15, 2024).

[29] Victoria Rideout, et al., *Coping With Covid-19: How Young People Use Digital Media to Manage Their Mental Health*, COMMON SENSE 11 (2021), http://tinyurl.com/4edefct5.

[30] Chris Hollis, et al., *Editorial: The role of digital technology in children and young people's mental health – a triple-edged sword?*, 61:8 J. OF CHILD PSYCH. & PSYCHIATRY 837, 837-41 (2020), http://tinyurl.com/bdhmxtaw.

comforting to both artists and listeners experiencing difficult times.

37.     Adolescents' use of social networks cannot be addressed or regulated monolithically.  Research confirms that children and adolescents are affected by social networks in different ways, based on their strengths, vulnerabilities, and predispositions, and on cultural, historical, and socio-economic factors.[31]

38.     The "use and effects of social media depend on a number of factors specific to individual teens," including "age, gender, race, ethnicity, personalities, and pre-existing emotional or mental health difficulties," as well as a teen's "familial rules/structure around social media, peer group dynamics, [and] parental and peer relationships," and "larger societal and cultural influences."[32]  For example, M.F.'s mother educated him about the perils of talking to strangers online and other issues of digital safety.

39.     Even officials and experts who have expressed concerns about the potential adverse effects of social media on young people acknowledge that "[t]he relationship between social media and youth mental health is complex and potentially bidirectional."[33]

40.     The Surgeon  General acknowledged that it is impossible to generalize about the potential effects of social media because "different children and adolescents are affected by social media in different ways," and because social media has many benefits, including studies showing most adolescents report social media helps them feel more accepted, more than two-thirds say

---

[31] Ine Beyens et al., *The effect of social media on well-being differs from adolescent to adolescent*, 10:10763 SCI. REPS. (2020), http://tinyurl.com/3fsn3mvz.

[32] Jessica L. Hamilton, et al., *Re-examining adolescent social medial use and socioemotional well-being through the lens of the COVID-19 pandemic: A theoretical review and directions for future research*, PERSPECT PSYCHOLO. SCI. (May 9, 2022), http://tinyurl.com/5a2hsyk6.

[33] SOCIAL MEDIA AND YOUTH MENTAL HEALTH, *supra* note 2 at 11.

people on social media can support them through tough times, and over 70 percent say social media allows them to show their creative side.[34]

41.    The American Psychological Association likewise has acknowledged that "[u]sing social media is not inherently beneficial or harmful to young people," and that mental health is determined primarily by individual characteristics.[35]

42.    To account for the differences among minors, parents have access to tools that allow them to monitor and control their children's social networking use.

43.    Meta, for example, enables parents to set time limits, restrict use to particular times or days, view their child's friends or followers, and receive notifications when the minor reports an account or post.[36]

44.    Snapchat publishes a guide for parents to promote safe social network use and provides tools that allow parents to set content controls and see with whom their children are communicating.[37]

45.    Parents can also download applications, such as Aura, Bark, Bright Canary, Qustodio, and FamilyKeeper, that link to their children's devices and enable them to limit screen time; see their messages; filter, block, and monitor access to certain sites or applications; set location alerts; and pause internet access.[38]

---

[34] *Id.* at 5-6.

[35] HEALTH ADVISORY ON SOCIAL MEDIA USE IN ADOLESCENCE, *supra* note 3 at 3.

[36] Meta, Supporting safer and more positive experiences for your family, https://familycenter.meta.com/ (last visited Aug. 15, 2024).

[37] Snapchat, Tools and Resources for Parents, https://parents.snapchat.com/parental-controls (last visited Aug. 15, 2024).

[38] Aura, Protection for Kids. Peace of Mind for Parents, http://tinyurl.com/33sfh2e8 (last visited Aug. 15, 2024); Family Keeper, Keep Your Kids Safe With Parental Controls,

46.     Phone manufacturers like Apple and Google offer "Screen Time" and "Family Sharing" controls that permit parents to manage a child's online activities, including their use of particular applications.[39]

### C.    Texas Enacts the SCOPE Act

47.     On June 13, 2023, Texas Governor Greg Abbott signed the SCOPE Act into law. The law takes effect September 1, 2024, when it will become enforceable by the Texas Attorney General.  *See* Tex. Bus. & Com. Code § 509.152(b).

48.     ***General Provisions.***  The Act governs "digital service providers" (DSPs) whose service—whether a website, application, program, or software—"(1) connects users in a manner that allows users to socially interact with other users on the digital service; (2) allows a user to create a public or semi-public profile for purposes of signing into and using the digital service; and (3) allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on (A) a message board; (B) a chat room; or (C) a landing page, video channel, or main feed that presents to a user content created and posted by other users." *Id.* §§ 509.001(1)-(2), 509.002(a).

49.     The Act governs not only social media platforms like YouTube and Instagram, but *any* platform that allows users to create a profile and share content with one another—including services like Goodreads, IMDb, Nextdoor, or Words with Friends.  The law extends to forums like

---

http://tinyurl.com/yc48vr8z (last visited Aug. 15, 2024); Bark, Parental controls reimagined, http://tinyurl.com/3x97y582 (last visited Aug. 15, 2024); Bright Canary, Keep Your Child Safe And On Track With BrightCanary Monitoring, https://tinyurl.com/3bk5vkwx (last visited Aug. 15, 2024).

