**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS, M.F., by and through next friend, VANESSA FERNANDEZ, AMPERSAND GROUP LLC, and BRANDON CLOSSON,<br><br>                              *Plaintiffs*,<br>v.<br><br>KEN PAXTON, in his official capacity as the Texas Attorney General,<br><br>                              *Defendant*. | Civil Action No. 1:24-cv-00945-RP |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

`

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 1

    A.    Social Networks Provide a Forum for Expression and Communication. ............... 1

    B.    Existing Tools Enable Individual Choice in Regulating Online Speech. ............... 3

    C.    The State Enacts Legislation to Censor Social Networks. ...................................... 3

III.    LEGAL STANDARD ......................................................................................... 6

IV.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ................................... 6

    A.    The Act Restricts Speech in Violation of the First Amendment. ........................... 6

        1.    The Act creates a system of prior restraint subject to strictest scrutiny. ....... 7

        2.    The Act is also content-based and subject to strict scrutiny. .................... 11

        3.    The challenged provisions fail this scrutiny. ............................................. 12

        4.    The challenged provisions fail even intermediate scrutiny ....................... 15

        5.    Each of the challenged provisions is facially overbroad. ......................... 17

            a.    The challenged provisions exclusively regulate speech. .............. 17

            b.    The challenged provisions' applications are overbroad ............... 18

    B.    The Act Is Void for Vagueness ............................................................................. 19

V.    THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION ................ 20

VI.    CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA v. Douds*,
  339 U.S. 382 (1950) ................................................................................................8

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008) ..................................................................................10

*Alexander v. Express Energy Servs. Operating L.P.*,
  784 F.3d 1032 (5th Cir. 2015) ..............................................................................10

*Alexander v. United States*,
  509 U.S. 544 (1993) ................................................................................................8

*Am. Acad. of Implant Dentistry v. Parker*,
  860 F.3d 300 (5th Cir. 2017) ..........................................................................16, 17

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ..............................................................................................17

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ........................................................................................ passim

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ........................................................................................10, 19

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ..................................................................................7

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ..............................................................................................19

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ........................................................................................7, 8, 11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020) ..............................................................................................11

*Bates v. City of Little Rock*,
  361 U.S. 516 (1960) ................................................................................................8

*Boos v. Barry*,
  485 U.S. 312 (1988) ..............................................................................................12

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011)................................................................................ passim

*BST Hldgs. LLC v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ....................................................................20

*Chiu v. Plano Indep. Sch. Dist.,*
  339 F.3d 273 (5th Cir. 2003) .....................................................................9

*City of El Cenizo v. Texas,*
  890 F.3d 164 (5th Cir. 2018) .....................................................................6

*Counterman v. Colorado,*
  600 U.S. 66 (2023)...................................................................................20

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,*
  518 U.S. 727 (1996).................................................................................10

*Elrod v. Burns,*
  427 U.S. 347 (1976).................................................................................20

*FEC v. Cruz,*
  596 U.S. 289 (2022).................................................................................16

*Free Speech Coalition, Inc. v. Paxton,*
  95 F.4th 263 (5th Cir.), *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024) ......................10

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
  527 U.S. 173 (1999).................................................................................16

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010).....................................................................................19

*Interstate Circuit v. City of Dallas,*
  390 U.S. 676 (1968).............................................................................7, 9, 11

*Junior Sports Mags. Inc. v. Bonta,*
  80 F.4th 1109 (9th Cir. 2023) ..................................................................16

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
  385 U.S. 589 (1967).................................................................................20

*Lopez v. Sentrillon Corp.,*
  749 F.3d 347 (5th Cir. 2014) ...................................................................10

*McConnell v. FEC,*
  540 U.S. 93 (2003)...................................................................................10

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ........................................................................................15

*McDonald v. Longley*,
    4 F.4th 229 (5th Cir. 2021) ............................................................................20

*Midwest Video Corp. v. FCC*,
    571 F.2d 1025 (8th Cir. 1978) ........................................................................10

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) .................................................................6, 15, 17, 18

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) ..........................................................................................7

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ..........................................................................................7

*NetChoice, LLC v. Bonta*,
    --- F. 4th ----, 2024 WL 3838423 (9th Cir. Aug. 16, 2024) ............................ passim

*NetChoice, LLC v. Fitch*,
    2024 WL 3276409 (S.D. Miss. July 1, 2024) ..................................................14

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ....................................10, 14, 19

*NetChoice, LLC v. Yost*,
    2024 WL 555904 (S.D. Ohio Feb. 12, 2024) ..............................................12, 14

*NRA of Am. v. Vullo*,
    602 U.S. 175 (2024) ..........................................................................................7

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ..........................................................................................17

*Polnac v. City of Sulphur Springs*,
    555 F. Supp. 3d 309 (E.D. Tex. 2021) ..............................................................3

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..................................................................................11, 12

*Reno v. ACLU*,
    521 U.S. 844 (1997) ..............................................................................1, 6, 16, 19

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) ........................................................................................16

*Se. Promotions, Ltd. v. Conrad,*
 420 U.S. 546 (1975) ....................................................................................7

*Sierra Club, Lone Star Chapter v. FDIC,*
 992 F.2d 545 (5th Cir. 1993) ......................................................................3

*Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.,*
 502 U.S. 105 (1991) ..................................................................................12

*Smith v. Daily Mail Publ'g Co.,*
 443 U.S. 97 (1979) ......................................................................................7

*Sorrell v. IMS Health Inc.,*
 564 U.S. 552 (2011) ....................................................................................6

*Tex. VFW of U.S. v. Tex. Lottery Comm'n,*
 760 F.3d 427 (5th Cir. 2014) ....................................................................15

*Turner Broad. Sys., Inc. v. FCC,*
 512 U.S. 622 (1994) ..................................................................................15