[39] Apple, Use Screen Time on your iPhone or iPad, http://tinyurl.com/5c2zffww (last visited Aug. 15, 2024); Google, Manage your child's screen time, http://tinyurl.com/bdfhztwp (last visited Aug. 15, 2024).

Quora and Reddit, which primarily offer bulletin-board style information on a variety of educational topics and allow users to ask any question and receive responses. And the law even appears to reach social messaging apps such as WhatsApp, Discord, and Signal—which members use to communicate and collaborate with groups of all sizes, from all over the world.

50.   At the same time, the Act exempts certain services based on the types of content they disseminate. In addition to exempting entities that do not control the means or purpose of collecting the users' information, *id.* § 509.001(2)(B), (C), the Act also exempts: small businesses, institutions of higher education, education service providers, and direct messaging or email-only services, *id.* § 509.002(b). It also exempts services that "primarily" provide a user "with access to news, sports, commerce, or content primarily generated or selected by the [DSP]" but allow "incidental" chat, comment, or other interactive functions. *Id.* And it further exempts internet service providers, search engines, or cloud service providers that are not "responsible for the creation of harmful material or other content" identified by the law, *id.* § 509.002(c).

51.   For all DSPs, the Act prohibits allowing *any* user to create an account unless that individual has "registered" their age. *See id.* § 509.051. In addition to that initial requirement, the Act further restricts speech in a variety of ways that Plaintiffs challenge here.

52.   ***Content Exposure Restrictions.*** The Act requires DSPs to develop a "strategy" to prevent minors' exposure to sexual material, as well as "content that promotes, glorifies, or facilitates: (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." *Id.* § 509.053(a). As part of each provider's "strategy," the Act requires the provider to maintain a "comprehensive list" of the content that the strategy will filter out as well as a "database of keywords" that users could deploy to evade the filter. *Id.* § 509.053(b)(1). And providers must

ensure that any algorithms they use to compile and arrange content enforce these restrictions.  *Id.* § 509.056.

53.     The content exposure restrictions thus require platforms to censor speech that does not fall into any category of constitutionally unprotected speech.  Moreover, to err on the side of caution, platforms have testified the content exposure restrictions will require them to more broadly block content that may only mention or discuss the listed topics, regardless of whether the content is actually harmful or beyond the First Amendment's protection.

54.     The Act compounds this constitutional flaw by failing to define or provide meaningful guidelines as to what constitutes "promot[ing], glorif[ying], or facilitat[ing]" suicide, self-harm, eating disorders, substance abuse, stalking, bullying, or harassment.  *Id.* § 509.053(a). The Act also fails to define certain topics like "grooming," a term that has historically been used to unconstitutionally censor LGBTQ+ content.

55.     The Act's requirement to filter out all content that hits on certain keywords will inevitably result in filtering technology excluding constitutionally protected speech, including *helpful* content on these topics, such as resources for those struggling.

56.     The content exposure restrictions will restrict Plaintiffs' speech.

57.     The content exposure provisions will prevent SEAT from using social media to discuss policymaking on issues of relevance to Texas youths—such as a school board attempting to ban books regarding substance abuse, bullying, violence, and LGBTQ+ topics; a recent petition to introduce legislation preventing bullying in schools after a fourth-grader died from suicide; or even opposing the Act itself.  They will also prevent M.F. from using social media to research topics for his debate team (such as whether to legalize marijuana or prostitution), and will stop him from discovering music or other art forms dealing with certain themes, such as a character

who lost a friend to suicide.

58.    The content exposure restrictions will also prevent adults and minors from communicating content to minors in need of information on one of these issues.

59.    Closson similarly fears filtering technology will incorrectly interpret his memes about bipolar disorder as "glorif[ying]" suicide, self-harm, or substance abuse, even though they encourage serious discussions about mental health in the comments sections, and are intended to promote understanding and awareness for the bipolar community.

60.    The content exposure restrictions will likewise prevent The Ampersand Group from sharing information with teens over social media regarding the dangers of fentanyl or how to identify warning signs of sex trafficking.

61.    ***Targeted Advertising Restrictions.***  The Act prohibits DSPs from "display[ing] targeted advertising" to minors at all, unless a "verified parent" consents.  *See* Tex. Bus. & Com. Code §§ 509.052, 509.102.  And even if such a "verified parent" does consent, DSPs must still "prevent advertisers" on its service "from targeting a known minor with advertisements that facilitate, promote, or offer a product, service, or activity that is unlawful for a minor in this state to use or engage in."  *Id.* § 509.055.

62.    These targeted advertising restrictions are not confined to commercial advertisements.  Instead, they encompass any "advertising," including public service messages and ads that advocate for or provide information about the mere *existence* of goods, services, or activities, regardless of whether they are proposing a transaction.

63.    Thus, absent parental consent, the Act bans *all* targeted advertising to minors *for any purpose*—including purely informational content advertising college fairs and voter registration drives. And the Act absolutely bans certain kinds of advertising based on its content

(including campaigns involving firearms, recreational drugs, and health services, even if legal in other states, and even as advocacy for decriminalization), even if a "verified parent" has consented.

64.     Even the all-encompassing ban that can be overcome by obtaining state-ordered preclearance from a person the state deems a "verified parent" requires navigating a burdensome and largely undefined identify verification process, whose perils of imprecision fall upon intermediaries incentivized to err on the side censorship.  *See id.* § 509.101.  And these "verified parents" acquire state-backed permission to surveil and restrict the minor's expression.  *See id.* §§ 509.102-103.