*United States v. Miselis,*
 972 F.3d 518 (4th Cir. 2020) ......................................................................8

*United States v. Playboy Ent. Grp.,*
 529 U.S. 803 (2000) ........................................................................... passim

*United States v. Rundo,*
 990 F.3d 709 (9th Cir. 2021) ......................................................................8

*United States v. Stevens,*
 559 U.S. 460 (2010) ..................................................................................17

*United States v. Williams,*
 553 U.S. 285 (2008) ..................................................................................19

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.,*
 425 U.S. 748 ................................................................................................6

*Vance v. Universal Amusement Co.,*
 445 U.S. 308 (1980) ....................................................................................8

*Wash. Post v. McManus,*
 944 F.3d 506 (4th Cir. 2019) ......................................................................8

**STATUTES**

Tex. Bus. & Com. Code

    § 17.47..............................................................................................................6

    § 509.151..........................................................................................................5

    § 509.001........................................................................................................20

    § 509.002.................................................................................5, 11, 14, 18, 20

    § 509.051........................................................................................................20

    § 509.052.....................................................................................................9, 20

    § 509.053.......................................................................................4, 8, 18, 19, 20

    § 509.054........................................................................................................14

    § 509.055...............................................................................................5, 8, 12, 20

    § 509.056..................................................................................................8, 18, 20

    § 509.057.......................................................................................5, 9, 18, 19, 20

    § 509.101........................................................................................................20

    § 509.102.....................................................................................................9, 20

    § 509.103.....................................................................................................9, 20

    § 509.152...................................................................................................3, 4, 6

Tex. Penal Code

    § 43.21............................................................................................................5

    § 43.24............................................................................................................5

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amdt. I................................................................................... passim

## I.    INTRODUCTION

This case concerns a brazen act of overt content-based censorship and prior restraint. Defying the Supreme Court's consistent reaffirmation that governments have no "free-floating power to restrict the ideas to which children may be exposed," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011), the Securing Children Online Through Parental Empowerment Act, 2023 Tex. Sess. Law Serv., 88th Reg. Sess., Ch. 795 (SCOPE Act or Act) mandates age registration, prohibits young people in Texas from accessing and exchanging protected speech based on its subject matter, and bars Texans from sending and receiving directed communications based on their contents and intended audience.  The Act also threatens the rights of Texans of all ages by compelling online intermediaries to enforce additional age-verification requirements triggered by a vague and arbitrary content-based threshold that will pressure online publishers to limit the expressive content they disseminate.  It thus violates the rule that the government cannot restrict "speech that adults have a constitutional right to receive" to keep minors from "potentially harmful" content.  *Reno v. ACLU*, 521 U.S. 844, 874 (1997).  The Act's challenged provisions are subject to at least strict scrutiny, cannot withstand any level of First Amendment review, and are invalid on their face.  Because Plaintiffs will suffer the irreparable loss of fundamental freedoms if the Act takes effect, Plaintiffs bring this motion to preliminarily enjoin the Act's enforcement.

## II.    BACKGROUND

### A.    Social Networks Provide a Forum for Expression and Communication.

Plaintiffs are Texas-based individuals and organizations, including teenagers and those seeking to reach teenagers, whose speech and access to speech would be chilled if the Act takes effect.  Students Engaged in Advancing Texas (SEAT) represents a coalition of Texas students, from middle-school to college, who seek to increase youth visibility and participation in policymaking, including via social media.  Samuels Decl. ¶¶ 1-2.  M.F. is a 16-year-old high school

student who uses social media to learn about current events and opportunities, follow the news, discover music, and conduct research for his debate team and other school activities. M.F. Decl. ¶¶ 1-9. The Ampersand Group publishes social-good and public service advertisements on YouTube, Instagram, Facebook, and gaming platforms. Janeway Decl. ¶¶ 1-2. Brandon Closson shares videos about living with bipolar disorder on Instagram. Closson Decl. ¶ 2.

Teens use social media for political advocacy, education, community, and creative expression. M.F. Decl. ¶¶ 2-9; Samuels Decl. ¶¶ 2-3. It provides a training ground for citizenship. M.F. Decl. ¶¶ 12-13; Samuels Decl. ¶¶ 1-2. And it offers an essential medium to communicate political and social messages to young people. Janeway Decl. ¶¶ 3-6. Social media also enables young people to find purpose and community. Sieff Decl. Ex. 1. SEAT built a network of students bound together by public policy advocacy. Samuels Decl. ¶ 2. Closson turned to Reddit for information and belonging when he was diagnosed with bipolar disorder, and now creates content for that community. Closson Decl. ¶¶ 5-6. And M.F. uses social media to discover music and gain inspiration for his own compositions. M.F. Decl. ¶ 4. Teenagers who use social media report feeling more connected to their friends (80%); better able to express their creativity (71%); more supported (67%); and generally more accepted (58%). Sieff Decl. Ex. 4. Overall, U.S. teenagers report that social media has positive rather than negative effects. *Id.* The isolation that results from disconnecting teens from social media may be more harmful than heavy use. *Id.* Exs. 5, 6

Social networks particularly benefit at-risk youth. *Id.* Ex. 3. "[N]early seven-in-ten teens receive support from friends through social media during tough times." *Id.* Members of The Ampersand Group managed the distribution of an advertising campaign on Facebook to prevent teen sex trafficking. Janeway Decl. ¶ 6. Access to social media is also important for teens with mental health conditions. Closson Decl. ¶¶ 5-9; Sieff Decl. Ex. 7. Indeed, mental health

professionals use social media to treat mental health problems among teens. *Id*. Ex. 8.