65.     These restrictions impose acute burdens on Plaintiffs.

66.     For The Ampersand Group, which creates and disseminates informational and advocacy content in Texas and across the Country on behalf of nonprofit and for-profit clients on a variety of important topics ranging from public health to education and literacy, the law would restrict the agency and its clients from deploying any advertisement campaigns designed to reach teen audiences.

67.     Closson has further noted that some hospitals and psychiatric research groups use targeted advertising to seek individuals to participate in medical studies—such as studies regarding bipolar disorder.  The targeted advertising restrictions would prohibit minors from learning about these potential opportunities and discussing them with their parents.

68.     For plaintiffs like M.F.—who, at 16, would prefer not to invite his parents into most of his private communications, as obtaining verified parental consent would require, *id.* §§ 509.102-103—the targeted advertising restrictions limit his ability to receive information about scholarship opportunities, college information, and other educational enrichment programs he would like to pursue, including information about student conferences like the one he recently

attended in Philadelphia focusing on free speech, hosted by the Foundation for Individual Rights and Expression.  The targeted advertising restrictions would likewise require online services to restrict him and other Texas teenagers from receiving promoted news or other information (like a promotion for a concert or party) if the underlying information could even arguably "facilitate" or "promote" unlawful activities (like sex, drinking, drugs, gambling, illegal street racing, or anything else), whether or not it does.  *See id.* § 509.055.

69.     ***Content monitoring and age-verification regime.***  The Act requires DSPs whose content is "more than one-third" "harmful" or "obscene" as to minors—defined to refer to sexually explicit content—to "use a commercially reasonable age verification method to verify that any person seeking to access content on or through the provider's digital service is 18 of age or older." *Id.* § 509.057(a).  If the person is a minor or an adult who refuses to submit to the process, the DSP may not provide them an account.

70.     The content monitoring and age-verification regime will result in sweeping censorship, whether or not platforms actually publish content that crosses the Act's arbitrary one-third threshold and so must age-verify.

71.     Where applied to DSPs with a qualifying volume of explicit content, the content monitoring and age-verification regime prohibits minors from using an entire service where up to two-thirds of the content is innocuous, and presents a barrier to adults who are entitled to access 100 percent of a service's content.

72.     The provision also affects services that do not host such content.  Because accurately reviewing and categorizing content is extremely burdensome for DSPs, and because even with unlimited resources DSPs cannot be sure what content will qualify toward the one-third threshold, some DSPs will opt to age verify regardless of whether they qualify, blocking minors

from participating entirely in websites that do not have substantial amounts of harmful material obscene as to minors. DSPs may also choose to over-censor speech to avoid crossing the one-third threshold, or just out of an abundance of caution because they cannot be sure the government will agree with their categorization of material. In all cases, both minors and adults will lose the ability to view and post content on important or controversial issues.

73.     The age verification required by the Act, where mandated, is itself an invasive and significant barrier to speech. Section 509.057(a) mandates a *commercially reasonable* age-verification method for sites meeting the harmful-material threshold, yet age-verification technologies are inherently unreliable,[40] and there are "straightforward workarounds" for users determined to bypass the rules.[41]

74.     Without guaranteed efficacy, age-verification technologies typically require collecting sensitive personal information, such as a government-issued ID, credit card information, or biometric data.

75.     Age-verification methods that involve submitting official documents or social security numbers also increase the risk that those documents could be stolen or leaked.[42]

76.     Other proposed age-verification methods—such as artificial intelligence, facial analysis, or facial recognition—pose their own transparency, security, and privacy concerns.[43]

---

[40] FRENCH NAT'L COMM'N ON INFO. & LIBERTIES, *Online Age Verification: balancing privacy and the protection of minors* (Sept. 22, 2022), https://tinyurl.com/yzv7ynem.

[41] Jackie Snow, *Why Age Verification Is So Difficult for Websites*, WALL ST. J. (Feb. 27, 2022), http://tinyurl.com/ymbvvzar.

[42] *Id.*

[43] *See* David McCabe, *Anonymity No More? Age Checks Come to the Web*, N.Y. TIMES (Oct. 27, 2021), https://nyti.ms/3S6U2ME.

77.     The content monitoring and age-verification regime may even conflict with other states' privacy laws regarding the collection of data.  Once triggered, the Act's age-verification requirement forces users—including adults—either to give up their anonymity and privacy or endure restrictions on their ability to communicate.

78.     Again, because some platforms may simply decide to age verify rather than engaging in a costly and time-consuming content-monitoring process, adults would have to choose between privacy and unrestricted speech even on websites that do not actually contain any harmful or obscene content.