**B.      Existing Tools Enable Individual Choice in Regulating Online Speech.**

Adolescents' use of social networks cannot be considered monolithically because "adolescents are affected by social media in different ways." Sieff Decl. Ex. 9 at 5. The "use and effects of social media depend on a number of factors specific to individual teens." *Id*. Ex. 10. Families are thus better positioned than the State to determine how to guide their children's social media usage. *See* M.F. Decl. ¶ 14; Sieff Decl. Exs. 20-23 (scientific research).

Online services, communication devices, and third-party apps provide tools allowing parents to tailor their children's social media use. *See CCIA v. Paxton*, No. 1:24-cv-849 (W.D. Tex.) ("CCIA Dkt."), ECF 6-2 at ¶ 22; *id*. ECF 6-3 at ¶ 8; *id*. ECF 6-4 at ¶ 13.[1] Third-party applications also enable parents to regulate their children's accounts. Sieff Decl. Exs. 11-14. And device makers offer parental controls to manage a child's online activities, including their use of particular applications. *Id*. Exs. 15-16.

**C.      The State Enacts Legislation to Censor Social Networks.**

The SCOPE Act takes effect September 1, 2024, when it will become enforceable by the Texas Attorney General. *See* Tex. Bus. & Com. Code § 509.152(b).

*General Provisions.* The Act governs any "digital service provider" (DSP) who (1) allows users to socially interact with other users on the digital service; (2) allows users to create public or semi-public profiles; and (3) allows users to create or post content that can be viewed by others, including sharing content on message boards, chat rooms, landing pages, video channels, or main feeds that present content created and posted by others. *Id*. §§ 509.001(1)-(2), 509.002(a). This

---

[1] The Court may take notice of court records, *see Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 327 (E.D. Tex. 2021), and consider hearsay evidence in ruling on a preliminary injunction motion. *See Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993).

includes services like YouTube and Instagram, as well as Goodreads, IMDb, Nextdoor, and Words with Friends.  It also extends to bulletin-board style fora like Quora and Reddit.

The Act arbitrarily exempts certain services based on the content they disseminate.  In addition to exempting entities that do not control the means or purpose of collecting user information, *id.* § 509.001(2)(B), (C), the Act exempts: small businesses, colleges, education services, messaging or email-only services, *id.* § 509.002(b); services that "primarily  function[] to provide a user with access to news, sports, commerce, or content primarily generated or selected" by the DSP, *id.*; and internet service providers, search engines, or cloud services that are not "responsible for" the "harmful" content the law restricts, *id.* § 509.002(c).

The Act requires all Texans to "register" their age before accessing a DSP.  *Id.* § 509.051. A user is a "known minor" if their registration shows they are under 18.  *Id.* § 509.001(4).

***Content Exposure Prohibitions.***  The Act requires DSPs to prevent known minors from accessing or exchanging sexual material, as well as "content that promotes, glorifies, or facilitates: (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." *Id.* § 509.053(a).  Providers must use "filtering technology" to block this content, and maintain a "comprehensive list" of filtered content, as well as a "database of keywords" that could be used to evade the filter.  *Id.* § 509.053(b)(1).  Providers must also ensure any algorithms they use to compile and arrange content enforce these restrictions.  *Id.* § 509.056.

Plaintiffs wish to send and receive educational, informational, artistic, and community-building material related to the listed subjects.  *See* Samuels Decl. ¶¶ 6-11; Closson Decl. ¶¶ 10-14; M.F. Decl. ¶¶ 10-13; Janeway Decl. ¶¶ 5-8.  And the DSPs they rely on to disseminate and access that protected information would continue to allow them to do so but for the Act's

requirements.  *See* CCIA Dkt., ECF 6-2 at ¶ 21; *id.* ECF 6-3 at ¶¶ 22-25; *id.* ECF 6-4 at ¶¶ 32-37.

    ***Targeted Advertising Restrictions.***    The Act bans DSPs from "display[ing] targeted advertising" to known minors unless a "verified parent" consents.  *Id.* §§ 509.052, 509.102. Obtaining consent from a verified parent requires a teen to grant that person full access to their account and communications.  *Id.* § 509.102.  Plaintiffs wish to send and receive targeted advertised content restricted by the Act.  *See* Janeway Decl. ¶¶ 9-12; M.F. Decl. ¶¶ 15-16.  And the DSPs would continue to allow them to do so but for the Act's requirements.  *See* CCIA Dkt., ECF 1 at ¶¶ 61-62, 70, 72; *id.* ECF 6-3 at ¶ 22; *id.* ECF 6-4 at ¶¶ 33-34, 40-42.  Even with consent, DSPs must still block minors from receiving "advertisements that facilitate, promote, or offer a product, service, or activity that is unlawful for a minor[.]" *Id.* § 509.055.  These requirements are not limited to commercial ads.  They encompass all "advertising," including, for example, PSAs providing information about forbidden activities, as well as messages advocating for changes in the law.  Plaintiffs wish to receive this content.  *See* Samuels Decl. ¶ 13.

    ***Content Monitoring and Age-Verification Regime.*** The Act requires *all* DSPs (not just social media services, *see* Tex. Bus. & Com. Code § 509.002(a)) to monitor the content they publish, and if "more than one-third" of that content qualifies as "harmful" or "obscene"— meaning sexually explicit, *see* Tex. Penal Code, §§ 43.21, 43.24—the DSP must "use a commercially reasonable age verification method to verify" that a person is 18.  Tex. Bus. & Com. Code  § 509.057(a).  If the person is a minor or an adult who refuses to submit to the process, the DSP may not provide them access. If a DSP fails to determine that it is subject to this provision and provides access to information without an age-verification mechanism, it faces liability.  *Id.*

    ***Penalties.*** The Texas Attorney General may enforce the Act through the Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 509.151, and parents may seek declaratory and injunctive

relief, *id.* § 509.152(b).  Penalties are $10,000 per violation. Tex. Bus. & Com. Code § 17.47(c)(1).