79.     The age-gating requirement will affect internet users everywhere.  The Act does not contain any geographical limitations on its application, meaning it putatively applies to users and DSPs wholly outside the State.  *See id.* §§ 509.001(1)-(2) (defining "digital service" and "digital service provider" without restriction to services located or offered in Texas); *id.* at 509.001(5) (defining "minor" without restriction to minors in Texas).  And even if the Act's application were somehow limited to persons located in Texas (despite its text), companies will still need to collect personal information (like IP addresses) from *all* users to comply with the Act's requirements and minimize the risk of liability.[44]

80.     The content monitoring and age-verification regime will restrict Plaintiffs' speech.

81.     Content creators like Closson, SEAT, and The Ampersand Group will see their content screened and blocked as services over-censor content to avoid triggering obligations that arise from crossing the one-third threshold.  *See CCIA v. Paxton*, No. 1:24-cv-849 (W.D. Tex.) ("CCIA Dkt."), ECF No. 6-2, Decl. of Matthew Schruers (CCIA) ¶ 11 ("Too much reliance on automated systems may be overinclusive and hamper users' experiences and access to valuable

---

[44] *Id.*

speech."); *id.* ¶ 21 ([I]ncreased use of filtering could result in over-inclusive moderation that would remove or restrict access to more speech than HB18's already-broad demands require."); CCIA Dkt. ECF No. 6-3, Decl. of Carl Szabo (NetChoice) ¶ 21 ("[O]verreliance on automated systems of content moderation may result in overinclusive removal of content that may not violate websites' policies."); CCIA Dkt. ECF No. 6-4, Decl. of Alexandra Veitch (YouTube) ¶¶ 33-34 ("To ensure compliance with this provision, YouTube may need to alter its policies and enforcement to take an overinclusive approach to content moderation …. That will have clear harms for users as well, who may be denied access to protected and valuable speech as a result of YouTube's overinclusive moderation.").

82.    Minors like M.F. and members of SEAT will lose access to protected speech and forums for such speech, whether or not the DSPs hosting the speech are actually subject to the age-verification requirement, and even if the vast majority of those services' content is (to the extent it can be calculated) constitutionally protected with respect to minors, because websites will implement age-verification procedures to prevent minors from accessing their content. *See* CCIA Dkt., ECF No. 6-2, Decl. of Matthew Schruers (CCIA) ¶ 20 ("Because all websites must provide age-registration and age-challenge processes *regardless* of whether they allow minors, some websites could shut down entirely."); CCIA Dkt., ECF No. 6-3, Decl. of Carl Szabo (NetChoice) ¶ 22 (the Act's requirements "impose large costs to implement and maintain … and may result in websites refusing to allow minors to access their websites to avoid the compliance costs and liability risks"); CCIA Dkt., ECF No. 6-4, Decl. of Alexandra Veitch (YouTube) ¶ 41 ("Developing [parental-consent] systems will require a large upfront investment of resources and would overly restrict the ability of teenagers to participate in online speech.").

83.    And adults like Jaryn Holbrook Janeway of The Ampersand Group, who prefer to

maintain their privacy and anonymity on certain platforms online and would not participate in any age verification for those platforms, would be precluded from accessing and engaging in protected speech across whole swaths of the internet.[45]  *See* CCIA Dkt., ECF No. 6-5, Decl. of Gautham Pai (Nextdoor) ¶¶ 24-25 ("Nextdoor has tested asking users for their date of birth on a voluntary basis, and has observed that merely seeking the age of users in various ways is a barrier to platform access. … [O]nly approximately 40% of users who were asked were willing to share their date of birth."); *id.* ¶ 28 ("[I]f verification of date of birth using government identification were required, we would expect even higher numbers of prospective and current users to decline to join the platform or be unable or unwilling to provide government identification.").

84.     ***Penalties for violations.***  The Texas Attorney General may bring enforcement actions as part of Texas's deceptive trade practices act, Tex. Bus. & Com. Code § 509.151, and parents may seek declaratory and injunctive relief, Tex. Bus. & Com. Code § 509.152(b).

## V.     STANDING

85.     Speakers and listeners have standing to challenge government action that regulates the intermediaries they rely on to disseminate and access information when, but for the challenged government action, those intermediaries would continue to provide such access and use.  *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Couns., Inc.*, 425 U.S. 748, 756–57 & 757 n.15 (1976); *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926–27 (5th Cir. 1996).

86.     Plaintiffs have standing because (i) enforcement of the Act against DSPs will restrict Plaintiffs' constitutional rights to disseminate and access information through DSPs; (ii) those concrete injuries are traceable to government action, and not the DSPs themselves, because the DSPs would continue to afford Plaintiffs unrestricted access and use of their services but for

---

[45] https://www.thecgo.org/research/tech-poll/ (48% of adults say they would not share their ID to use social media) (last visited Aug. 15, 2024).

the Act, *see, e.g.*, CCIA Dkt., ECF Nos. 1, 6, 6-2, 6-3, 6-4, 6-5, 6-6; and (iii) a favorable decision invalidating and enjoining enforcement of the Act would prevent the state action that causes Plaintiffs' injuries, redressing them. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

87.    This is true with respect to each of the challenged restrictions Plaintiffs challenge and seek to enjoin under each of their claims for relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

88.    With respect to the content-exposure provisions, all Plaintiffs use and intend to continue using DSPs regulated by the Act to send and receive information on topics the Act broadly and vaguely forbids them from discussing, either because they are required to register as minors or because they intend to communicate about such or similar topics with persons who would be required to register as minors.

89.    With respect to the targeted advertising provisions, Plaintiffs M.F. and SEAT and its members, receive and intend to continue receiving targeted advertising published through DSPs, both for commercial and non-commercial opportunities including across state lines. Plaintiff The Ampersand Group likewise manages social good advertising on important issues across state lines and to persons required to register as minors. While The Ampersand Group does not target minors directly by age (as most DSPs do not allow such targeting), for certain campaigns, it purposefully seeks to reach teens through other means, such as by targeting ad placements on content or topics already frequented by teens. In short, the Act would encumber or prohibit the dissemination of advertising to registered minors.