## III.   LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if they show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury absent relief, (3) that their injury outweighs any harm to the party they seek to enjoin, and (4) that the public interest supports an injunction. *See City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018).  An injunction is warranted here.

## IV.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.    The Act Restricts Speech in Violation of the First Amendment.

The First Amendment protects the creation, dissemination, and right to access ideas and expression.  *See Brown*, 564 U.S. at 792 & n.1; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.*, 425 U.S. 748, 756-57 & 757 n.15 (1976).  These protections apply without qualification to the internet, *Reno*, 521 U.S. at 852-53, including social media.  *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024).  They also apply to minors, who "are entitled to a significant measure of First Amendment protection," and whose rights to engage in protected speech "cannot be suppressed solely to protect [them] from ideas or images that a legislative body thinks unsuitable."  *Brown*, 564 U.S. at 794-95 (citation omitted).  And they prohibit the government from restricting adults' protected speech in the name of shielding children. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).  The government "bears the burden of proving the constitutionality of its actions" that abridge these protections,  *id.* at 816, under some form of "heightened judicial scrutiny."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 563 (2011).  Because the State cannot show that these restrictions satisfy *any* First Amendment standard, Plaintiffs will prevail on the merits.

### 1.    The Act creates a system of prior restraint subject to strictest scrutiny.

A prior restraint is any government action that in substance prevents or deters speech without a prior judicial determination "that such publications may lawfully be banned." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70-71 (1963). Prior restraints present "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976); *see Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979). To survive review, a prior restraint must supply the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude—a standard more stringent than strict scrutiny. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726-27 (Brennan, J., concurring) (same).

Requiring intermediaries to classify the suitability of third-party content before publishing it creates a prior restraint because threatening penalties for speech that falls into a proscribed class results in collateral censorship. *See NetChoice, LLC v. Bonta*, --- F. 4th ----, 2024 WL 3838423, at *9-10 (9th Cir. Aug. 16, 2024) (requiring online businesses to classify and block potentially harmful content "deputizes covered businesses into serving as censors for the State") (citing *Interstate Circuit v. City of Dallas*, 390 U.S. 676, 678-88 (1968) (requiring theaters to classify whether films were "suitable for young persons" before exhibiting them created a prior restraint)); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 n.8 (1975) (similar). Even "informal" methods "of coercion, persuasion, and intimidation" effectuate a prior restraint when directed at intermediaries to restrict the dissemination of third-party speech the government "deem[s] objectionable." *Bantam Books*, 372 U.S. at 67; *see also NRA of Am. v. Vullo*, 602 U.S. 175, 180-81, 188-91 (2024); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235-36 (7th Cir. 2015) (Posner, J.).

The Act establishes several independent and interlocking prior restraints.

***Content exposure restriction***. The Act's content exposure restriction threatens DSPs with

liability that compels DSPs to block Plaintiffs from sending and receiving protected content on a variety of subjects the State deems unsuitable. *See* Tex. Bus. & Com. Code §§ 509.053, 509.056. As in *Bantam Books*, this type of informal proxy censorship constitutes a prior restraint because it forces intermediaries to block protected speech the government disfavors. 372 U.S. at 66-67, 70-71 (commission that pressured booksellers to remove titles unsuitable to children created a prior restraint). The government cannot "deputize" online businesses to act as "censors for the State," *NetChoice*, 2024 WL 3838423 at *10, or use "indirect 'discouragements,'" *ACA v. Douds*, 339 U.S. 382, 402 (1950), or other "subtle" forms of "interference" to restrict expression, when it could not do so through "frontal attack," *Bates v. City of Little Rock*, 361 U.S. 516, 523-24 (1960); *see also Wash. Post v. McManus*, 944 F.3d 506, 517 (4th Cir. 2019) (Wilkinson, J.) (regulating online "platforms" impermissibly censored speech "indirectly").

*Targeted advertising restrictions.* The Act's targeted advertising restrictions—not limited to commercial advertising—likewise threaten civil liability to coerce intermediaries into "forbidding certain communications" before they "occur," and impose formal statutory preconditions (state-ordered parental consent) on minors' ability to access and disseminate advertised information. *Alexander v. United States*, 509 U.S. 544, 550 (1993) (cleaned up); *see Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316-17 (1980) (statutory prohibition established a prior restraint). The prohibition in Tex. Bus. & Com. Code § 509.055 absolutely bans DSPs from disseminating protected speech—like advertisements for a homecoming party where there may be underage drinking, or for a peaceful rally to protest Texas's restrictions on abortion—that may "facilitate" or "promote" illegal activity without abetting it. *See, e.g.*, *United States v. Miselis*, 972 F.3d 518, 530, 535 (4th Cir. 2020) (speech that promotes but does not abet unlawful activity is protected); *United States v. Rundo*, 990 F.3d 709 (9th Cir. 2021) (same). And

even when a teenager obtains consent from a "verified parent" to receive the type of targeted advertising the Act conditionally allows—which requires granting that person state-backed permission to surveil and restrict the minor's expression, *see* Tex. Bus. & Com. Code §§ 509.052(2)(D), 509.102-103—the Act still imposes a preclearance requirement that burdens the speech of those minors and persons who wish to speak with them. *See Brown*, 564 U.S. at 795 n.3 (requiring parents' consent to speak unconstitutional); *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 277, 283 (5th Cir. 2003) ("pre-clearance" to distribute information was a prior restraint).