90.    And with respect to the content-monitoring and age-verification regime, all Plaintiffs use and intend to continue using DSPs regulated by the Act to send and receive information that DSPs have indicated—including in the CCIA litigation—they would either have

to collaterally censor or restrict access to through age-verification, due either to the mix of content they currently publish, or as a precautionary measure to avoid liability.  Plaintiffs like M.F. and SEAT members under the age of 18 would lose access to these forums altogether; adults like Closson or The Ampersand Group will become subject to invasive age-verification screens or lose the ability to reach teenagers with their messages through these forums altogether.

## VI.    CLAIMS FOR RELIEF

91.    Plaintiffs raise a facial challenge to Tex. Bus. & Com. Code §§ 509.001-002, 509.051, 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057, 509.101-103.  These provisions are facially invalid under the First Amendment because their unconstitutional applications are, at minimum, substantial compared to whatever legitimate sweep they might have.  *See United States v. Stevens*, 559 U.S. 460, 473 (2010).  And they are facially invalid under the Commerce Clause, since there is no possible constitutional application of the challenged provisions across state lines. *See United States v. Salerno*, 481 U.S. 739, 745 (1987).

92.    Plaintiffs also challenge these provisions as unconstitutional as applied to Plaintiffs' use of the DSPs covered by the Act.

### COUNT ONE

### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: FREEDOM OF SPEECH (All Challenged Provisions)

93.    Plaintiffs incorporate all prior paragraphs of this Complaint.

94.    The First Amendment to the United States Constitution provides that government "shall make no law … abridging the freedom of speech, or of the press."  U.S. CONST., Amend. I. The First Amendment protects publishing, disseminating, creating, distributing, and consuming speech.  *Brown*, 564 U.S. at 792 & 792 n.1.  The First Amendment's protections apply without qualification to speech communicated through the internet, *Reno*, 521 U.S. at 852–53, including

social media platforms. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024); *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Playboy Ent. Grp.*, 529 U.S. at 816.

95.     The government cannot create new categories of speech that are unprotected as to minors. *Brown*, 564 U.S. at 794. This is because "minors are entitled to a significant measure of First Amendment protection … and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* (citation omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable." *Id.* at 795 (citation omitted). Nor may the government restrict adults from engaging in constitutionally protected speech in the name of protecting children. *Playboy Ent. Grp.*, 529 U.S. at 813; *Sable Commc'ns of Cal.*, 492 U.S. at 126.

96.     The Act violates Plaintiffs' First Amendment rights by limiting the information Plaintiffs may access and disseminate based on its content and subject matter; banning or imposing preconditions on delivering and accessing protected speech that effectuates a system of prior restraint; restricting minors' First Amendment rights to access and disseminate constitutionally protected content; and burdening adults' access to protected speech, forcing them to sacrifice anonymity or privacy to exercise their First Amendment rights. The Act's provisions are subject to at least strict scrutiny, and cannot survive any level of First Amendment review.

97.     ***Prior restraint.*** The Act's content-exposure restrictions threaten civil penalties to compel intermediaries to screen and block Plaintiffs from sending and receiving protected content on a variety of subjects the State has deemed unsuitable to minors. *See* Tex. Bus. & Com. Code

§§ 509.053, 509.065.  This type of informal proxy censorship constitutes a prior restraint—one that is only amplified by the Act's content-monitoring mandate, *id.* § 509.057(a), that promotes self-censorship by requiring intermediaries to evaluate the mix of content they publish, with additional obligations and potential penalties levied depending on the nature of that mix.  *See Bantam Books*, 372 U.S. at 67, 70–71.

98.     The Act's targeted advertising ban, Tex. Bus. & Com. Code §§ 509.052(1)(D), 509.055, also categorically "forbids certain communications" before they "occur," and imposes formal statutory preconditions (state-ordered parental consent) on minors' abilities to access and disseminate information.  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (cleaned up); *see also Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 311, 316–17 (1980).

99.     The Act's age-verification mandate, where triggered, further layers on an additional preclearance requirement that burdens and restrains access to online content for adults and minors alike.  *See Ashcroft*, 542 U.S. at 667, 673.

100.     Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity subject to a more stringent standard than even strict scrutiny.  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976) (citation omitted); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979).  The challenged provisions cannot satisfy that standard, which requires showing the provisions supply the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same).

101.     ***Content-based restrictions.***  Content-based regulations of speech are presumed unconstitutional and cannot survive review if they do not satisfy strict scrutiny.  *Brown*, 564 U.S.

at 799.

102.    The entire Act and each of the provisions Plaintiffs challenge is content-based because the definition of "digital service provider," Tex. Bus. & Com. Code § 509.002, causes the application of all the Act's substantive speech restrictions to "depend entirely on the communicative content" a service provides.  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 636 (2020) (plurality opinion).

103.    Each of the Act's individual challenged provisions are also independently content- and speaker-based and subject to strict scrutiny.

104.    The content-exposure restrictions are content-based and subject to strict scrutiny because they restrict speech "because of the topic discussed" and "particular subject matter" addressed.  *Reed*, 576 U.S. at 163; *see also Ashcroft*, 542 U.S. at 670 (laws "designed to protect minors from viewing harmful materials" are content-based).