*Content monitoring and age verification.* Like the classification regime in *Interstate Circuit* that created an unconstitutional prior restraint by promoting self- and collateral censorship, 390 U.S. at 678-88, the content-monitoring mandate in Section 509.057 requires DSPs to somehow quantify the speech they publish and face additional obligations and potential penalties depending on the nature of its editorial mix. *See NetChoice*, 2024 WL 3838423, at *10 (requiring services to assess whether their content could harm minors was unconstitutional). Platforms will censor in response to this requirement. *See* CCIA Dkt., ECF 6-3 at ¶ 22; *NetChoice, LLC v. Bonta*, No. 5:22-cv-8861 (N.D. Cal.), ECF 29-21 at ¶¶ 7,15; *id.* ECF 29-22 at ¶ 19; *id.* ECF 29-28 at ¶ 18; *id.* ECF 29-29 at ¶ 15; *see also* Sieff Decl. Ex. 24 at 1-2, 4.

The Act's age-verification mandate, where triggered, adds another precondition that further burdens access to online content, including to websites where the vast majority of content is protected. *See* Tex. Bus. & Com. Code §§ 509.057(a)-(b). "[T]here is currently no privacy-protective way to determine whether a consumer is a child." Sieff Decl. Ex. 17 at 5. The mandate thus requires Texans—including adults—to forgo anonymity and supply sensitive identifying information (such as a government ID, credit card, or biometric data) to access and engage in protected speech. *See NetChoice, LLC v. Fitch*, No. 1:24-cv-00170 (S.D. Miss.), ECF 3-4 at ¶ 27;

9

*id.* ECF 3-5 at ¶ 10. Many Texans, including some Plaintiffs, would stop using DSPs rather than provide ID. *See* Sieff Decl. Ex. 18 Janeway Decl. ¶¶ 13-14; Samuels Decl. ¶ 12. Such state-imposed barriers to speech are a form of prior restraint. *See Ashcroft v. ACLU*, 542 U.S. 656, 667, 673 (2004); *ACLU v. Mukasey*, 534 F.3d 181, 196-98 (3d Cir. 2008); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *18-21 (W.D. Ark. Aug. 31, 2023).[2] So is requiring a DSP to bar a teenager from its forum, even if up to two-thirds of its content is protected for them. The idea that "protected speech may be banned as a means to ban unprotected speech … turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

*    *    *    *

The State's attempt to transform DSPs into "a corps of involuntary government surrogates" is nothing new. *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1056 (8th Cir. 1978). Censors from time immemorial have commandeered intermediaries to enforce systems of prior restraint precisely because it "halt[s] the whole apparatus" of free expression. *McConnell v. FEC*, 540 U.S. 93, 251 (2003) (Scalia, J., concurring in part and dissenting in part). "Restrict the sale of books, and it matters little who prints them." *Id.* The government can no more conscript online platforms to restrict online speech than it could compel cable systems to restrict third-party programming, *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 732, 753-60 (1996);

---

[2] The Act's age-verification requirements are unconstitutional for at least the same reasons as the materially identical age-verification requirements of Tex. Civ. Prac. & Rem. § 129B.002(a), under parallel challenge in this district. *See Free Speech Coal., Inc. v. Colmenero*, No. 1:23-cv-00917 (W.D. Tex.). Although the Fifth Circuit reversed a preliminary injunction against that statute in *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 286-87 (5th Cir.), *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024), the decision departs from unbroken Supreme Court precedent and the Supreme Court has granted review. This Court is "bound by extant Supreme Court precedent" until the Supreme Court supersedes it. *Lopez v. Sentrillon Corp.*, 749 F.3d 347, 351 (5th Cir. 2014); *Alexander v. Express Energy Servs. Operating L.P.*, 784 F.3d 1032, 1037 (5th Cir. 2015). If Section 129B.002(a) is enjoined, corresponding relief would necessarily follow here.

10

*Playboy*, 529 U.S. at 806, theaters to restrict the exhibition of films, *Interstate Circuit*, 390 U.S. at 678, 684, or bookstores to restrict the sale of books, *Bantam Books*, 372 U.S. at 66-67, 70-71. *See also Bonta*, 2024 WL 3838423, at *12 (invalidating internet regulation that "deputizes private actors into censoring speech" on their services). Like each of those laws, the Act's proxy censorship is presumptively invalid and subject to the Constitution's most demanding scrutiny.

### 2.    The Act is also content-based and subject to strict scrutiny.

"Government regulation of speech is content based" and subject to strict scrutiny "if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

The Act is content-based in many obvious respects. The law's overall premise—that DSPs must take actions to protect minors from "harmful" content—is content-based. *See Ashcroft*, 542 U.S. at 670. And the law's definition of "digital service provider," Tex. Bus. & Com. Code § 509.002—combined with its content-based exemptions for services that principally provide "access to news, sports, [or] commerce," *id.* § 509.002(b)(10)—makes *all* of the Act's substantive speech restrictions content-based since the definition causes the application of these restrictions to "depend entirely on the communicative content" a service provides. *Reed*, 576 U.S. at 164; *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 636 (2020) (plurality op.). Strict scrutiny applies to the Act's substantive regulations for these reasons alone.

Each of the challenged provisions is also independently content-based.

The ***content-exposure restriction*** is content-based since it literally restricts speech "because of the topic discussed" and "particular subject matter" addressed. *Reed*, 576 U.S. at 163. That is "the essence of content-based regulation." *Playboy*, 529 U.S. at 811-12 (citation omitted). The State may not "create a wholly new category of content-based regulation" for certain classes of protected speech "directed at children." *Brown*, 564 U.S. at 794.

The ***targeted advertising restrictions*** are content-based because they regulate speech based on "its function or purpose," *Reed*, 576 U.S. at 163, because they cannot be justified without reference to "the direct impact that speech has on its listeners," *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Playboy*, 529 U.S. at 812 (same), and because whether a targeted ad may be published to a teenager without parental consent under Tex. Bus. & Com. Code § 509.055 depends on whether its message involves certain subject matter or topics. *See Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (singling out specified content for regulation is plainly content-based); *Reed*, 576 U.S. at 163. Any law that requires parental consent for teenagers to access constitutionally protected speech, for that matter, is subject to strict scrutiny. *See Brown*, 564 U.S. at 795 n.3; *NetChoice, LLC v. Yost*, 2024 WL 555904, at *12 (S.D. Ohio Feb. 12, 2024).