105.    The targeted advertising restrictions are content-based because they regulate speech based on "its function or purpose," *Reed*, 576 U.S. at 163, and because they cannot be justified without reference to the communicative impact of the speech they seek to restrict.  *See Boos v. Barry*, 485 U.S. 312, 321 (1988); *see also Playboy Ent. Grp.*, 529 U.S. at 811.

106.    The content-monitoring and age-verification regime is also content-based because the additional obligations triggered by that provision depends entirely on the content a service provides.  *See Reed*, 576 U.S. at 164; *Playboy Ent. Grp.*, 529 U.S. at 811–12 ("This is the essence of content-based regulation.").

107.    The Act's exemptions further confirm the extent to which the law is content-based. It exempts institutions of higher education, education service providers, and direct messaging or

email-only services.   Tex. Bus. & Com. Code § 509.002(b).   It also exempts services that

"primarily" provide a user "with access to news, sports, commerce, or content primarily generated

or selected by the [DSP]" but allow "incidental" chat, comment, or other interactive functions.   *Id.*

It further exempts internet service providers, search engines, or cloud service providers that are

not "responsible for the creation of harmful material or other content" identified by the law.   *Id.*

§ 509.002(c).   *See Barr*, 591 U.S. at 636.

108.   The Act fails strict scrutiny because the State cannot show that any of the

challenged provisions' restrictions of speech are both necessary and the least-restrictive means to

serve a compelling government interest.   *Playboy Ent. Grp*., 529 U.S. at 813.

109.   The State has not identified a concrete problem in need of a legislated solution, or

shown that the Act and each of the challenged provisions is necessary to that solution.   If the

problem concerns harms to minors from unregulated use of the internet—and the Act lacks

legislative findings, so it is impossible to know for sure—there are numerous household-based

solutions available to parents and guardians that are more flexible and capable of being tailored to

the needs of each individual child than the government's universal top-down regulations.   *See*

*Ashcroft*, 542 U.S. at 666–67; *Playboy Ent. Grp.*, 529 U.S. at 826.   The State's desire to improve

upon these voluntary household options, based on the apparent belief that parents may fail to use

them effectively, is not a compelling government interest.   *See Brown*, 564 U.S. at 803; *accord*

*Playboy Ent. Grp.*, 529 U.S. at 824.

110.   Even if the State could demonstrate that the Act were necessary to the

accomplishment of some compelling interest, the State cannot show that the Act and each of its

challenged provisions is narrowly tailored and the least restrictive means to do so.

111.   The Act is overinclusive for several reasons.   It applies to the vast majority of online

services, without regard for whether each of them bears whatever defect or vulnerability the government claims an interest in solving.  It is also overinclusive because it invents and then regulates or bans broad new categories of speech, well beyond the few and narrow categories of speech that fall beyond the First Amendment's protection.  The same is true insofar as the Act regulates and treats all minors alike, regardless of differences in those minors' development or their parents' preferences. *See Reno*, 521 U.S. at 865–66.

112.    At the same time, the Act is also underinclusive because it arbitrarily exempts a wide range of online services, and has no application to other forms of media.  *See Brown*, 564 U.S. at 801–02.

113.    ***Intermediate scrutiny.***  The Act would be unconstitutional even if subjected to intermediate scrutiny, *NetChoice*, 144 S. Ct. at 2407, which requires a law to serve a substantial government interest "unrelated to the suppression of free expression" by alleviating in "a direct and material way" harms that are "not merely conjectural" and (2) be narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662, 664 (1994) (citation omitted); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487, 491 (1995).

114.    Texas has done nothing to demonstrate either the existence or magnitude of harm purportedly caused by the services it has chosen to regulate through the Act, or how the State's chosen solution will help.  The State has made no effort to explain or substantiate how the Act's speech restrictions relate to the purported harms, or how the restrictions will have any measurable impact in reducing the harms.  Instead, in a "shoot first, ask questions later" manner, the Act calls for research into the topic—reason alone to strike down the law under the First Amendment. *See Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023).   The First

Amendment does not permit the Government to restrict speech and then seek information to justify its actions. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1128 (9th Cir. 2020) (doing so "reflect[s] a fundamental misunderstanding about the State's burden in justifying restrictions on speech").

115.    The Act's broad speech restrictions are the opposite of narrow tailoring: the Act restricts enormous swaths of speech on social networks on the theory that some speech for some people is potentially harmful, while arbitrarily exempting whole classes of similarly situated media.

116.    ***Facial overbreadth.*** Each of the challenged provisions is also facially overbroad. A law is unconstitutionally overbroad under the First Amendment if "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice*, 144 S. Ct. at 2397 (citation omitted). Because each of the challenged provisions applies only to speech, their legitimate sweep is limited to instances where they happen to permissibly restrict access to unprotected speech.

117.    The Act restricts far more content than is unprotected. All of the Act's provisions are facially overbroad because they rest upon overinclusive content-based coverage definitions in Tex. Bus. & Com. Code §§ 509.001-002 that require the suppression of speech that both adults and minors have a right to send and receive, simply because some user-generated content shared through some online services may be harmful and unprotected by the First Amendment. The idea "that protected speech may be banned as a means to ban unprotected speech … turns the First Amendment upside down." *Free Speech Coal.*, 535 U.S. at 255.