The ***content monitoring and age-verification regime*** is likewise content-based because whether the Act's age-verification obligations are triggered depends on the mix of content a service provides. *See Reed*, 576 U.S. at 164. And the age-verification requirement is itself content-based and subject to strict scrutiny because it burdens adults and blocks minors from accessing speech forums based on content, and cannot be justified without reference to that objective. *See Ashcroft*, 542 U.S. at 670 (age-verification restriction to access harmful content was content-based).

### 3. The challenged provisions fail this scrutiny.

A law subject to strict scrutiny is presumptively invalid unless the government shows it is necessary to achieve a compelling interest and uses the least restrictive means. *See Playboy*, 529 U.S. at 813. This is a "demanding standard" that vanishingly few restrictions of speech can survive. *Brown*, 564 U.S. at 799. The Act's challenged provisions fail this test.

***Not necessary to a compelling interest.*** Although protecting minors from harm may present a compelling interest in the abstract, *see* Sieff Decl. Ex. 19 (bill analysis), the State "must present more than anecdote and supposition" to show each restriction is necessary to that objective.

12

*Playboy*, 529 U.S. at 822.  The record contains no such evidence. *Cf.* Sieff Decl. Ex. 19.  The State simply assumes the existence of a problem and asserts that censorship is the solution.  That is not enough.  *See Brown*, 564 U.S. at 799-800 ("predictive judgment" inadequate; causal link required).

The lack of evidence is unsurprising. Data show that access to social media provides benefits to many young people, and demonstrate no causal link between use of social media and adverse adolescent mental health outcomes.  *See* Sieff Decl. Exs. 2, 9, 20-23.  This is consistent with Plaintiffs' experience.  *See* M.F. Decl. ¶¶ 2-9; Samuels Decl. ¶¶ 2-4; Closson Decl. ¶¶ 5-9. In fact, preventing teens from talking about mental health could itself harm their mental health. *See* M.F. Decl. ¶ 11.

***Not the least restrictive means.***  The State cannot show that limiting all Texans' speech is the "least restrictive" means to eliminate potential harms to some children from some speech, even if it had evidence showing the challenged provisions actually had some beneficial effect.  *Playboy*, 529 U.S. at 827.  Just this month, the Ninth Circuit affirmed in relevant part a preliminary injunction against a similar California regime requiring online services to monitor and block speech and targeted information to prevent minors from "being exposed to potentially harmful content."  *Bonta*, 2024 WL 3838423, at *13 (citation omitted).  The court held the law failed strict scrutiny because it "necessarily compels companies" to shield minors from "online mental health resources and communities that many children turn to for support," publicly important "reporting" on sensitive topics, and even "minors' own political or religious speech, as well as their personal updates about deaths in the family, rejection from a college, or a breakup."  *Id.* (citation omitted). It concluded California "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and

13

(3) relying on existing criminal laws that prohibit related unlawful conduct." *Id.*; *see also, e.g.*, *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at *11 (S.D. Miss. July 1, 2024) (granting preliminary injunction against similar law); *Yost*, 2024 WL 555904, at *12 (same); *Griffin*, 2023 WL 5660155, at *6-8, 21 (same).

So too here.  Existing tools allow families to govern internet use by children, and a less restrictive law might have focused on informing parents about these tools.  *See Playboy*, 529 U.S. at 823-26; *Ashcroft*, 542 U.S. at 669.  Virtually every social media service and smartphone manufacturer provides these tools.  *See* CCIA Dkt., ECF 6-2 at ¶ 22; *id.* ECF 6-3 at ¶ 8; *id.* ECF 6-4 at ¶ 13.  And even the Act's unchallenged provisions *requiring* them, Tex. Bus. & Com. Code § 509.054, would have been less restrictive.  *Cf. Playboy*, 529 U.S. at 816, 825-26 (mandatory restrictions invalid where same law provided voluntary measures).  The State ignored these alternatives, instead imposing what it "thinks parents *ought* to want."  *Brown*, 564 U.S. at 804.

**Underinclusive.**  The Act's simultaneous underinclusivity "is alone enough to defeat it." *Id.* at 802.  A law that professes to serve broad goals like the well-being of minors, and yet regulates only a slice of potential causes, "raises serious doubts about whether the government is in fact pursuing the interest in invokes." *Id.*  (citing cases).  Here as in *Brown*, the Act focuses on one type of media—DSPs that permit account holders to create profiles and interact socially, *see* Tex. Bus. & Com. Code § 509.002(a)—and arbitrarily exempts services that "primarily" provide a user "with access to news, sports, commerce, or content primarily generated or selected by the [DSP]." *Id.* § 509.002(b)(10).  The State does not explain why—or even *if*—these other services have less effect on young people.

Other arbitrary distinctions raise similar underinclusivity problems.  The ***content exposure restriction*** prohibits DSPs from showing minors content related to "self-harm," "eating disorders,"

"substance abuse," "bullying," and "sexual exploitation," *id*. § 509.053, without explaining what sets those categories apart, or what distinguishes DSPs from other media. The ***targeted advertising restrictions*** allow DSPs to publish certain kinds of supposedly "dangerous, mind-altering material" to minors "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802. And the ***content monitoring and age verification regime*** would allow teenagers to view the *same piece of* sexually-oriented material on one DSP but not another, depending on the volume of *other* non-pornographic material also on that DSP. In all these respects, the Act "leave[s] significant influences bearing on [the government's] interest unregulated." *Tex. VFW of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) (citation omitted).

"Even where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804-05. Texas has failed to show how the Act's restrictions and exclusions satisfy strict scrutiny.