118.    Each of the Act's substantive provisions are also overbroad.

119.    The content-exposure restrictions require services to block information and expression involving a variety of important topics of public concern—including suicide, self-harm,

eating disorders, substance abuse, stalking, bullying, and experiences with sex-trafficking and abuse—that are protected even as to minors.

120. The targeted advertisement restrictions presumptively bar access to any kind of directed information, not just unprotected content, and absolutely bar information even related to illegal activity, which includes protected advocacy and education.

121. The content-monitoring and age-verification regime likewise applies to massive amounts of protected speech, preventing minors from and burdening adults in accessing entire websites whose content may be up to two-thirds innocuous, merely because (the State believes) access to *some* information by *some* minors on those services may be legitimately proscribed.

122. Restricting adults' access to a communications medium as a means of protecting minors is inherently overbroad, and especially so where it would even restrict access to speech forums whose content is admittedly comprised of mostly protected and unproblematic speech. *See United States v. Stevens*, 559 U.S. 460, 473 (2010).

123. ***Defects not severable.*** Because the Act's unconstitutional content-based coverage formula in Tex. Bus. & Com. Code §§ 509.001-002 is integral to the entire Act, no other provision of the Act could operate without it, and thus the entire Act—and not just the challenged provisions—requires invalidation.

124. Unless invalidated and enjoined, Tex. Bus. & Com. Code §§ 509.001-002, 509.051, 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057, and 509.101-103 will deprive Plaintiffs of their First Amendment rights and cause them to suffer irreparable injuries.

## COUNT TWO

### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS:
### VOID FOR VAGUENESS
**(Tex. Bus. & Com. Code §§ 509.002(a)(1), 509.002(a)(2), 509.002(b)(10)(B), 509.053(a), 509.052(2)(D),  509.055, 509.057(a), 509.101)**

125.    Plaintiffs incorporate all prior paragraphs of this Complaint.

126.    "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Cir. Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (citation omitted).

127.    Vagueness in a law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech," *Brown*, 564 U.S. at 807 (citation omitted), requiring a "more stringent" test, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (citation omitted).

128.    Standards of "permissible statutory vagueness" are "strict in the area of free expression" and the "government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

129.    The Act fails to provide ordinary persons with fair notice of the proscribed conduct.

130.    The Act is so dependent on inherently subjective, undefined standards that it practically mandates platforms to undertake overbroad enforcement against disfavored content, viewpoints, and speakers.

131.    The Act is void for vagueness because it fails to define key terms and phrases underpinning its core requirements, giving regulators unbridled discretion to impose massive penalties on a wide range of intermediaries that fail to censor Plaintiffs' speech.

132.    First, the Act's coverage formula rests on unconstitutionally vague definitions.  The Act regulates only where the online service provider allows account holders "to *socially interact with other users*," Tex. Bus. & Com. Code § 509.002(a)(1) (emphasis added), a term left undefined. Nor does it define what it means to "allow[] a user to create a public or semi-public profile *for purposes* of signing into and using the digital service." *Id.* at § 509.002(a)(2) (emphasis added). And the Act does not explain what it means to "allow[] chat, comment, or other interactive functionality that is *incidental to* the digital service." *Id.* § 509.002(b)(10)(B) (emphasis added). Because these vague coverage definitions are integral to the entire Act—including all of the challenged provisions—no part of the Act could operate without them, and the entire Act requires invalidation.

133.    Second, the Act's operative regulations are also unconstitutionally vague.  The Act does not  define "promot[ing], glorif[ying], or facilitat[ing]" suicide, self-harm, eating disorders, substance abuse, stalking, bullying, or harassment, *id.* § 509.053(a), or "advertising," *id.* §§ 509.052(2)(D), 509.055.  The Act's content-monitoring and age-verification regime, as well as its "verified parent" definition—essential requirements intertwined with the law's other mandates and prohibitions—do not define what counts as a "commercially reasonable method" of verifying a user's age or a parent's verified identity.  *Id.* §§ 509.057(a), 509.101.

134.    Because no one can know with reasonable certainty what these terms mean, the "predictable tendency" will be broad censorship of Plaintiffs' speech to "steer 'wide of the unlawful zone.'" *Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).  In fact, platforms have already stated they will respond to the Act and these vague terms in particular by broadly censoring user speech to avoid potential liability.  The Act's failure to provide

36

constitutionally sufficient notice thus invites overbroad collateral enforcement against content, viewpoints, and speakers platforms believe regulators will disfavor.

135. Unless declared invalid and enjoined, the Act and each of the challenged provisions will unlawfully deprive Plaintiffs of their First Amendment and Due Process rights, causing them to suffer irreparable injuries.

**COUNT THREE**

**VIOLATION OF THE COMMERCE CLAUSE**
**(Entire Act)**

136. Plaintiffs incorporate all prior paragraphs of this Complaint.

137. Article I, Section 8 of the U.S. Constitution vests Congress with the power "[t]o regulate Commerce … among the several States." U.S. CONST., art. I, § 8, cl. 3. The Commerce Clause bars state laws that unduly restrict interstate commerce.