### 4. The challenged provisions fail even intermediate scrutiny.

A speech restriction survives intermediate scrutiny only if the government proves the law (1) serves a "real" and "not merely conjectural" government interest "unrelated to the suppression of free expression," and (2) "will in fact" serve that interest in "a direct and material way" (3) that is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-64 (1994) (citation omitted). If shown, the government still must prove its regulation (4) leaves open "ample alternative channels for communication." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (citation omitted).

The challenged provisions fail this test too. Shielding minors from the effects of protected speech, or "correct[ing] the mix of speech" that a DSP presents to users, "is … related to the suppression of free expression" and an impermissible basis to restrict expression under any standard. *Moody*, 144 S. Ct. at 2407. The legislative record lacks evidence showing minors'

unregulated use of social media to communicate on the proscribed topics, receive targeted advertisements, or access DSPs with some unprotected content requires a *government* solution. *See FEC v. Cruz*, 596 U.S. 289, 307 (2022) (speculation about "anticipated harm" insufficient "to carry a First Amendment burden").  And nothing in the record shows the Act's speech restrictions will have any positive effects on adolescent mental health.  *See Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 309-10 (5th Cir. 2017) (government failed to carry its "significant" burden to show that the lines drawn by its regulation actually protected consumers).  In fact, Plaintiffs' testimony and much of the scientific literature indicate that restricting teenagers' use of social media will for many individuals do more harm than good.  *See supra* §§ II.A, IV.A.3.  A statute cannot meaningfully advance the government's interests if it "undermine[s] and counteract[s]" those goals.  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (intermediate scrutiny); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193 (1999) (same).

Nor can the State show that each of the Act's restrictions is narrowly tailored.  Overall, the Act applies to a wide range of online services without evidence that each of those services bears whatever defect or vulnerability the government claims an interest in solving, and it treats all minors alike regardless of differences in those minors' development or their parents' preferences.  *See Reno*, 521 U.S. at 865-66.  More specifically, the ***content exposure restriction*** invents and then bans dissemination of broad "new categories" of speech to minors, well beyond the few narrow categories of speech that lie beyond the First Amendment's protection.  *Brown*, 564 U.S. at 791.  The ***targeted advertising restrictions*** require DSPs to ban targeted advertisements to minors, commercial or otherwise, without regard for any given ad's harmful effects, and will not even allow parents to consent to minors receiving speech on certain topics.  *See Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1119 (9th Cir. 2023) (enjoining similar advertising ban for

minors).    And the **content monitoring and age-verification regime** deters adults' access to protected speech, and denies minors access even to DSPs the majority of whose content they have a right to access.    "[E]ven a 'legitimate and substantial' governmental interest 'cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'"    *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 597 (2021) (citation omitted). Texas was required to provide evidence showing it "considered less-burdensome alternatives." *Parker*, 860 F.3d at 311.    It failed to do so.

**5.    Each of the challenged provisions is facially overbroad.**

A regulation is facially invalid under the First Amendment if "a substantial number of [its] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted).    To determine this, a court must first determine the scope of a law's application by evaluating "[w]hat activities, by what actors" the law regulates. *Id.* at 2398. It then evaluates "which of the [law's] applications violate the First Amendment," and "measure[s] them against the rest." *Id.*    What matters "are the principal things regulated"—speech or conduct— and that is a legal determination courts make from a statute's plain language, not a mathematical exercise.  *Id.* at 2398-99; *see also, e.g.*, *Brown*, 564 U.S. at 804-05 (affirming facial injunction based on principal applications); *Packingham v. North Carolina*, 582 U.S. 98, 110 (2017) (granting same).  When the substantial effect of a regulation is to restrict protected speech, the regulation is facially invalid.  *See United States v. Stevens*, 559 U.S. 460, 482 (2010).

The Act's challenged provisions are facially invalid under this test.  It is clear that (i) the principal thing they regulate is speech; and (ii) their only potentially legitimate applications are thus the rare instances where they may happen to restrict constitutionally *unprotected* speech.

**a.    The challenged provisions exclusively regulate speech.**

The **content exposure restriction** prohibits DSPs from publishing speech to minors based

on its subject matter. *See* Tex. Com. & Bus. Code §§ 509.053, 509.056. The ***targeted advertising restrictions*** likewise prohibit DSPs from publishing speech to minors based on its content and purpose. *See id.* §§ 509.052, 509.055. These provisions necessarily restrict speech because in any application they restrict the information Texans—adults and minors alike—may disseminate and consume. *See Brown*, 564 U.S. at 794-95, 795 n.3; *see also* Tex. Bus. & Com. Code § 509.002(a)(1)-(3) (defining DSPs for purposes of these provisions specifically by reference to their role enabling the communication of information). The provisions also necessarily restrict speech because in every application they inherently limit DSPs' editorial "choices about … how to display [content]" to different audiences through their platforms. *Moody*, 144 S. Ct. at 2393.

The ***content monitoring and age verification regime*** requires DSPs to collect personal information from Texans before allowing them to engage in speech on their services, depending on the type of content those services publish. *See* Tex. Bus. & Com. Code § 509.057. Because a DSP is a medium for communication—and because the Act defines DSPs covered by this provision to mean websites that convey information across the internet, *id.* § 509.001(1)—the regime's only possible application is to restrict speech. *See Ashcroft*, 542 U.S. at 661-62, 670-71 (affirming injunction because regulation requiring age or identity verification to publish "World Wide Web content that is 'harmful to minors'" was facially overbroad).