138. Under the Commerce Clause, even laws that regulate evenhandedly and do not purport to discriminate against other states are unconstitutional if they impose burdens on interstate commerce that are clearly excessive in relation to the putative local benefits. *See Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970). The Commerce Clause's prohibition on undue restrictions of interstate commerce applies to restrictions on speech transmitted online just as it does to physical goods. *See ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999). It likewise prohibits states from "directly" regulating activity, including speech, which occurs "wholly outside" the regulating state's jurisdiction. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar v. MITE Corp*., 457 U.S. 624, 641-43 (1982)).

139. The Act violates the Commerce Clause because the law imposes an unreasonable and undue burden on channels of interstate commerce that would impede the flow of information, including commercial speech across state lines, in clear excess of any local benefit conferred on

the State of Texas.  For example, Closson earns income from the content that he creates on platforms including Instagram, and he has a substantial number of followers on both platforms outside of Texas.  Likewise, The Ampersand Group conducts digital advertising campaigns for clients outside of Texas and also attempts to reach audiences outside of Texas for many of its in-state clients.  SEAT has hosted fundraising campaigns, using social media platforms like Instagram and Facebook to encourage the public to contribute. SEAT has received contributions during these campaigns from supporters in and outside of Texas.

140.    The Act further violates the Commerce Clause because it directly regulates speech and internet communications "wholly outside" Texas's borders. *Ross*, 598 U.S. at 376 n.1. Because the internet is accessible globally, a state cannot block internet content from its own citizens without affecting citizens of other states. *See Johnson*, 194 F.3d at 1162.  The Act also does not contain geographical limitations, and thus purports to restrict the speech of any person who arguably has a connection to Texas, whether or not they are physically located in Texas.  M.F. thus believes, as a Texas legal resident, he will be subject to the Act's strictures even if he eventually moves outside the State to attend college.  Likewise, the executive director of SEAT, Cameron Samuels, is a Texas resident who occasionally  resides in Massachusetts to attend college, and likewise will be subject to the provisions of the Act that apply beyond minors (such as age registration).  The same would apply to SEAT organizers who often travel to conferences or events nationwide, or attend college or programs in other states.

141.    The State has not identified any local interest (as opposed to an abstract interest in the wellbeing of minors generally), and certainly no local interest actually advanced by the Act, sufficient to justify its obstruction of interstate commerce.

142.    Unless declared invalid and enjoined, the Act will unconstitutionally burden

interstate commerce in violation of the Commerce Clause.

## VII.    PRAYER FOR RELIEF

143.    WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Declare that Tex. Bus. & Com. Code §§ 509.001-002, 509.051, 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057, and 509.101-103 are unconstitutional under the First and Fourteenth Amendments of the United States Constitution, both facially and as applied to Plaintiffs;

b.    Declare that Tex. Bus. & Com. Code §§ 509.002(a)(1), 509.002(a)(2), 509.002(b)(10)(B),   509.053(a), 509.052(2)(D),   509.055, 509.057(a), 509.101 are void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, both facially and as applied to Plaintiffs;

c.    Declare that Tex. Bus. & Com. Code §§ 509.001-002, 509.051, 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057, and 509.101-103 are unconstitutional under the Commerce Clause of the United States Constitution, both facially and as applied to Plaintiffs;

d.    Declare that the unconstitutional provisions are integral to and inseverable from any surviving portions of the Act, such that the entire Act must be declared invalid.

e.    Preliminarily and permanently enjoin Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act;

f.    Enter judgment in favor of Plaintiffs;

g.    Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

h.    Award Plaintiffs all other relief as the Court deems just and proper.

Dated: August 16, 2024                   Respectfully submitted,


/s/ Adam S. Sieff                        /s/ Robert Corn-Revere

AMBIKA KUMAR*                            ROBERT CORN-REVERE*
  ambikakumar@dwt.com                      bob.corn-revere@thefire.org
CAESAR KALINOWSKI IV*                    FOUNDATION FOR INDIVIDUAL
  caesarkalinowski@dwt.com               RIGHTS AND EXPRESSION
DAVIS WRIGHT TREMAINE LLP                700 Pennsylvania Avenue SE, Suite 340
920 Fifth Avenue, Suite 3300            Washington, DC  20003
Seattle, WA  98104                       Telephone: (215) 717-3473
Telephone: (206) 622-3150


ADAM S. SIEFF*                           DAVID RUBIN*
  adamsieff@dwt.com                        david.rubin@thefire.org
DAVIS WRIGHT TREMAINE LLP                FOUNDATION FOR INDIVIDUAL
865 South Figueroa Street, 24th Floor    RIGHTS AND EXPRESSION
Los Angeles, CA  90017                   700 Pennsylvania Avenue SE, Suite 340
Telephone: (213) 633-6800                Washington, DC  20003
                                         Telephone: (215) 717-3473


DAVID M. GOSSETT*                        /s/ JT Morris
  davidgossett@dwt.com                   JT MORRIS (TX Bar. 24094444)
CHELSEA T. KELLY*                          jt.morris@thefire.org
  chelseakelly@dwt.com                   FOUNDATION FOR INDIVIDUAL
MARIETTA CATSAMBAS*                      RIGHTS AND EXPRESSION
  mariettacatsambas@dwt.com              700 Pennsylvania Avenue SE, Suite 340
DAVIS WRIGHT TREMAINE LLP                Washington, DC  20003
1301 K Street NW, Suite 500 East         Telephone: (215) 717-3473
Washington, DC  20005
Telephone: (202) 973-4200


*Attorneys for Plaintiffs*


*pro hac vice application forthcoming