### b.    The challenged provisions' applications are overbroad.

Since the challenged provisions exclusively regulate speech by persons engaged in expressive activities, the only even potentially legitimate applications of the challenged provisions concern instances where they *just happen* to restrict some type of unprotected and thus legitimately regulable speech. But these "narrowly limited classes of speech"—such as defamation, true threats, incitement, or obscenity—comprise a tiny fraction of the speech communicated through DSPs. *Brown*, 564 U.S. at 790-91 (citation omitted). This approach is typified by the Act's content

monitoring and age-verification regime, which would ban minors and burden adults from accessing a DSP even if the vast majority—up to two-thirds—of its content were protected even for minors. *See* Tex. Bus. & Com. Code § 509.0057. Restricting protected speech to potentially block some unprotected speech is the definition of overbreadth. *See Ashcroft*, 535 U.S. at 255.

The same logic infects the other challenged provisions. "[C]ontent on the Internet is as diverse as human thought." *Reno*, 521 U.S. at 852 (citation omitted). Just as a stopped clock that is right twice a day is still broken, the fact that the challenged provisions may occasionally prevent minors from viewing or sharing unprotected content does not render the law permissible. These applications are substantially outweighed by the restrictions on covered services' "vast amounts of constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *16. The State may not deploy universal restrictions that "torch a large segment of the Internet" simply to protect minors from a small subset of the expression these platforms communicate. *Reno*, 521 U.S. at 882 (CDA facially overbroad); *Ashcroft*, 542 U.S. at 666-70 (COPA facially invalid).

**B.     The Act Is Void for Vagueness.**

The challenged provisions are independently invalid because they are vague. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Laws regulating expression face a more stringent test because they force speakers to self-censor to avoid liability. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010); *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

The Act's speech regulations are void for vagueness because they fail to define key terms underpinning their restrictions. The ***content exposure restriction*** does not define "promot[ing], glorif[ying], or facilitat[ing]" suicide, self-harm, eating disorders, substance abuse, stalking, bullying, or harassment, Tex. Bus. & Com. Code § 509.053(a). Nor do the ***targeted advertising***

*restrictions* make clear what counts as "advertising," *id.* § 509.052(2)(D), or advertisements that "facilitate" or "promote" unlawful activity. *Id.* § 509.055. The former ostensibly prohibits DSPs from disseminating discussions of *Hamlet* and *Madame Bovary*. The latter could be used to penalize the dissemination of speech advocating for the decriminalization of abortions or recreational drugs, or encouraging civil disobedience. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 601 (1967) (proscribing speech teaching or advising the overthrow of government was vague and overbroad because it threatened advocacy and inquiry). Likewise, the Act's ***content-monitoring and age-verification regime***, as well as its "verified parent" definition—essential requirements intertwined with the law's other regulations—do not define what counts as a "commercially reasonable method" of verifying a user's age or a parent's identity. Tex. Bus. & Com. Code §§ 509.057(a), 509.101.

The "predictable tendency" in the face of this type of uncertainty is the broad censorship of speech. *Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023). That is precisely what will happen here. *See* CCIA Dkt., ECF 6-2 at ¶¶ 11, 21; *id.* ECF 6-3 at ¶ 21; *id.* ECF 6-4 at ¶¶ 33-34.

## V.    THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION

The loss of speech rights is irreparable. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); M.F. Decl. ¶¶ 10-17; Samuels Decl. ¶¶ 6-14; Janeway Decl. ¶¶ 5-14; Closson Decl. ¶¶ 10-18. Texas cannot enforce unconstitutional laws. *BST Hldgs. LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). The public interest supports speech. *See McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021).

## VI.    CONCLUSION

Plaintiffs respectfully request an order enjoining Tex. Bus. & Com. Code §§ 509.001-002, 509.051, 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057, and 509.101-103 on their face.

Dated: August 23, 2024                     Respectfully submitted,


*/s/ Adam S. Sieff*                        /s/ *Robert Corn-Revere*
AMBIKA KUMAR*                              ROBERT CORN-REVERE**
  ambikakumar@dwt.com                        bob.corn-revere@thefire.org
CAESAR KALINOWSKI IV*                      FOUNDATION FOR INDIVIDUAL
  caesarkalinowski@dwt.com                 RIGHTS AND EXPRESSION
DAVIS WRIGHT TREMAINE LLP                  700 Pennsylvania Avenue SE, Suite 340
920 Fifth Avenue, Suite 3300              Washington, DC  20003
Seattle, WA  98104                         Telephone: (215) 717-3473
Telephone: (206) 622-3150

                                           DAVID RUBIN**
ADAM S. SIEFF*                               david.rubin@thefire.org
  adamsieff@dwt.com                        FOUNDATION FOR INDIVIDUAL
DAVIS WRIGHT TREMAINE LLP                  RIGHTS AND EXPRESSION
865 South Figueroa Street, 24th Floor      700 Pennsylvania Avenue SE, Suite 340
Los Angeles, CA  90017                     Washington, DC  20003
Telephone: (213) 633-6800                  Telephone: (215) 717-3473


DAVID M. GOSSETT*                          J.T. MORRIS (TX Bar. 29094444)
  davidgossett@dwt.com                       jt.morris@thefire.org
CHELSEA T. KELLY*                          FOUNDATION FOR INDIVIDUAL
  chelseakelly@dwt.com                     RIGHTS AND EXPRESSION
MARIETTA CATSAMBAS*                        700 Pennsylvania Avenue SE, Suite 340
  mariettacatsambas@dwt.com                Washington, DC  20003
DAVIS WRIGHT TREMAINE LLP                  Telephone: (215) 717-3473
1301 K Street NW, Suite 500 East
Washington, DC  20005
Telephone: (202) 973-4200


*Attorneys for Plaintiffs*

                                                        * pro hac vice
                                                   **pro hac vice forthcoming


21

**CERTIFICATE OF CONFERENCE**

I conferred with counsel for Defendant regarding this motion on August 21, 2024.

Defendant indicated he will oppose this motion.

/s/ *Adam S. Sieff*
Adam S. Sieff