**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **STUDENTS ENGAGED IN ADVANCING TEXAS, M.F.,** by and through next friend, **VANESSA FERNANDEZ, AMPERSAND GROUP LLC,** and **BRANDON CLOSSON,** Plaintiffs, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| **v.** | §<br>§ | **Civil Action No. 1:24-cv-945-RP** |
| **KEN PAXTON,** in his official capacity as Attorney General of Texas, Defendant. | §<br>§<br>§<br>§ | |

---

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief - General Litigation Division

TODD A. DICKERSON
Attorney-in-Charge
Assistant Attorney General
Texas Bar No. 24118368
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
Todd.Dickerson@oag.texas.gov

**COUNSEL FOR DEFENDANT**

T<span style="font-variant:small-caps">ABLE OF</span> C<span style="font-variant:small-caps">ONTENTS</span>

Table of Contents ..................................................................................................................i

Table of Authorities ............................................................................................................ii

Introduction .........................................................................................................................1

Background ..........................................................................................................................4

    I.    Social Media Can Hurt Children. ...........................................................................4

    II.   An Overview of HB 18. ..........................................................................................7

Argument ...........................................................................................................................10

    I.    Plaintiffs Lack Standing. ......................................................................................10

    II.   *NetChoice I* Bars Plaintiffs' Attempt to Classify All of HB 18 as a Content- or
           Speaker-Based Regulation. ..................................................................................18

    III.  Reviewing the Challenged Provisions Confirms that They are Constitutional. .....20

        A.    The Age Registration Provision. ....................................................................20

        B.    The Targeted Advertising Provision. ..............................................................20

        C.    The Illegal Advertising Provision. ..................................................................23

        D.    The Parental Powers Provisions. ....................................................................24

        E.    The Harm to Minors Provisions. ....................................................................25

            1.    Analysis of § 509.053(a) ........................................................................25

                (a)    Even Under a Broad Interpretation, § 509.053(a) is Constitutional. ...........25

                (b)    Section 509.053(a) is Readily Susceptible to a Limiting Construction. ......26

            2.    The Remaining Harm to Minors Provisions. .........................................31

        F.    The Age Verification Provision. .....................................................................31

    IV.  Plaintiffs' Vagueness Claims are Not Likely to Succeed on the Merits...................32

    V.   Four More Issues Concerning Plaintiffs' Motion for a Preliminary Injunction. .....34

Conclusion .........................................................................................................................37

Certificate of Service ..........................................................................................................38

i

## TABLE OF AUTHORITIES

<u>Cases</u>

*Alexander v. United States,*
   509 U.S. 544 (1993) ........................................................................................................ 36

*Animal Legal Def. Fund v. Kelly,*
   434 F. Supp. 3d 974 (D. Kan. 2020) ................................................................................ 13

*Arce v. Douglas,*
   793 F.3d 968 (9th Cir. 2015) .......................................................................................... 33

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
   591 U.S. 610 (2020) .................................................................................................. 35, 36

*Bass v. United States,*
   324 F.2d 168 (8th Cir. 1963) .......................................................................................... 33

*Bates v. State Bar of Arizona,*
   433 U.S. 350 (1977) ........................................................................................................ 35

*Bennett v. Spear,*
   520 U.S. 154 (1997) .................................................................................................. 12, 15

*Bolger v. Youngs Drug Products Corp.,*
   463 U.S. 60 (1983) .......................................................................................................... 21

*Bond v. Utreras,*
   585 F.3d 1061 (7th Cir. 2009) ........................................................................................ 13

*Brown v. Entm't Merchants Ass'n,*
   564 U.S. 786 (2011) ........................................................................................................ 24

*Bystrom By & Through Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14,*
   822 F.2d 747 (8th Cir. 1987) .......................................................................................... 33

*Career Colleges & Sch. of Tex. v. United States Dep't of Educ.,*
   No. 1:23-CV-433-RP, 2023 WL 4291992 (W.D. Tex. June 30, 2023) ............................. 37

*Cent. Pines Land Co. v. United States,*
   274 F.3d 881 (5th Cir. 2001) .......................................................................................... 20

*City of El Cenizo, Tex. v. Tex.,*
   890 F.3d 164 (5th Cir. 2018) .......................................................................................... 26

*City of Houston v. Jackson,*
   192 S.W.3d 764 (Tex. 2006) ........................................................................................... 22

*Clapper v. Amnesty Intern. USA,*
   568 U.S. 398 (2013) .................................................................................................. 11, 14

*Collura v. Maguire,*
   569 Fed. Appx. 114 (3d Cir. 2014) ................................................................................. 17

*Computer & Communications Industry Association v. Paxton,*
   1:24-cv-00849-RP (W.D. Tex.) .................................................................................. passim

*Ctr. for Individual Freedom v. Carmouche,*
    449 F.3d 655 (5th Cir. 2006) ...................................................................................17

*Ctr. for Individual Freedom v. Madigan,*
    697 F.3d 464 (7th Cir. 2012) ...................................................................................17

*Ctr. for Law & Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) ...............................................................................18

*Data Mktg. P'ship, LP v. United States Dep't of Labor,*
    45 F.4th 846 (5th Cir. 2022) ....................................................................................20

*Daves v. Dallas Cnty., Tex.,*
    22 F.4th 522 (5th Cir. 2022) .............................................................................. 12, 15

*Digerati Distribution & Marketing, LLC v. Sarl,*
    No. 1:22-CV-01302-DII, 2023 WL 5687040 (W.D. Tex. Aug. 2, 2023) ..................37

*Doe I v. Landry,*
    909 F.3d 99 (5th Cir. 2018) .........................................................................16, 23, 32

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) .................................................................................2, 14

*El Paso Cnty., Tex. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ...................................................................................18

*Elend v. Basham,*
    471 F.3d 1199 (11th Cir. 2006) .........................................................................11, 14

*Florida Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995) .................................................................................................23

*Free Speech Coal., Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024) .............................................................................. 20, 32

*Free Speech Coal., Inc. v. Shurtleff,*
    No. 2:05CV949DAK, 2007 WL 922247 (D. Utah Mar. 23, 2007) ..........................33

*Gibson v. Tex. Dep't of Ins.--Div. of Workers' Comp.,*
    700 F.3d 227 (5th Cir. 2012) ...................................................................................36

*Ginsberg v. State of N. Y.,*
    390 U.S. 629 (1968) ...........................................................................................21, 26

*Glossip v. Gross,*
    576 U.S. 863 (2015) .................................................................................................30

*Greater Philadelphia Chamber of Commerce v. City of Philadelphia,*
    949 F.3d 116 (3d Cir. 2020) ....................................................................................22

*Helms Realty Corp. v. City of New York,*
    320 F. Supp. 3d 526 (S.D.N.Y. 2018) ......................................................................33

*Hill v. Colorado,*
    530 U.S. 703 (2000) .................................................................................................22

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................................................18

*In re Comprehensive Power, Inc.,*
  578 B.R. 14 (Bankr. D. Mass. 2017) ....................................................................34

*In re United Services Auto. Ass'n,*
  307 S.W.3d 299 (Tex. 2010) ..................................................................................25

*Inclusive Communities Project, Inc. v. Dep't of Treasury,*
  946 F.3d 649 (5th Cir. 2019) ..........................................................................12, 15

*Jose Carreras, M.D., P.A. v. Marroquin,*
  339 S.W.3d 68 (Tex. 2011) ....................................................................................21

*Justice v. Hosemann,*
  771 F.3d 285 (5th Cir. 2014) ................................................................................17

*Lawline v. Am. Bar Ass'n,*
  956 F.2d 1378 (7th Cir. 1992) ..............................................................................17

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................................12

*Machete Productions, L.L.C. v. Page,*
  809 F.3d 281 (5th Cir. 2015) ..........................................................................11, 14

*Malouf v. State ex rels. Ellis,*
  No. 22-1046, 2024 WL 3075672 (Tex. June 21, 2024) ......................................24

*Martin v. U.S. E.P.A.,*
  271 F. Supp. 2d 38 (D.D.C. 2002) ........................................................................13

*McKinley v. Abbott,*
  643 F.3d 403 (5th Cir. 2011) ................................................................................35

*Metavante Corp. v. Emigrant Sav. Bank,*
  619 F.3d 748 (7th Cir. 2010) ................................................................................34

*Military-Veterans Advocacy v. Sec'y of Veterans Affairs,*
  7 F.4th 1110 (Fed. Cir. 2021) ..............................................................................18

*Moody v. NetChoice, LLC,*
  144 S. Ct. 2383 (2024) ....................................................................................passim

*Morse v. Frederick,*
  551 U.S. 393 (2007) ........................................................................................21, 26

*Murphy v. Matheson,*
  742 F.2d 564 (10th Cir. 1984) ..............................................................................27

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) ............................................................................................13

*NetChoice, L.L.C. v. Paxton,*
  49 F.4th 439 (5th Cir. 2022) ..........................................................................18, 19

*NetChoice, LLC v. Griffin,*
    No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)............26

*NetChoice, LLC v. Reyes,*
    No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626 (D. Utah Sept. 10, 2024) .................2

*Netherland v. Eubanks,*
    302 Fed. Appx. 244 (5th Cir. 2008) ............35

*Packingham v. North Carolina,*
    582 U.S. 98 (2017)............26, 29

*Pennsylvania Family Inst., Inc. v. Black,*
    489 F.3d 156 (3d Cir. 2007) ............13

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,*
    413 U.S. 376 (1973)............23

*Powers v. Ohio,*
    499 U.S. 400 (1991)............16

*R J Reynolds Tobacco Co. v. Food & Drug Admin.,*
    96 F.4th 863 (5th Cir. 2024)............19

*Recht v. Morrisey,*
    32 F.4th 398 (4th Cir. 2022)............22

*Serafine v. Branaman,*
    810 F.3d 354 (5th Cir. 2016)............35

*Shields v. Norton,*
    289 F.3d 832 (5th Cir. 2002) ............12, 15

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envtl. Quality,*
    968 F.3d 419 (5th Cir. 2020)............2, 14

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)............24

*Specialty Earth Scis., LLC v. Carus Corp.,*
    No. 15-CV-06133, 2021 WL 4804076 (N.D. Ill. Oct. 14, 2021) ............34

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ............13, 15

*StreetMediaGroup, LLC v. Stockinger,*
    No. 1:20-CV-03602-RBJ, 2021 WL 5770231 (D. Colo. Dec. 6, 2021) .................33

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019)............16

*Texans Against Censorship, Inc. v. State Bar of Tex.,*
    888 F. Supp. 1328 (E.D. Tex. 1995)............33

*Three Expo Events, L.L.C. v. City of Dallas, Tex.,*
    907 F.3d 333 (5th Cir. 2018)............12

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ....................................................................................10

*Traxler v. Entergy Gulf States, Inc.,*
   376 S.W.3d 742 (Tex. 2012) .......................................................................24

*Turaani v. Wray,*
   988 F.3d 313 (6th Cir. 2021) ................................................................ 12, 15

*Turner Broad. Sys., Inc. v. F.C.C.,*
   512 U.S. 622 (1994) ....................................................................................19

*United States v. Buttorff,*
   761 F.2d 1056 (5th Cir. 1985) ....................................................................23

*United States v. Cavalier,*
   17 F.3d 90 (5th Cir. 1994) ..........................................................................33

*United States v. Hansen,*
   599 U.S. 762 (2023) .............................................................................passim

*United States v. Inv. Enterprises, Inc.,*
   10 F.3d 263 (5th Cir. 1993) ........................................................................36

*United States v. Magana,*
   837 F.3d 457 (5th Cir. 2016) ......................................................................16

*United States v. White,*
   769 F.2d 511 (8th Cir. 1985) ......................................................................23

*United States v. Williams,*
   553 U.S. 285 (2008) ................................................................ 27, 28, 29, 33

*Vill. of Hoffman Estates v. Flipside,*
   455 U.S. 489 (1982) .......................................................................... 23, 35

*Vote.Org v. Callanen,*
   39 F.4th 297 (5th Cir. 2022) .......................................................................16

*Vugo, Inc. v. City of New York,*
   931 F.3d 42 (2d Cir. 2019) .........................................................................22

*Welch v. United States,*
   578 U.S. 120 (2016) ....................................................................................33

*Yamada v. Snipes,*
   786 F.3d 1182 (9th Cir. 2015) ....................................................................33

*Yim v. City of Seattle,*
   63 F.4th 783 (9th Cir. 2023) .......................................................................22

*Young v. Am. Mini Theatres, Inc.,*
   427 U.S. 50 (1976) ......................................................................................17

*Zoulek v. Hass,*
   2:24-cv-00031-RJS-CMR (D. Utah) .................................................... 2, 10

Statutes

15 U.S.C. § 7706 ................................................................................................................34

17 U.S.C. § 115 ..................................................................................................................34

18 U.S.C. § 2252A .............................................................................................................28

Tex. Bus. & Com. Code § 120.001 ...................................................................................18

Tex. Bus. & Com. Code § 120.051 ...................................................................................18

Tex. Bus. & Com. Code § 120.052 ...................................................................................18

Tex. Bus. & Com. Code § 509.001 .....................................................................................7

Tex. Bus. & Com. Code § 509.002 ...................................................................7, 9, 10, 11

Tex. Bus. & Com. Code § 509.051 .............................................................................1, 7, 20

Tex. Bus. & Com. Code § 509.052 .............................................................................passim

Tex. Bus. & Com. Code § 509.053 .............................................................................passim

Tex. Bus. & Com. Code § 509.054 .................................................................................. 8, 9

Tex. Bus. & Com. Code § 509.055 .............................................................................passim

Tex. Bus. & Com. Code § 509.056 .............................................................................. 14, 31

Tex. Bus. & Com. Code § 509.057 .............................................................................passim

Tex. Bus. & Com. Code § 509.101 .......................................................................... 1, 8, 16

Tex. Bus. & Com. Code § 509.103 .............................................................................passim

Tex. Civ. Prac. & Rem. Code § 143A.002 .......................................................................18

Tex. Gov't Code § 311.032 ...............................................................................................27

Tex. Pen. Code § 15.032 ...................................................................................................29

Tex. Pen. Code § 20A.02 ..................................................................................................29

Tex. Pen. Code § 22.08 .....................................................................................................29

Tex. Pen. Code § 42.07 .....................................................................................................29

Tex. Pen. Code § 42.072 ...................................................................................................29

Tex. Pen. Code § 43.261 ...................................................................................................29

Tex. Pen. Code § 43.262 ...................................................................................................29

Tex. Pen. Code §§ 481.001–490.151 ................................................................................29

U.C.C. § 2-402 ..................................................................................................................34

U.C.C. § 2-614 ..................................................................................................................34

U.C.C. § 2-710 ..................................................................................................................34

Other Authorities

*Adult Nudity and Sexual Activity*, META ...........................................................................3

Aksha M. Memon, *The Role of Online Social Networking on Deliberate Self-Harm and Suicidality in Adolescents: A Systemized Review of Literature*, INDIAN J. PSYCHIATRY (Dec. 2018) ...............................6

Alisa Bowman, *Social Media's Effects on the Teen Brain*, MAYO CLINIC (Sept. 5, 2023) ...........................5

Amro Khasawneh, et al., *Examining the Self-Harm and Suicide Contagion Effect of the Blue Whale Challenge on YouTube and Twitter: Qualitative Study*, JMIR PUBL'N (June 2020)....................................5

Amy Orben, et al., *Windows of Developmental Sensitivity to Social Media*, NATURE COMMC'N (Mar. 28, 2022) .........................................................................................................................................5

Barbara Ortutay, *Facebook Parent Meta Posts Sharply Higher Profit in 3Q Thanks to Increase in Ad Revenue*, AP (Oct. 25, 2023) .............................................................................................................4

BLACK'S LAW DICTIONARY (12th ed. 2024) ...............................................................................................27

*Bullying and Harassment*, META .......................................................................................................... 3, 6

Cecilia Kang, *Meta Reaches $1.4 Billion Settlement with Texas Over Privacy Violations*, NEW YORK TIMES ............................................................................................................................................21

DICTIONARY.COM ....................................................................................................................... 20, 27

Elizabeth Napolitano, *Social Media Apps Made $11 Billion from Children and Teens in 2022*, CBS NEWS..............................................................................................................................................21

*Google and YouTube will Pay Record $170 Million for Alleged Violations of Children's Privacy Law*, FTC .................................................................................................................................................21

*H.R.821 – Social Media Child Protection Act*, CONGRESS.GOV .................................................................30

Jessica Bursztynsky & Lauren Feiner, *Facebook Documents Show how Toxic Instagram is for Teens, Wall Street Journal Reports*, CNBC (Sept. 14, 2021) ..............................................................................5

Karen Hao, *The Facebook Whistleblower Says its Algorithms are Dangerous. Here's Why.*, MIT TECHNOLOGY REVIEW ......................................................................................................................6

Kathy Katella, *How Social Media Affects Your Teen's Mental Health: A Parent's Guide*, YALE MED. (June 17, 2024) ............................................................................................................................ 4, 6

Kolbe Nelson, *Facebook Knew Instagram was Pushing Girls to Dangerous Content: Internal Document*, CBS NEWS (Dec. 11, 2022) .................................................................................................................6

*Legislative Record for HB 18*, TEX. LEG. ONLINE .....................................................................................37

MERRIAM-WEBSTER ........................................................................................................................ 20, 27

Michaeleen Doucleff, *The Truth About Teens, Social Media and the Mental Health Crisis*, NPR (Apr. 25, 2023) ................................................................................................................................4

Oxford American Dictionary 739 (3d ed. 2010) ....................................................................................27

*Policy Statement on the Impact of Social Media on Youth Mental Health*, AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY .................................................................................................................5

*Rules Enforcement*, X...........................................................................................................................3

Ryan Mac & Sheera Frenkel, *Facebook Downplays Internal Research Released on Eve of Hearing*, NEW YORK TIMES ...............................................................................................................................6

*S.1291 – Protecting Kids on Social Media Act*, CONGRESS.GOV ......................................................30

*S.1409 – Kids Online Safety Act*, CONGRESS.GOV ....................................................................30

*S.4213 – Kids Off Social Media Act*, CONGRESS.GOV ...............................................................30

*Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology,"* CBS NEWS ................... 4, 5

*Social Media and Youth Mental Health*, U.S. DEP'T OF HEALTH AND HUMAN SERV. .................................4

*Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, U.S. DEP'T OF HEALTH AND HUMAN SERV., 9 (2023) ........................................................................................6

*Social Media Platforms Generate Billions in Annual Ad Revenue from U.S. Youth*, HARVARD SCH. OF PUB. HEALTH (Dec. 27, 2023) ........................................................................................4

*Suicide and Self-Injury*, META ........................................................................................3

*Transparency Report: July 1, 2023 – December 31, 2023*, SNAP ................................................3

Vania Martinez, et al., *Social Contagion, Violence, and Suicide Among Adolescents*, CURR OPIN PSYCHIATRY (May 2023) ...........................................................................................5, 6

*What is "Brain Hacking"? Tech Insiders on Why You Should Care*, CBS NEWS ......................................4

*What the Online Safety Act Does*, GOV.UK ......................................................................26

INTRODUCTION

Plaintiffs are two users of social media (one adult, one minor), one company that wants to place advertisements on social media, and an organization whose members access social media. They challenge Texas's new social media regulations (HB 18) mainly on First Amendment grounds. Their claims overlap with those brought in *Computer & Communications Industry Association v. Paxton*, 1:24-cv-00849-RP (W.D. Tex.) (hereinafter "*NetChoice II*"). Given the similarities, we focus our introduction on how this Court's recent decision on the *NetChoice II* plaintiffs' motion for a preliminary injunction (ECF 25) impacts this case.

The *NetChoice II* decision forecloses most of Plaintiffs' claims—specifically, their challenges to Tex. Bus. & Com. Code §§ 509.051, 509.052(2)(D), 509.055, and 509.101–.103. The *NetChoice II* plaintiffs also targeted these sections. This Court rejected their claims, finding that many of these provisions "regulate conduct and only incidentally burden speech" or otherwise do not "implicate[] First Amendment concerns."[1] This Court further noted that the *NetChoice II* plaintiffs had to, but did not, establish that a substantial number of these provisions' applications are unconstitutional.[2] Plaintiffs here also did not make this showing.

There are three main issues unique to this case. First, the *NetChoice II* plaintiffs were effectively digital service providers; entities directly regulated by, and subject to enforcement under, HB 18. But Plaintiffs here are *users* of digital services. HB 18 does not control their conduct, nor can this Act be enforced against them. This creates justiciability problems for Plaintiffs that were not present in *NetChoice II*. For instance, the more stringent standing test applied to indirect injuries governs here as Plaintiffs' injuries turn on how social media companies will respond to HB 18. Plaintiffs lack standing under this test as they did not show that the challenged provisions have a "determinative or coercive

---

[1] *See NetChoice II*, ECF 25, 24.
[2] *Id.* at 23–24.

effect" on providers that leads to their injuries. Also, Plaintiffs' claims largely turn on HB 18 increasing the risk that providers could restrict their speech and that of countless other users. This is not a cognizable injury in the Fifth Circuit: "This circuit does not 'recognize the concept of probabilistic standing based on a non-particularized increased risk—that is, an increased risk that equally affects the general public.'"[3] These are a few standing problems specific to this case; more will be discussed later.

Indeed, the United States District Court for the District of Utah recently found that plaintiffs who consisted of "minors, adults, and a youth-led organization who use social media platforms" lacked standing to challenge Utah's Minor Protection in Social Media Act.[4] The court found that these plaintiffs had to satisfy the stricter standing test applied to indirect injuries as "[t]he Act regulates social media companies—not social media users," and as their injuries would only "arise as the second-order effects of social media companies' responses to the Act."[5] The plaintiffs did not meet this test, as they did not show "that social media companies—which are free to restrict user access, remove content, and otherwise moderate their platforms as they see fit—will maintain minors' access to their platforms absent an injunction."[6] Put differently, the users' claims were nonjusticiable as they did "not plead facts demonstrating social media companies will likely react in predictable ways if the court enjoins the Act."[7] The same result is warranted here. Also notable, the users in the Utah-based case were backed by many of the same attorneys representing Plaintiffs here.[8]

---

[3] *E.T. v. Paxton*, 41 F.4th 709, 715 (5th Cir. 2022) (quoting *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envtl. Quality*, 968 F.3d 419, 424 (5th Cir. 2020)).

[4] *NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626, at *1, 18–20 (D. Utah Sept. 10, 2024). This decision also addresses the case *Zoulek v. Hass*, 2:24-cv-00031-RJS-CMR (D. Utah).

[5] *Id.* at *18–19.

[6] *Id.* at *19.

[7] *Id.* at *20 (quotations omitted).

[8] This can be confirmed by reviewing the PACER docket report for *Zoulek v. Hass*, 2:24-cv-00031-RJS-CMR (D. Utah).

Second, Plaintiffs target HB 18's age verification requirement (§ 509.057). Yet this only applies to providers that knowingly publish or distribute material more than one-third of which is harmful or obscene. Plaintiffs did not identify any sites they want to access that would cross this one-third threshold. So, they did not establish an imminent injury traceable to this section, as needed for Article III standing in this context.

Also, Plaintiffs' claims against § 509.057 turn on their erroneous assumption that the major social media companies will have to age verify. Yet the evidence indicates that less than 1% of the material on these sites can be considered harmful or obscene as defined by HB 18.[9] This makes sense. When a site is open to an infinite array of speech, it is unlikely that *33%* of the material on that site will fall under the eleven discrete topics of harmful content identified by HB 18.[10] Notably, the major social media companies do not believe that their sites cross this one-third threshold. This is why the *NetChoice II* plaintiffs challenged practically every HB 18 provision *except* § 509.057.[11]

Third, Plaintiffs argue that §§ 509.057(a)'s and 509.101's use of the term "commercially reasonable method" in connection with age/identity verification is vague. Yet Plaintiffs did not explain how they, as social media *users*, have standing to challenge these provisions on vagueness grounds. Also, the phrase "commercially reasonable" appears in numerous laws, including the Uniform Commercial Code. If this term is unconstitutionally vague, then many other statutes would also appear to be unconstitutional.

---

[9] *See, e.g., Adult Nudity and Sexual Activity*, META (around .07% of viewed content contains adult nudity and sexual activity material), https://tinyurl.com/2pbu5ktx; *Bullying and Harassment*, META (around .09% of viewed content contains bullying and harassment material), https://tinyurl.com/4t6pn32s; *Suicide and Self-Injury*, META (around .05% of viewed content contains suicide and self-injury material), https://tinyurl.com/28c9ed4t; *Rules Enforcement*, X (around .01% of impressions are on posts that violate X's policies), https://tinyurl.com/4wd4ya38; *Transparency Report: July 1, 2023 – December 31, 2023*, SNAP (around .01% of views concern posts found to violate Snap's policies), https://tinyurl.com/yc89bsca.
[10] *See* Tex. Bus. & Com. Code § 509.053(a).
[11] *See, e.g., NetChoice II*, ECF 1, pgs. 21, 26.

One final point. Defendant asserts certain arguments here, such as merit-based arguments for §§ 509.053, 509.056(1), that mirror positions this Court rejected in *NetChoice II*. Defendant respectfully disagrees with portions of this Court's decision and wants to preserve these arguments for appeal.[12]

**BACKGROUND**

## I.    Social Media Can Hurt Children.

Facebook's founding president, Sean Parker, has spoken candidly about the designs and goals of social media platforms. "The thought process that went into building these applications . . . was all about: 'How do we consume as much of your time and conscious attention as possible?'"[13] Like a slot machine, these platforms give users dopamine hits every so often—a liked comment, a post they are interested in, etc.—to keep them hooked just a little longer.[14] More user time means more targeted advertisements, which means more money for the social media platforms.[15]

Social media companies are good at keeping users engaged. Too good. 95% of teenagers (ages 13 to 17) report using social media, with more than a third of them using it "almost constantly."[16] 22% of tenth grade girls spend *seven or more hours a day* on social media.[17] "[This] means many teenage girls are doing little else than sleeping, going to school and engaging with social media."[18] This problem is

---

[12] To be clear, Defendant intends to preserve *all* issues/arguments that he lost on in *NetChoice II*.

[13] *Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology,"* CBS NEWS, https://tinyurl.com/4zb7s9d2.

[14] *Id.*; *What is "Brain Hacking"? Tech Insiders on Why You Should Care*, CBS NEWS, https://tinyurl.com/y4m278k3.

[15] *See Social Media Platforms Generate Billions in Annual Ad Revenue from U.S. Youth*, HARVARD SCH. OF PUB. HEALTH (Dec. 27, 2023), https://tinyurl.com/3cysj46e; Barbara Ortutay, *Facebook Parent Meta Posts Sharply Higher Profit in 3Q Thanks to Increase in Ad Revenue*, AP (Oct. 25, 2023), https://tinyurl.com/emj4sbjc.

[16] Kathy Katella, *How Social Media Affects Your Teen's Mental Health: A Parent's Guide*, YALE MED. (June 17, 2024), https://tinyurl.com/53jsztv7.

[17] *Social Media and Youth Mental Health*, U.S. DEP'T OF HEALTH AND HUMAN SERV., https://tinyurl.com/m64xzwjx.

[18] Michaeleen Doucleff, *The Truth About Teens, Social Media and the Mental Health Crisis*, NPR (Apr. 25, 2023), https://tinyurl.com/3r4why5x.

not confined to teenagers. 40% of children (ages 8 to 12) are also on social media.[19]

"God only know what [social media] is doing to our children's brains."[20] This is a quote from Sean Parker in 2017. Since then, the research has developed. It is now clear that social media can cause significant harm to users. This is especially true for minors. An adult's brain "is equipped with a strong braking system (called executive functioning)," which helps curb destructive behaviors.[21] Yet a teenager's "prefrontal cortex (where executive functioning takes place) isn't fully developed," and thus they have a harder time "stop[ping] themselves from getting into trouble."[22] For this and other reasons, there are "distinct developmental windows of sensitivity to social media in adolescence," which generally last between the ages of 11 and 19.[23]

Social media posts depicting harmful behavior have a "contagious effect," where the undesired behavior spreads to other members.[24] Indeed, "[r]esearch suggests that direct exposure to suicidal behaviors and acts of self-harm through social media may increase suicidality through imitation and modeling, particularly in more vulnerable populations."[25] A Facebook internal report, which we only know about because it was leaked, found "that among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the issue to Instagram."[26] More suicidal thoughts leads

---

[19] *Policy Statement on the Impact of Social Media on Youth Mental Health*, AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY, https://tinyurl.com/3ptxpyzy.

[20] *Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology," supra* note 13.

[21] Alisa Bowman, *Social Media's Effects on the Teen Brain*, MAYO CLINIC (Sept. 5, 2023), https://tinyurl.com/bdcsnmfc.

[22] *Id.*

[23] Amy Orben, et al., *Windows of Developmental Sensitivity to Social Media*, NATURE COMMC'N (Mar. 28, 2022), https://tinyurl.com/536jkx52.

[24] Vania Martinez, et al., *Social Contagion, Violence, and Suicide Among Adolescents*, CURR OPIN PSYCHIATRY (May 2023), https://tinyurl.com/ye252na8; *Technology Use and the Mental Health of Children and Young People*, ROYAL COLL. OF PSYCHIATRISTS, 31 (Jan. 2020), *available at* https://tinyurl.com/yv9cvu6w.

[25] Amro Khasawneh, et al., *Examining the Self-Harm and Suicide Contagion Effect of the Blue Whale Challenge on YouTube and Twitter: Qualitative Study*, JMIR PUBL'N (June 2020), https://tinyurl.com/yc23y54d.

[26] Jessica Bursztynsky & Lauren Feiner, *Facebook Documents Show how Toxic Instagram is for Teens, Wall Street Journal Reports*, CNBC (Sept. 14, 2021), https://tinyurl.com/bdnmnsrs.

to more suicides. And "deaths have been linked to suicide- and self-harm-related content, such as 'cutting,' partial asphyxiation, and risk-taking challenges on social media platforms."[27]

This "contagious effect" also appears in cyberbullying,[28] which Meta recognizes as being "especially harmful for minors."[29] Between 10% and 40% of adolescents experience cyberbullying.[30] And "a positive association exists between cyberbullying, deliberate self-harm, and suicidal behavior among victims of such bullying."[31]

Social media use can also cause eating disorders. Facebook's leaked internal research states "we make body image issues worse for 1 in 3 teen girls."[32] In one internal investigation (also leaked), an Instagram employee opened a false account as a 13-year-old girl looking for diet tips, only to be "led to graphic content and recommendations to follow accounts tilted 'skinny binge' and 'apple core anorexic.'"[33] A former Facebook product manager blamed the company's "engagement-based ranking systems," which she said "caus[ed] teenagers to be exposed to more anorexia content."[34]

The U.S. Surgeon General also reports that "social media platforms can be sites for predatory behaviors and interactions with malicious actors who target children and adolescents."[35] These behaviors include: (1) sexual exploitation; (2) financial extortion; and (3) attempts to sell illegal drugs.[36]

---

[27] Katella, *supra* note 16.
[28] Martinez, *supra* note 24.
[29] *Bullying and Harassment, supra* note 9.
[30] Aksha M. Memon, *The Role of Online Social Networking on Deliberate Self-Harm and Suicidality in Adolescents: A Systemized Review of Literature*, INDIAN J. PSYCHIATRY (Dec. 2018), https://tinyurl.com/4ab3uj8v.
[31] *Id.*
[32] Ryan Mac & Sheera Frenkel, *Facebook Downplays Internal Research Released on Eve of Hearing*, NEW YORK TIMES, https://tinyurl.com/r66dyr93.
[33] Kolbe Nelson, *Facebook Knew Instagram was Pushing Girls to Dangerous Content: Internal Document*, CBS NEWS (Dec. 11, 2022).
[34] Karen Hao, *The Facebook Whistleblower Says its Algorithms are Dangerous. Here's Why.*, MIT TECHNOLOGY REVIEW, https://tinyurl.com/65vxa64s.
[35] *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, U.S. DEP'T OF HEALTH AND HUMAN SERV., 9 (2023), *available at* https://tinyurl.com/m64xzwjx.
[36] *Id.*

Nearly 60% of "adolescent girls say they've been contacted by a stranger on certain social media platforms in ways that make them feel uncomfortable."[37]

As the above shows, social media is hurting our children at an alarming and growing rate. States are allowed to implement reasonable regulations of this omnipresent industry—as Texas did with HB 18.

## II.    An Overview of HB 18.

HB 18 is a multifaceted bill designed to protect minors from harms associated with social media and to increase parents' ability to supervise their children's activities in this area. Below is an overview of HB 18's main provisions.

**The "Coverage" and "Applicability" Sections (§§ 509.001–.002):** These mainly describe which "digital service providers" HB 18 covers. Plaintiffs target the exemption for a provider that: "(A) primarily functions to provide a user with access to news, sports, commerce, or content primarily generated or selected by the digital service provider; and (B) allows chat, comment, or other interactive functionality that is incidental to the digital service."[38]

**The "Privacy" Sections (§§ 509.051–.052):** HB 18 requires providers to "register[]" a person's age before allowing him or her to create an account.[39] This differs from age verification, a more involved procedure that applies to a subset of providers.[40] If a user registers as under 18, the user becomes a "known minor."[41] This triggers certain privacy protections, like a limit on the collection and use of the minor's personally identifiable information.[42] Most relevant here, § 509.052(2)(D) bars providers from "us[ing] the digital service to display targeted advertising to [a]

---

[37] *Id.*

[38] Tex. Bus. & Com. Code § 509.002(b)(10).

[39] *Id.* at § 509.051(a).

[40] *See id.* at § 509.057(a).

[41] *Id.* at § 509.051(d)(1).

[42] *Id.* at § 509.052.

known minor."

**The "Illegal Advertising" Section (§ 509.055):** This requires providers to make a "commercially reasonable effort" to prevent advertisers on that service "from targeting a known minor" with certain unlawful advertisements.[43]

**The "Parental Powers" Sections (§§ 509.054, 509.101–.103):** HB 18 expands parents' ability to supervise their kids' use of social media. To obtain this authority, a parent must first prove that he or she is, in fact, the parent of the minor in question.[44] The provider must adopt a "commercially reasonable method" for verifying a parent's identity and relationship to the minor.[45] Once verified, parents can limit the amount of time their children spend on the service and alter their kids' privacy and account settings.[46]

**The "Harm to Minors" Sections (§§ 509.053, 509.056):** These require providers to prevent a minor's exposure to specified harmful content, like that promoting, glorifying, or facilitating suicide or child pornography.[47] Providers must make certain efforts, such as employing filtering technology, to prevent minors' exposure to harmful material.[48]

**The "Age Verification" Provision (§ 509.057):** Section 509.057(a) states that a provider "that knowingly publishes or distributes material, more than one-third of which is harmful material or obscene . . . must use a commercially reasonable age verification method to verify that any person seeking to access content on or through the provider's digital service is 18 years of age or older." Subsection (b) states that, if a person is under 18, a "provider for which age verification is required under this section . . . may not enter into an agreement with the person for access to the digital service."

---

[43] *Id.* at § 509.055.
[44] *Id.* at § 509.101.
[45] *Id.* at § 509.101(a).
[46] *Id.* at § 509.054(b)(1), (4).
[47] *Id.* at § 509.053(a).
[48] *Id.* at § 509.053(b).

**The Enforcement Clause (§ 509.151):** This states that "[a] violation of this chapter is a deceptive act or practice actionable under Subchapter E, Chapter 17, solely as an enforcement action by the consumer protection division of the attorney general's office." The clear thrust of this provision is that it can *only* be enforced against providers, not users.[49]

**The Severability Clause (§ 5.01):** This provides "[i]f any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act that can be given effect without the invalid provision or application."[50]

## III.    An Overview of Plaintiffs' Lawsuit.

Plaintiffs consist of: (1) the Students Engaged in Advancing Texas ("SEAT"), an organization that allegedly represents certain Texas students, some of whom use social media; (2) M.F., a minor resident of Texas who uses social media; (3) Ampersand Group LLC, a Texas-based company that advertises on social media; and (4) Brandon Closson, an adult resident of Texas whose social media followers include minors.[51] None of the Plaintiffs are digital service providers.

For their First Amendment claims, Plaintiffs challenge only the following HB 18 provisions: (1) §§ 509.001–.002 (the coverage/applicability sections); (2) § 509.051 (the age registration section); (3) §§ 509.052(2)(D), 509.055 (the restrictions on advertisements to minors); (4) §§ 509.053, 509.056(1) (the harm to minors sections); (5) § 509.057 (the age verification requirement); and (6) §§ 509.101– .103 (certain parts of the parental powers sections).[52] Plaintiffs also assert three overarching vagueness

---

[49] *See id.* at § 509.151; *see also id.* at § 509.152(b) ("If a digital service provider violates this chapter, the parent or guardian of a known minor affected by that violation may bring a cause of action . . . .").
[50] ECF 1-1, 19.
[51] ECF 1, ¶¶ 7–10.
[52] *Id.* at ¶ 91. Plaintiffs notably did not challenge: (1) §§ 509.052(1) and 509.052(2)(A)–(C), which limit the collection and use of a minor's personally identifiable information, a minor's ability to make financial transactions through a social media site, and the collection of a minor's geolocation data; and (2) § 509.054, which, among other things, requires providers to create certain tools for verified parents, allows parents to control a minor's privacy/account settings, and allows parents to monitor and limit the time a minor spends on a social media.

claims, which concern: (1) § 509.053(a)'s use of the terms "promotes, glorifies, or facilitates"; (2) §§ 509.052(2)(D)'s and 509.055's use of the term "advertising"; and (3) §§ 509.057(a)'s and 509.101's use of the term "commercially reasonable method" in connection with age/identity verification.[53] Plaintiffs included a commerce clause challenge in their complaint.[54] But they did not press this claim in their preliminary injunction motion, likely because their attorneys lost on this point on Article III standing grounds in the case against Utah's social media regulations.[55] So, we do not address it here.

As to standing, Plaintiffs generally contend that HB 18 increases the risk that providers will ban either their content or that of other users that they want to view.[56] Plaintiffs seemingly did not answer obvious standing questions, such as: (1) what they want to post; (2) when will they post it; (3) on what social media platform; and (4) why they believe HB 18 will result in their speech getting restricted. They also did not grapple with the fact that any hateful or obscene speech they want to post or view is likely already restricted under the provider's terms of service.[57] Further, Plaintiffs admit that "most DSPs do not allow" advertisements targeting minors due to their internal policies.[58] So, it is unclear why Plaintiffs believe that HB 18 "encumber[s]" their ability to view or disseminate "advertising to registered minors."[59]

## ARGUMENT

### I.    Plaintiffs Lack Standing.

Plaintiffs must establish standing for each claim they press.[60] They did not make this showing,

---

[53] *See* ECF 17, 26–27. Plaintiffs also challenged parts of § 509.002 as vague in their complaint. But they dropped these arguments in their preliminary injunction motion. Thus, we do not address them here.
[54] ECF 1, ¶¶ 136–42.
[55] *See Zoulek v. Hass*, 2:24-cv-00031-RJS-CMR, ECF 67, 8–14 (D. Utah).
[56] *See* ECF 1, ¶¶ 85–90.
[57] *Compare* Tex. Bus. & Com. Code § 509.053(a), *with NetChoice II*, ECF 6-3, ¶¶ 12(a), 12(e), 13(g).
[58] *See* ECF 1, ¶¶ 85–90.
[59] *Id.* at ¶ 89.
[60] *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

as detailed below.

**Coverage/Definitions (§§ 509.001–.002):** Plaintiffs did not explain how HB 18's provisions establishing what "digital service providers" are and are not covered by the Act can possibly injure *users* of such services in any meaningful way.

**Age Registration (§ 509.051):** Plaintiffs did not explain how self-inputting one's name when creating an account with a provider creates an Article III injury to users. Nor did they establish that they have concrete plans to create an account with a provider in the imminent future, as needed to have standing in this pre-enforcement context.[61]

**Targeted Advertising/Illegal Advertising (§§ 509.052(2)(D), 509.055):** First, Plaintiffs did not establish that they have concrete plans to view or post advertisements restricted by HB 18 in the near future. For instance, what specific ads are at issue? On which digital service? When will these ads be viewed/posted? Plaintiffs never really explain. Their vague advertisement-based assertions do not show a sufficiently imminent injury, as needed to create Article III standing.[62]

Second, Plaintiffs did not identify any advertising targeting minors that a provider would allow but for HB 18. And they admit that most providers "do not allow" paid ads that target minors.[63] Thus, Plaintiffs did not show that their injuries are fairly traceable to HB 18, as opposed to the provider's terms of service. And if a provider's terms of service independently restricts the ads in question, then enjoining HB 18's advertising sections will not redress Plaintiffs' injuries.

Third, Plaintiffs' injuries turn on how providers will respond to HB 18. This is mainly because HB 18 is only enforceable against, and only regulates the conduct of, digital service providers—as

---

[61] *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013); *Machete Productions, L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015); *Elend v. Basham*, 471 F.3d 1199, 1206–07 (11th Cir. 2006).
[62] *See id.*
[63] ECF 1, ¶ 89.

opposed to the users of such services.[64] This triggers the stricter standing test for indirect injuries.

Where a third party's choice "is essential to a plaintiff's standing, the plaintiff must introduce facts showing that the third party's choices 'have been or will be made in such manner as to produce causation and permit redressability of injury.'"[65] Specifically, the plaintiff must show the defendant's conduct had a "determinative or coercive effect" upon the third party.[66] Plaintiffs did not show that §§ 509.052(2)(D), 509.055—as opposed to providers' own terms of service—have a determinative or coercive effect that leads to providers banning ads they want to post or view.

This point highlights why even if the *Netchoice II* plaintiffs had standing (and Defendant does not concede that they do), that does not mean Plaintiffs have standing. The *NetChoice II* plaintiffs relied largely on injuries to their own content-moderation practices, which itself can be First Amendment-protected activity following *Moody*.[67] The argument goes then that any change HB 18 makes to these practices impacts social media companies' speech and thus creates an Article III injury. But here, Plaintiffs must show that HB 18 determinatively or coercively leads to providers restricting the *exact* speech they want to view or access. Absent this, they have no First Amendment injury. Moreover, they need to establish that this speech would not be otherwise be barred under the providers' terms of service. Plaintiffs did not make these showings for *all* of their claims, so they lack standing.

Fourth, the ripeness doctrine bars Plaintiffs' claims, as they merely speculate about how social

---

[64] *Supra*, 9.

[65] *Three Expo Events, L.L.C. v. City of Dallas, Tex.*, 907 F.3d 333, 341 (5th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

[66] *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997); *see also Daves v. Dallas Cnty., Tex.*, 22 F.4th 522, 543 (5th Cir. 2022); *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019); *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021).

[67] Defendant does not intend to admit that *all* the social media companies represented by the two associations in *NetChoice II* are engaging in First Amendment protected activity, or that every aspect of their services are protected. *Moody* showed that this is not a foregone conclusion.

media companies will interpret and implement HB 18's advertising restrictions.[68]

Fifth, Plaintiffs allege a right to view advertisements and other content posted by third parties. In *Murthy v. Missouri*, the Supreme Court characterized a similar "right to listen" argument as "startingly broad" and noted that "[t]he Court has never accepted such a boundless theory of standing."[69] The Court explained that a "right to listen" injury is cognizable "only where the listener has a concrete, specific connection to the speaker."[70] Also, the plaintiff must identify "specific speakers" and "specific instance[s] of content moderation that caused them identifiable harm" to have standing in this context.[71] Plaintiffs here did not identify: (1) a specific speaker; (2) a concrete connection to that speaker; and (3) specific instances of content moderation due to HB 18 that caused them identifiable harm. Thus, they lack standing to assert a "right to listen" injury. Also notable, the identified "willing speaker" must him or herself be able to independently satisfy Article III's requirements.[72] Plaintiffs did not make this showing either.

Finally, Plaintiffs' standing claim largely turns on their misreading of HB 18's advertising provisions. They contend that this statute reaches non-commercial "public service messages."[73] But as we will explain later, the better interpretation is that these provisions restrict *commercial* advertising.[74] Plaintiffs' misinterpretation creates a justiciability problem. To have standing, they must show that their "constitutionally protected speech is arguably proscribed by, or at least arguably regulated, by [the challenged statute]."[75] Yet their identified non-commercial informational messages are not

---

[68] *See Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002).
[69] 144 S. Ct. 1972, 1996 (2024) (quotations omitted).
[70] *Id.*
[71] *Id.*
[72] *Bond v. Utreras*, 585 F.3d 1061, 1078 (7th Cir. 2009); *Pennsylvania Family Inst., Inc. v. Black*, 489 F.3d 156, 165–66 (3d Cir. 2007); *Animal Legal Def. Fund v. Kelly*, 434 F. Supp. 3d 974, 995 (D. Kan. 2020); *Martin v. U.S. E.P.A.*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002).
[73] ECF 1, ¶¶ 62, 68.
[74] *Infra*, 20–24.
[75] *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 (5th Cir. 2020).

"arguably proscribed by" or "arguably regulated by" HB 18's advertising restrictions.

**Harm to Minors (§§ 509.053, 509.056(1)):** First, Plaintiffs' "intent to engage" allegations are too vague to create an imminent injury. They generally did not identify the specific content they want to post/access, what digital service is at issue, or when they will post/access the material in question.[76] For instance, M.F. contends that § 509.053(a) prevents him "from using social media to research topics for his debate team (such as whether to legalize marijuana or prostitution)."[77] Does M.F. even have an upcoming debate that concerns these topics? If so, when is it? Plaintiffs assume they can jump into court based on hypothetical concerns that HB 18 *might* restrict their speech at some indefinite point in the future. But this is not how Article III standing works.[78]

Second, Plaintiffs overlook that § 509.053(a)'s restrictions mirror social media companies' own content-moderation policies.[79] Given the similarities, chances are that whatever Plaintiffs want to say or access is already restricted by the provider's terms of service. For traceability/redressability reasons, Plaintiffs need to identify content that HB 18 restricts that is not already barred by the provider's own policies. They did not make this showing.

This gets to the true nature of Plaintiffs' claim to standing. They are really arguing that §§ 509.053, 509.056(1) *increase the risk* that providers could restrict their speech and that of countless other users. This is not a cognizable injury in the Fifth Circuit.[80]

Third, Plaintiffs treat § 509.053(a) as if it requires providers to censor *any* speech on the eleven topics covered by this section.[81] But § 509.053(a) only restricts *harmful* material.[82] Plaintiffs are

---

[76] *See* ECF 1, ¶¶ 52–60, 88, 119.

[77] *Id.* at ¶ 57.

[78] *See Amnesty Intern. USA*, 568 U.S. at 409; *Machete Productions, L.L.C.*, 809 F.3d at 288; *Elend*, 471 F.3d at 1206–07.

[79] *Compare* Tex. Bus. & Com. Code § 509.053(a), *with NetChoice II*, ECF 6-3, ¶¶ 12(a), 12(e), 13(g).

[80] *See E.T.*, 41 F.4th at 715; *Shrimpers & Fishermen of RGV*, 968 F.3d at 424.

[81] *See* ECF 1, ¶¶ 52–60, 88, 119.

[82] *Infra*, 25–26.

seemingly concerned that providers will overreact and restrict more content than what § 509.053(a) requires, leading to a speech/access injury. But they lack standing to asset such a claim, mainly as: (1) HB 18 would not be producing a "determinative or coercive effect" on providers;[83] (2) Plaintiffs merely speculate about how providers will respond to HB 18 (particularly in light of this Court's recent *NetChoice II* order);[84] and (3) HB 18 does not "arguably proscribe" the speech Plaintiffs want to make or access, especially as they did not allege any desire to view or post material that is even remotely harmful to minors.[85]

Fourth, Plaintiffs allege a right to view content posted by third parties. Yet they did not make the required showing to assert a cognizable "right to listen" injury, as explained above.[86]

Finally, Plaintiffs did not adequately explain how § 509.053(b), which requires *digital service providers* to adopt certain content-moderation practices, injures *users* of those services. They express "fear" that use of "filtering technology" will cause providers to restrict their speech.[87] But this is purely speculative. And Plaintiffs ignore the fact that the major social media companies already use "filtering technology" to moderate content.[88] Further, they did not identify what content they want to post or access that will supposedly be blocked by this "filtering technology."

**Age Verification (§ 509.057):** This section only applies to a provider "that knowingly publishes or distributes material, more than one-third of which is harmful material or obscene." As discussed above, Plaintiffs lack standing to challenge § 509.057 as they did not identify any services they want to access in the imminent future that would feasibly be covered by this section.[89] There is

---

[83] *See Bennett*, 520 U.S. at 168–69; *Daves*, 22 F.4th at 543; *Inclusive Communities Project, Inc.*, 946 F.3d at 655; *Turaani*, 988 F.3d at 316.
[84] *See Shields*, 289 F.3d at 835.
[85] *See Speech First, Inc.*, 979 F.3d at 332.
[86] *Supra*, 12–13.
[87] ECF 1, ¶ 59.
[88] *See infra*, 31.
[89] *Supra*, 3.

also a ripeness problem here. Plaintiffs may *never* access a site that requires age verification due to § 509.057. And "[a] claim is not ripe for review if it rests upon contingent future events that . . . may not occur at all."[90]

    **Parental Powers (§§ 509.101–.103):** Plaintiffs did not assert any injuries stemming from these sections. They stated that M.F. is a minor who "would prefer not to invite his parents into most of his private communications."[91] But M.F. did not allege that his parents have any intention of using the *optional* authority given to them by §§ 509.101–.103.[92] Further, Plaintiffs try to base their standing claim on burdens §§ 509.101–.103 impose on social media companies.[93] Yet they did not establish a "close relationship" with social media companies and a "hindrance" to these companies' ability to protect their own interests, as needed for third-party standing.[94]

    **Vagueness Challenges:** Plaintiffs lack standing to assert vagueness claims. First, to have standing for such a claim, the plaintiff must at least show an Article III injury fairly traceable to the challenged provision.[95] Plaintiffs did not make this showing, largely for the reasons given during our standing analyses for each provision underlying their vagueness claims—namely, §§ 509.052(2)(D), 509.053, 509.055, 509.057, and 509.101.

    Second, Plaintiffs appear to rely on the "relaxed" way courts treat third-party standing in the context of First Amendment facial vagueness claims. But a facial vagueness claim is limited to situations where "a party to whom the law can constitutionally *be applied* . . . bring[s] claims for others

---

[90] *United States v. Magana*, 837 F.3d 457, 459 (5th Cir. 2016) (quotations omitted).
[91] ECF 1, ¶ 68.
[92] *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) ("For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur.").
[93] *See* ECF 1, ¶¶ 64, 68.
[94] *See Vote.Org v. Callanen*, 39 F.4th 297, 303–04 (5th Cir. 2022).
[95] *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *see also Doe I v. Landry*, 909 F.3d 99, 114–15 (5th Cir. 2018).

to whom it allegedly cannot."[96] Thus, in *Doe I v. Landry*, the Fifth Circuit found that a person who was over the age of 21 lacked standing to assert a vagueness challenge to a statute that required erotic dancers to be at least 21 years old.[97] And in *Collura v. Maguire*, the Third Circuit found that a plaintiff to a lawsuit lacked standing to challenge "the Rules of Professional Conduct as vague or overbroad . . . because he is not a lawyer and the rules do not apply to him."[98] Here, HB 18 only regulates the conduct of, and can only be enforced against, digital service providers. Plaintiffs are not digital service providers, so they cannot challenge HB 18 on vagueness grounds.

Finally, even if the relaxed Article III standard applies, Plaintiffs still did not meet it. "[I]f the statute's deterrent effect on legitimate expression is not both real and substantial, and if the statute is readily subject to a narrowing construction by the state courts, the litigant is not permitted to assert the rights of third parties."[99] Plaintiffs allege that officials from certain social media companies have said that HB 18 "*could* result" or "*may* result" in the removal of content that would not otherwise violate their terms of service.[100] This is far from a "real and substantial" deterrent effect.[101] And HB 18 is subject to a narrowing construction, as we will explain later.[102]

**As-Applied Claims:** The general rule is that "a party cannot challenge a statute as-applied unless the statute has been applied to him."[103] Plaintiffs did not explain how they can have standing to challenge HB 18 as applied, given that this statute cannot be enforced against them.

---

[96] *Doe I*, 909 F.3d at 114 (emphasis added).

[97] *Id.* at 114–15.

[98] 569 Fed. Appx. 114, 117 (3d Cir. 2014).

[99] *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (plurality opinion) (citation and quotations omitted).

[100] ECF 1, ¶ 81 (emphasis added).

[101] *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 486 (7th Cir. 2012) ("Courts do not decide facial challenges on the basis of . . . speculative hypotheticals.").

[102] *Infra*, 28–32.

[103] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006); *see also Justice v. Hosemann*, 771 F.3d 285, 292–95 (5th Cir. 2014); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992).

**Organizational/Associational Standing:** SEAT lacks standing to sue as an organization. First, it did not show that HB 18 "perceptibly impairs" its mission, as needed for organizational standing.[104] Second, SEAT cannot rely on "ideological" or "pure issue-advocacy" injuries as these do not confer organizational standing.[105] As to associational standing, this is lacking as SEAT did not show that one of its members would have standing to sue in his or her own right.[106]

II.    *NetChoice I* **Bars Plaintiffs' Attempt to Classify All of HB 18 as a Content- or Speaker-Based Regulation.**

Plaintiffs contend that: (1) HB 18 exempts news, sports, and commerce sites from its definition of digital service providers; (2) this creates a content- or speaker-based distinction that triggers strict scrutiny for all of HB 18; and (3) the entire Act fails this heightened review.[107] Plaintiffs ignore that the Fifth Circuit and Supreme Court rejected this *exact* argument in *NetChoice I.*

To recap, the statutes at issue in *NetChoice I* (HB 20) contain two main provisions. Chapter 120 imposes certain disclosure and operational requirements on social media platforms.[108] Chapter 143 bars social media platforms from censoring users based on their viewpoints.[109] Both chapters rely on the same definition of "social media platform."[110] This definition carries an exception for sites "that consist primarily of news, sports, [or] entertainment."[111]

At the Fifth Circuit, the plaintiffs argued that HB 20's "news, sports, and entertainment" exception created a content- and speaker-based distinction that triggered strict scrutiny for the entire

---

[104] *See, e.g.*, *El Paso Cnty., Tex. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020).

[105] *See Military-Veterans Advocacy v. Sec'y of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005).

[106] *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

[107] *See* ECF 17, 18–19.

[108] Tex. Bus. & Com. Code §§ 120.051–.052.

[109] Tex. Civ. Prac. & Rem. Code § 143A.002.

[110] *See* Tex. Bus. & Com. Code §§ 120.001, 120.051–.052; Tex. Civ. Prac. & Rem. Code §§ 143A.001(4), 143A.002.

[111] Tex. Bus. & Com. Code § 120.001(1)(C).

act.[112] The Fifth Circuit rejected this point, explaining that the exception "does not render HB 20 content-based because the excluded websites are fundamentally dissimilar mediums."[113] The Court continued: "'[T]he fact that a law singles out a certain medium is insufficient by itself to raise First Amendment concerns.'"[114]

The plaintiffs raised the point again before the Supreme Court.[115] The Supreme Court also rebuffed it. Remember, the plaintiffs' core point was that HB 20's content-moderation and disclosure provisions should *both* receive strict scrutiny as the act turned on a content- or speaker-based distinction. Yet the Supreme Court found that HB 20's disclosure requirement was subject to the "very differential"[116] *Zauderer*-level scrutiny.[117] And the Court found that HB 20's content-moderation provisions are subject to strict *or intermediate* scrutiny; it did not decide which.[118]

In short, *Moody* adopted a provision-by-provision analysis, as opposed to the plaintiffs' desired one-size-fits-all approach.[119] *Moody* also effectively confirmed, or at least did not disturb, the Fifth Circuit's analysis of HB 20's news, sports, and entertainment exception. Again, if *Moody* had accepted Plaintiffs' argument on the impact of HB 20's exemption, the Court would have found strict scrutiny applicable to *all* of HB 20, including the disclosure requirements. It did not.

HB 18 does nothing more than regulate certain distinct mediums; Plaintiffs themselves even

---

[112] Brief of Appellees, 15–16, 41–42, *available at* 2022 WL 1046833.

[113] *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 480 (5th Cir. 2022) (hereinafter "*NetChoice I*"), *cert. granted in part sub nom. NetChoice, LLC v. Paxton*, 144 S. Ct. 477 (2023) *and vacated and remanded sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024).

[114] *Id.* at 480–81 (ellipsis omitted) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 660 (1994)).

[115] Brief for Petitioners, 9–10, 14–15, 37–38, *available at* 2023 WL 8437869; Reply Brief for Petitioners, 15–16, *available at* 2024 WL 693692.

[116] *R J Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 870 (5th Cir. 2024).

[117] *Moody*, 144 S. Ct. at 2398.

[118] *Id.* at 2407.

[119] *See id.* ("[N]othing said here puts regulation of NetChoice's members off-limits as to a whole array of subjects.").

classify "a DSP [as] a *medium* for communication."[120] The Fifth Circuit's *NetChoice I* decision controls the analysis and confirms that this does not trigger strict scrutiny for the entire Act.[121] Thus, a provision-by-provision analysis is warranted. Such an analysis will confirm that HB 18's challenged provisions do not violate the First Amendment.

## III.    Reviewing the Challenged Provisions Confirms that They are Constitutional.

### A.    The Age Registration Provision.

Section 509.051(a) requires providers to "register[] the person's age" before allowing him or her to create an account with the service. This section allows users to *self-select* their age when signing up. It is hard to see how this restricts any First Amendment rights. Plaintiffs did not meaningfully argue otherwise.

### B.    The Targeted Advertising Provision.

Section 509.052(2)(D) bars providers from "us[ing] the digital service to display targeted advertising to the known minor." This is a commercial speech restriction that triggers (and survives) intermediate scrutiny.[122] Plaintiffs argue otherwise, but only because they misread § 509.052(2) as reaching unpaid "public service messages."[123] The better interpretation is that this statute restricts *paid* advertising.

To begin, the term "advertising" generally refers to paid announcements, not unpaid

---

[120] ECF 17, 25 (emphasis added).

[121] *See Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 856 (5th Cir. 2022) ("[C]ircuit opinions in which the judgment was reversed on some but not all grounds are still precedential with respect to the portions not reversed.") (citing *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001)).

[122] *See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 279–80 (5th Cir. 2024) (finding that a restriction placed on advertising was properly considered a commercial speech restriction), *cert. granted*, No. 23-1122, 2024 WL 3259690 (U.S. July 2, 2024).

[123] ECF 1, ¶ 62.

informational campaigns.[124] While perhaps insufficient by itself to definitively make this a *commercial* speech restriction,[125] there are other clues in HB 18 that undermine Plaintiffs' broad interpretation. For instance, § 509.052(2)(D) places limits on the *provider's* use of a digital service, which makes sense as providers are necessarily involved with paid advertisements on their services. If the Legislature truly wanted to reach material like non-commercial informational posts on users' accounts, they would have placed the advertising restriction on the *users* themselves.

Also, Plaintiffs' broad interpretation makes little sense. Under their reading, § 509.052(2)(D) bans speech such as a university's post on its own social media account identifying upcoming "scholarship opportunities" or a nonprofit organization's announcement of an upcoming conference to discuss "free speech" issues.[126] But this ignores the context: the bill was written to protect minors. Put differently, Plaintiffs' reading of § 509.052(2)(D) leads to absurd results given HB 18's statutory context, including its purpose. Thus, this interpretation should be rejected.[127]

Once § 509.052(2)(D) is properly read as reaching only *paid* advertising, its purpose and the reasons why it is constitutional become evident. This section concerns the state's interests in protecting children from abuse and their privacy.[128] Social media companies are driven to collect gobs of sensitive personal information about minors so they can target them with ads.[129] And these companies have been caught evading privacy and other child protection laws due to this perverse

---

[124] *Advertising*, MERRIAM-WEBSTER, https://tinyurl.com/5n9x6jjy; *Advertising*, DICTIONARY.COM, https://tinyurl.com/mrxaabtz.

[125] *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66–67 (1983) (noting that speech is considered commercial if it: (1) is an advertisement; (2) references a specific product; and (3) the speaker has an economic motivation for the speech).

[126] ECF 1, ¶ 68.

[127] *See Jose Carreras, M.D., P.A. v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) ("We . . . interpret statutes to avoid an absurd result.").

[128] *See Morse v. Frederick*, 551 U.S. 393, 407 (2007); *Ginsberg v. State of N. Y.*, 390 U.S. 629, 640 (1968).

[129] *See, e.g.*, Elizabeth Napolitano, *Social Media Apps Made $11 Billion from Children and Teens in 2022*, CBS NEWS, https://tinyurl.com/2ty9n8nw.

financial incentive.[130] By banning paid ads that target known minors, § 509.052(2)(D) removes providers' profit motive for evading privacy laws. And as this section is aimed directly at the heart of the problem—the financial incentive to collect and sell personal information on minors—it survives intermediate scrutiny.

HB 18's structure further supports Defendant's interpretation of § 509.052(2)(D) and undermines Plaintiffs'.[131] The targeted ad provision appears in a statute that mainly restricts a provider's ability to collect/disclose personal information about known minors. This makes sense as § 509.052(2)(D) complements the other privacy restrictions contained in this statute: It removes the financial incentive for violating these privacy regulations. If the Legislature thought that *all* ads targeting children harmed their well-being, it would have placed the ad restriction in § 509.053(a)— the section that specifically regulates content likely to harm to minors.

Three more points. First, this Court's finding that HB 18's exemptions create a content-based distinction that triggers strict scrutiny for the entire Act does not raise the level of scrutiny for § 509.052(2)(D).[132] This is because "the Supreme Court has consistently applied intermediate scrutiny to commercial speech restrictions, even those that were content- and speaker-based . . . ."[133] Thus, § 509.052(2)(D) receives intermediate scrutiny, regardless of whether it is considered content-based or content-neutral.[134]

---

[130] *See, e.g.*, *Google and YouTube will Pay Record $170 Million for Alleged Violations of Children's Privacy Law*, FTC, https://tinyurl.com/yckd5fxp; Cecilia Kang, *Meta Reaches $1.4 Billion Settlement with Texas Over Privacy Violations*, NEW YORK TIMES, https://tinyurl.com/ydjcvhyj.

[131] *See City of Houston v. Jackson*, 192 S.W.3d 764, 771 (Tex. 2006) (finding a law's structure relevant to its interpretation).

[132] *See NetChoice II*, ECF 25, 18–22.

[133] *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 138 (3d Cir. 2020); *see also Yim v. City of Seattle*, 63 F.4th 783, 793 n.14 (9th Cir. 2023); *Recht v. Morrisey*, 32 F.4th 398, 409 (4th Cir. 2022); *Vugo, Inc. v. City of New York*, 931 F.3d 42, 44, 50 (2d Cir. 2019).

[134] This point applies to § 509.055 as it too is a commercial speech restriction. Also, to be clear, § 509.052(2)(D) bans *all* pain ads directly targeting minors, regardless of their viewpoint or subject

Second, Plaintiffs attack § 509.052(2)(D), and the other challenged HB 18 provisions, on grounds that the "legislative record lacks evidence showing minors' unregulated use of social media . . . requires a government solution."[135] Yet the state is not limited to the legislative record underlying HB 18. In *Doe 1 v. Landry*, the Fifth Circuit found that evidence that "may not have been presented to the enacting officials and was only produced at the time of trial" can justify a speech restriction in the context of an intermediate scrutiny analysis.[136] And the Supreme Court has acknowledged that "simple common sense" can be enough to overcome even strict scrutiny.[137]

Finally, even if Plaintiffs' broad interpretation was viable and created unique First Amendment issues, this Court would still have to reject it under the constitutional avoidance doctrine.[138] In sum, this Court should apply intermediate scrutiny and uphold § 509.052(2)(D) as constitutional.

### C.    The Illegal Advertising Provision.

Section 509.055 requires a provider to "make a commercially reasonable effort" to stop advertisers on the digital service "from targeting a known minor with advertisements that facilitate, promote, or offer a product, service, or activity that is unlawful for a minor in this state to engage in." This is constitutional as "the first amendment does not protect commercial speech which promotes an illegal activity or transaction."[139]

---

matter. Thus, it is content neutral. *See Hill v. Colorado*, 530 U.S. 703, 723 (2000) (stating that a statute is content neutral if "it places no restrictions on . . . either a particular viewpoint or any subject matter that may be discussed by a speaker").

[135] ECF 17, 22–23 (emphasis omitted).

[136] 909 F.3d at 110.

[137] *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995).

[138] *See United States v. Hansen*, 599 U.S. 762, 781 (2023) ("It bears emphasis that even if the Government's reading were not the best one, the interpretation is at least fairly possible—so the canon of constitutional avoidance would still counsel us to adopt it.") (quotations omitted).

[139] *United States v. White*, 769 F.2d 511, 516 (8th Cir. 1985) (citing *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 496 (1982)); *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973) ("Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the

Plaintiffs did not seriously argue that § 509.055 is anything other than a commercial speech restriction. Nor could they. For starters, this statute plainly targets a well-settled First Amendment exception that is specific to *commercial* speech—namely, the exception that commercial speech promoting illegal activities or transactions is not protected under the First Amendment.[140] Extending § 509.055 to noncommercial messages would run contrary to the Legislature's intent to trigger this exception.[141] Also, § 509.052(2)(D)'s use of the term "advertising" refers to commercial speech, as explained above. Section 509.055's use of nearly identical terms ("advertisers" and "advertisements") should be interpreted the same way given the presumption that "the Legislature uses the same word consistently throughout a statute."[142] Further, the constitutional avoidance doctrine counsels against any interpretation of § 509.055 that would render it unconstitutional.[143] In sum, § 509.055 is a commercial speech regulation that does not restrict any First Amendment-protected activity. Thus, it is constitutional.

### D.    The Parental Powers Provisions.

Plaintiffs did not meaningfully explain how §§ 509.101–.103—which give parents authority to supervise their kids' social media usage—create a First Amendment issue. These sections leave minors free to post content on social media and view content posted by others. While a parent can limit a minor's social media usage with this new authority; it would not be the *state* doing the restricting. To

---

regulation is altogether absent when the commercial activity itself is illegal . . . ."); *United States v. Buttorff*, 761 F.2d 1056, 1066 (5th Cir. 1985) ("The United States Supreme Court also continues to refuse to shield commercial speech which promotes an illegal activity or transaction.").

[140] *See id.*

[141] *See, e.g.*, *Traxler v. Entergy Gulf States, Inc.*, 376 S.W.3d 742, 748 (Tex. 2012) ("We presume the Legislature is aware of relevant caselaw when it enacts or amends statutes.").

[142] *Malouf v. State ex rels. Ellis*, No. 22-1046, 2024 WL 3075672, at *11 (Tex. June 21, 2024).

[143] *See Hansen*, 599 U.S. at 781.

the extent this is even a First Amendment restriction, it is easily justifiable under any level of scrutiny.[144]

### E.    The Harm to Minors Provisions.

#### 1.    Analysis of § 509.053(a).

Section 509.053 (a) requires providers to prevent known minors from being exposed to "material and other content that promotes, glorifies, or facilitates" certain specified harms, like stalking and child pornography. Our analysis of this section unfolds in two parts. First, even under a broad interpretation of § 509.053(a), this statute is constitutional. Social media poses real dangers to minors, and § 509.053(a) is aimed directly at the source of the harm. Second, § 509.053(a) is readily susceptible to a limiting construction—not to mention severance—that would avoid or at least limit any First Amendment issues.

##### (a)    Even Under a Broad Interpretation, § 509.053(a) is Constitutional.

Plaintiffs set up an extremely expansive interpretation of § 509.053(a)—saying it precludes material that "promote[s] understanding and awareness for the bipolar community,"[145] information on "how to identify [the] warning signs of sex trafficking,"[146] and so on—and attack this strawman on tailoring grounds. This is not a fair reading of the statute. Section 509.053(a)'s focus is on preventing harm to minors. This is apparent from the statute's title ("Digital Service Provider Duty to Prevent Harm")[147] and its substantive provisions, which turn on acts likely to cause harm to minors. Plaintiffs'

---

[144] *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573 (2011) ("[P]rivate decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge."); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 795 n.3 (2011) (implying that a state can constitutionally "enforce parental prohibitions" or, at least, that the state has more leeway to act in this context); *see also id.* at 805 (finding that "helping concerned parents control their children" is a "legitimate" governmental interest).

[145] ECF 1, ¶ 59.

[146] *Id.* at ¶ 60.

[147] *See In re United Services Auto. Ass'n*, 307 S.W.3d 299, 307 (Tex. 2010) ("[W]hile . . . a heading cannot limit or expand the statute's meaning, the heading gives some indication of the Legislature's intent.") (quotations and citation omitted).

cited examples would not reasonably harm minors. So, § 509.053(a) does not forbid them.[148]

Properly read, § 509.053(a) is constitutional under any standard of review. The state clearly has a compelling interest in protecting minors from abuse.[149] And ample evidence shows the myriad harms associated with minors' use of social media, as discussed above.[150] Section 509.053(a) is narrowly tailored as it directly targets the content that is hurting minors.

The district court in *Griffin* effectively endorsed § 509.053(a)'s targeted approach. There, the court examined the U.K.'s Online Safety Bill and found it "more consistent with Supreme Court precedent than Arkansas's [Social Media Safety Act]."[151] *Griffin* acknowledged that the Supreme Court has recognized that states can feasibly enact laws targeted at specific conduct, like that which "often presages a sexual crime," without violating the First Amendment.[152]

The U.K. bill contains content-moderation provisions that mirror § 509.053(a)'s. For instance, the U.K. bill requires social media companies to remove content relating to, or otherwise encouraging or promoting: (1) "suicide"; (2) "child sexual abuse"; (3) "people smuggling"; (4) "sexual exploitation"; (5) "pornography"; (6) "self-harm"; and (7) "eating disorders."[153] It also severely limits content that is (8) "bullying" and (9) "abusive or hateful."[154] Given the similarities, if the U.K. bill is "more consistent with Supreme Court precedent,"[155] then so too is § 509.053(a).

> **(b)    Section 509.053(a) is Readily Susceptible to a Limiting Construction.**

When a state statute is readily susceptible to a narrower interpretation that would preserve its

---

[148] *See Moody*, 144 S. Ct. at 2397–98, 2409 (noting that a facial First Amendment challenge tuns on the statute's "heartland applications").
[149] *See Morse*, 551 U.S. at 407; *Ginsberg*, 390 U.S. at 640 (1968).
[150] *Supra*, 4–7.
[151] *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *20 (W.D. Ark. Aug. 31, 2023).
[152] *Id.* (quoting *Packingham v. North Carolina*, 582 U.S. 98, 106–07 (2017)).
[153] *What the Online Safety Act Does*, GOV.UK, https://tinyurl.com/ycy4atxp.
[154] *Id.*
[155] *Griffin*, 2023 WL 5660155, at *16.

constitutionality, a court *must* adopt that interpretation.[156] Such a limiting construction is available for § 509.053(a). And, regardless, severability applies to avoid any unconstitutional applications of the statute without negating the whole.

    **i.**    The main question is how to interpret § 509.053(a)'s "promotes, glorifies, or facilitates" language. "Glorify" can be read broadly to mean to "honor, praise, or admir[e]."[157] But it can also be read narrowly to mean to "describe or represent as admirable."[158] Together with the canon of constitutional avoidance, the cannon of *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated."[159]

    That is, the use of "glorify" in conjunction with "promote" or "facilitate" suggests that the Court should adopt this narrower interpretation as each represents a synonym for solicitation or incitement—concepts that courts have held to be within constitutional bounds.[160] "Facilitate" can mean "[t]o make the occurrence of (something) easier; to render less difficult."[161] "Promote" can mean "to help bring (something, such as an enterprise) into being."[162] Read in conjunction with these terms, the narrow interpretation of "glorify"—to make appear desirable—makes far more sense than simply to "praise." Each can be seen as encouraging or importuning someone to perform the relevant act.

    Plaintiffs don't say it explicitly, but they need this Court to adopt the broadest possible definition of "glorify" and then interpret "facilitate" and "promote" in accordance with it. Why?

---

[156] *See City of El Cenizo, Tex. v. Tex.*, 890 F.3d 164, 182 (5th Cir. 2018) ("Federal courts *must* accept a reasonable narrowing construction of a state law to preserve its constitutionality.") (emphasis added).
[157] *Glorify*, MERRIAM-WEBSTER, https://tinyurl.com/2s45ajec.
[158] *Glorify*, Oxford American Dictionary 739 (3d ed. 2010).
[159] *United States v. Williams*, 553 U.S. 285, 294 (2008).
[160] *See, e.g., Hansen*, 599 U.S. at, 771–72; *cf. Murphy v. Matheson*, 742 F.2d 564, 575 (10th Cir. 1984) ("[T]he Utah Legislature could make the reasoned judgment that the unrestricted sale and glorification of drug paraphernalia tends to enhance the consumption of illegal drugs.").
[161] *Facilitate*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Facilitate*, MERRIAM-WEBSTER ("[T]o make (something) easier."), https://tinyurl.com/46c5pnkz.
[162] *Promote*, MERRIAM-WEBSTER, https://tinyurl.com/4k6kvzjs; *Promote*, DICTIONARY.COM ("[T]o help or encourage to exist or flourish; further."), https://tinyurl.com/4s2v3cxm.

Because if "glorify" is the only unconstitutional provision, then only it should be severed from §
509.053(a), as per HB 18's severability clause.[163] This is not the best interpretation of § 509.053(a) for
reasons touched on above and below. Indeed, it is the opposite of how courts typically read statutes—
namely, to avoid any interpretations that create constitutionality issues.

    **ii.**    A narrower reading provides more than adequate notice of what is prohibited under
relevant Supreme Court precedent. For example, the Supreme Court has found the terms "promote"
and "facilitate" to be readily understandable. *United States v. Williams* concerned an overbreadth
challenge to a federal act aimed at preventing the sexual exploitation of children. Under that act, it is
a crime to knowingly "advertise[], *promote[]*, present[], distribute[], or solicit[]" material that contains a
"visual depiction" of a "minor engaging in sexually explicit conduct."[164]

    The Court found the term "promote" to be "susceptible of multiple and wide-ranging
meanings."[165] The Court adopted a narrower interpretation, reading it to cover "the act of
recommending [the unlawful activity] to another person."[166] With this limited construction in place,
the Court found that the act was constitutional, relying on the settled principle that the First
Amendment does not protect speech "that is intended to induce or commence illegal activities."[167]

    Next up is *United States v. Hansen.* There, the Supreme Court acknowledged that the term
"facilitation," as used in the criminal context, "captur[ed] only a narrow band of speech" and would
be presumptively constitutional.[168] The Court interpreted "facilitation" as "the provision of assistance

---

[163] *See* Tex. Gov't Code § 311.032(a) ("If any statute contains a provision for severability, that provision
prevails in interpreting that statute."); ECF 1-1, 19 (containing HB 18's broad severability provision).
[164] *Williams*, 553 U.S. at 290 (emphasis added) (citing 18 U.S.C. § 2252A(a)(3)(B)).
[165] *Id.* at 294–95.
[166] *Id.*
[167] *Id.* at 297–98.
[168] *See Hansen*, 599 U.S. at 770–73 (finding that the terms at issue in that case, "encourage" and "induce"
were constitutional largely because they should be interpreted in line with well-settled terms like
"solicitation" and "facilitation").

to a wrongdoer with the intent to further an offense's commission."[169] The Court found that narrow terms such as this do not violate the First Amendment, as they "stretch[] no further than speech integral to unlawful conduct."[170]

      **iii.**    Read against these precedents, Plaintiffs did not establish that they are likely to succeed on their First Amendment challenge to § 509.053(a). Their as-applied claims will largely turn on factors that are not and cannot be before the Court because the statute has never been applied. As to their facial claims, Plaintiffs did not identify the universe of § 509.053(a)'s constitutional applications and explain why they consider them to vastly outweigh the unconstitutional ones, as *Moody* requires.[171] This failure is damning, especially as Plaintiffs carry the burden on this point.[172]

      A proper facial review shows that § 509.053(a)'s constitutional applications substantially outweigh any unconstitutional ones. This section covers eleven topics. Eight (suicide, stalking, harassment, grooming, trafficking, child pornography, sexual exploitation or abuse, and substance abuse) directly concern activity made illegal by either the Texas Penal Code or the Texas Health and Safety Code.[173] The list grows to nine when "bullying" is read in line with the other grouped topics, as per the cannon of *noscitur a sociis*.[174] Speech on these nine topics is unprotected as it is "integral to unlawful conduct" or otherwise "intended to bring about a particular unlawful act."[175] Put simply,

---

[169] *Id.* at 771.
[170] *Id.* at 783.
[171] *See* 144 S. Ct. at 2398.
[172] *See id.* at 2409.
[173] *See, e.g.*, Tex. Pen. Code § 15.032 (child grooming); *id.* at § 20A.02 (trafficking); *id.* at § 22.08(a) (suicide); *id.* at § 42.07(a)(7)–(8) (electronic harassment); *id.* at § 42.072 (stalking); *id.* at §§ 43.261(b)(1), 43.262(b) (child pornography); *id.* at §§ 481.001–490.151 (containing Title 6 of the Tex. Health and Safety Code, Subtitle C, which is titled "*Substance Abuse* Regulation and Crimes") (emphasis added).
[174] *See Williams*, 553 U.S. at 294; Tex. Pen. Code § 42.07(a)(7)–(8).
[175] *Hansen*, 599 U.S. at 783; *see also Packingham*, 582 U.S. at 107 ("[T]he First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor.").

most of § 509.053(a)'s restrictions target unprotected speech. Thus, it cannot be said that a substantial number of the applications of this section violate the First Amendment.

Plaintiffs may point to the remaining topics (self-harm and eating disorders) to support their facial claims, but this does not change the analysis above. Admittedly, unlike the other topics, speech on these issues will not necessarily be independently unlawful and thus unprotected. But the fact that only a small portion of the topics at issue (two out of eleven) cover protected speech supports our position, not Plaintiffs'. Again, facial invalidity is only appropriate when a *substantial* number of the statute's applications are unconstitutional.[176] And most of § 509.053(a)'s applications relate to unprotected speech. Also, at least some speech on these two remaining topics will likely be unprotected. For instance, a user who repeatedly "fat shames" another and sends them multiple videos about how to "binge and purge" has likely violated Texas's electronic harassment law.[177]

Moreover, to the extent there are overbreadth issues here, § 509.053(a) is readily susceptible to a narrowing construction that would limit its scope to only those activities must likely to harm minors or otherwise trigger the First Amendment exception for speech integral to unlawful conduct. This would further shift the facial analysis in Defendant's favor, as a narrowing construction would *increase* the proportion of § 509.053(a)'s constitutional applications and *decrease* the situations where it is unconstitutional.

Plaintiffs read the First Amendment as a straightjacket that renders state and federal governments[178] powerless to protect children from the clear harms associated with social media use.

---

[176] *See Moody*, 144 S. Ct. at 2397.

[177] *See* Tex. Pen. Code § 42.07(a)(7)–(8).

[178] *See, e.g.*, *S.1291 – Protecting Kids on Social Media Act*, CONGRESS.GOV, https://tinyurl.com/4r5cy939; *S.4213 – Kids Off Social Media Act*, CONGRESS.GOV, https://tinyurl.com/b9bakfj5; *H.R.821 – Social Media Child Protection Act*, CONGRESS.GOV, https://tinyurl.com/4ye6rmfd; *S.1409 – Kids Online Safety Act*, CONGRESS.GOV, https://tinyurl.com/3v6mf7rd.

But the Constitution simply does not work that way.[179] This Court should find that § 509.053(a) does not violate the First Amendment.

### 2.    The Remaining Harm to Minors Provisions.

Plaintiffs' challenge to the "Harm to Minors" provisions also covers §§ 509.053(b), 509.056(1). Section 509.056(1) requires providers that use "algorithms to automate the suggestion, promotion, or ranking of information to known minors" to reasonably ensure that the algorithm does not interfere with the provider's duties under § 509.053. This provision does not raise First Amendment issues independent of § 509.053(a). Thus, if this Court upholds § 509.053, it should also uphold § 509.056(1).

Section 509.053(b) mainly requires providers to use certain well-settled content-moderation procedures (filtering,[180] hash-sharing,[181] methods to stop filter evasion,[182] and human-level monitoring[183]) as part of their strategy to block harmful content. Plaintiffs did not adequately explain how they, as users of social media sites, are injured by these provisions. And it is hard to imagine how they ever could be. Thus, Plaintiffs lack standing to challenge § 509.053(b).[184] And these provisions are constitutional for the reasons we gave in the *NetChoice II* lawsuit.[185]

### F.    The Age Verification Provision.

Section 509.057(a) requires providers that knowingly publish or distribute material more than

---

[179] *See Glossip v. Gross*, 576 U.S. 863, 869 (2015) (noting that, if the constitution allows states to take a certain act—here, protecting children from abuse—it "necessarily follows that there must be a constitutional means of carrying it out").

[180] *See, e.g., How Enforcement Technology Works*, META (Jan. 19, 2022) (discussing how Meta filters content via artificial intelligence technology), https://tinyurl.com/39uvfmmb.

[181] *See, e.g., Online Child Protection*, META (discussing how Meta filters child sexual abuse material via hash-sharing), https://tinyurl.com/2ayszkf7.

[182] *AI Advances to Better Detect Hate Speech*, META (May 12, 2020) (discussing issues concerned with filter evasion, such as users intentionally misspelling certain terms), https://tinyurl.com/5xvubmyw.

[183] *How Review Teams Work*, META (Jan. 19, 2022) (discussing how Meta uses human-level monitoring), https://tinyurl.com/2wx2bc6j.

[184] *Supra*, 15.

[185] *See NetChoice II*, ECF 18, 38–40.

one-third of which is harmful or obscene, to use a commercially reasonable age verification method to verify that the person seeking access is 18 years or older. Subsection (b) states that if a person is under 18, a provider covered by this section "may not enter into an agreement with the person for access to the digital service." As shown below, Plaintiffs' challenge to § 509.057 is not viable.

To begin, Plaintiffs lack standing to challenge § 509.057. Again, they did not identify a single social media platform they want to access that believes its site crosses § 509.057's one-third threshold.[186] And Plaintiffs' claims are unripe as they may *never* try to access a site that requires age verification due to this section.[187]

Turning to the merits, § 509.057 realistically shares the same fate as § 509.053(a). If rational basis review applies to § 509.503(a), as most of its topics concern speech integral to unlawful conduct, then § 509.057 is constitutional. In *Free Speech Coal., Inc.*, the Fifth Circuit found that a similar age-verification requirement survived rational basis review.[188] And if § 509.053(a) overcomes strict scrutiny, as it is narrowly tailored to the content most likely to cause harm to minors, then § 509.057 should also be upheld. It targets that same harmful content and sets a high bar; one that only the worst of the worst social media sites would possibly meet.

## IV. Plaintiffs' Vagueness Claims are Not Likely to Succeed on the Merits.

The **"Promotes, Glorifies, or Facilitates" Analysis:** Plaintiffs contend that § 509.053(a)'s terms "promotes," "glorifies," and "facilitates" are unconstitutionally vague.[189] They are wrong.

To begin, § 509.053(a) mirrors social media companies' own content-moderation policies.[190] Of course, the major social media platforms wouldn't use these terms in this context if they were so

---

[186] *Supra*, 3.

[187] *Id.*

[188] *See* 95 F.4th at 278.

[189] ECF 17, 26–27.

[190] *Compare* Tex. Bus. & Com. Code § 509.053(a), *with NetChoice II*, ECF 6-3, ¶¶ 12(a), 12(e), 13(g).

vague that "ordinary people [could not] understand what conduct is prohibited."[191] Also, to the extent its terms are unclear, § 509.053(a) is susceptible to a narrowing construction that would avoid any vagueness issues, as discussed above.[192] Indeed, *Hansen* found the term "facilitation" can be interpreted in a way that would be presumptively constitutional.[193]

As to "promote," *Williams* shows that this term can be narrowly construed in a manner that would be constitutional.[194] And other courts have found that "promote" is not unconstitutionally vague.[195] Thus, Plaintiffs' vagueness challenge to § 509.053(a) is flawed and should be rejected.

**"Advertising":** Plaintiffs challenge §§ 509.052(2)(D)'s and 509.055's use of the term "advertising" on vagueness grounds.[196] Yet their arguments turn on a misreading of these statutes as covering unpaid informational campaigns. Again, HB 18's advertising provisions only cover *paid* advertisements.[197] Once properly read, there should be no dispute that these provisions are readily understandable. Further, courts have found that the term "advertising" is not unconstitutionally vague.[198] Plaintiffs cite no caselaw holding otherwise.

**"Commercially Reasonable Method":** Plaintiffs argue that §§ 509.057(a)'s and 509.101's

---

[191] *See Doe I*, 909 F.3d at 116.

[192] *See Welch v. United States*, 578 U.S. 120, 134 (2016) ("It has long been our practice before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction.") (ellipsis and quotations omitted).

[193] *See Hansen*, 599 U.S. at 770–73.

[194] *See Williams*, 553 U.S. at 294–98.

[195] *See, e.g., United States v. Cavalier*, 17 F.3d 90, 93 n.5 (5th Cir. 1994); *Arce v. Douglas*, 793 F.3d 968, 985 (9th Cir. 2015); *Yamada v. Snipes*, 786 F.3d 1182, 1193 (9th Cir. 2015); *Bass v. United States*, 324 F.2d 168, 172–73 (8th Cir. 1963).

[196] ECF 17, 26–27. The argument above also covers Plaintiffs' contention that § 509.055's terms "facilitate" and "promote" are vague.

[197] *Supra*, 20–24.

[198] *See, e.g., Free Speech Coal., Inc. v. Shurtleff*, No. 2:05CV949DAK, 2007 WL 922247, at *16 (D. Utah Mar. 23, 2007) ("The term advertises has a common understanding."); *see also Bystrom By & Through Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 753 (8th Cir. 1987); *StreetMediaGroup, LLC v. Stockinger*, No. 1:20-CV-03602-RBJ, 2021 WL 5770231, at *5 (D. Colo. Dec. 6, 2021); *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 534 (S.D.N.Y. 2018); *Texans Against Censorship, Inc. v. State Bar of Tex.*, 888 F. Supp. 1328, 1369–71 (E.D. Tex. 1995), *aff'd*, 100 F.3d 953 (5th Cir. 1996).

use of the term "commercially reasonable method" in connection with age/identity verification is vague.[199] Yet "'commercial reasonableness' is a familiar standard used in a variety of commercial contexts."[200] Indeed, a Westlaw search of the Uniform Commercial Code for the term "commercially reasonable" produces 242 hits. If this term was too vague, large swaths of the UCC, and many other statutes, would also appear to be unconstitutional.[201]

## V.   Four More Issues Concerning Plaintiffs' Motion for a Preliminary Injunction.

**Facial Claims:** Plaintiffs assert that the challenged HB 18 provisions are facially overbroad.[202] They did not establish a valid facial claim.

First, the challenged provisions are narrowly tailored to substantial or compelling government interests, as discussed above.[203] Thus, these provisions are not "facially overbroad."

Second, §§ 509.052(2)(D) and 509.055 are commercial speech restrictions as they ban paid

---

[199] ECF 17, 27.

[200] *Specialty Earth Scis., LLC v. Carus Corp.*, No. 15-CV-06133, 2021 WL 4804076, at *13 (N.D. Ill. Oct. 14, 2021); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010).

[201] *See, e.g., In re Comprehensive Power, Inc.*, 578 B.R. 14, 40 (Bankr. D. Mass. 2017) (noting that, at least in some contexts, "[t]he term 'commercially reasonable' is not specifically defined by the UCC . . . ."); U.C.C. § 2-710 ("Incidental damages to an aggrieved seller include any *commercially reasonable* charges . . . .") (emphasis added); U.C.C. § 2-614(1) ("Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a *commercially reasonable* substitute is available, such substitute performance must be tendered and accepted.") (emphasis added); U.C.C. § 2-402(2) ("A creditor of the seller may treat a sale or an identification of goods to a contract for sale as void if as against him a retention of possession by the seller is fraudulent under any rule of law of the state where the goods are situated, except that retention of possession in good faith and current course of trade by a merchant-seller for a *commercially reasonable* time after a sale or identification is not fraudulent.") (emphasis added); *see also* 17 U.S.C. § 115(L)(III) ("The mechanical licensing collective . . . shall use *commercially reasonable* efforts to facilitate access to relevant information maintained by third parties.") (emphasis added); 15 U.S.C. § 7706(f)(3)(D) ("In assessing damages . . . the court may consider whether—(i) the defendant has established and implemented, with due care, *commercially reasonable* practices and procedures designed to effectively prevent such violations; or (ii) the violation occurred despite *commercially reasonable* efforts to maintain compliance the practices and procedures to which reference is made in clause (i).") (emphasis added).

[202] ECF 17, 24–26.

[203] *Supra*, 20–32.

advertisements directed at minors.[204] Binding precedent holds that "[t]he overbreadth doctrine does not apply to commercial speech."[205] To prevail on a facial challenge in this context, Plaintiffs must satisfy the more rigorous *Salerno* test. This means they must establish that there are no set of circumstances under which HB 18's advertising provisions would be valid or that they lack a plainly legitimate sweep.[206] Plaintiffs made no showing on either point.

Third, Plaintiffs missed that "overbreadth . . . appl[ies] to laws as construed by state courts— or as easily susceptible to construction by those courts—not as written."[207] Thus, they ignored the fact that there are limiting constructions of the challenged provisions that avoid any overbreadth issues.

Finally, Plaintiffs did not perform the two-step analysis *Moody* requires for facial challenges. Most notably, they did not measure the constitutional vs. unconstitutional applications of the challenged provisions.[208] This alone is enough for this Court to deny Plaintiffs' facial challenge, as they did not carry their burden to establish a viable claim.[209] And performing the proper analysis shows that most of the challenged provisions—namely, §§ 509.053(a), 509.055, and 509.507—directly relate to speech that is not protected under the First Amendment.[210]

**Severability:** If the Court finds any HB 18 provision to be unconstitutional, it should sever only that provision. While hard to analyze in the abstract, there is one notable severability point about HB 18's "news, sports, and commerce" exemption. Even if Plaintiffs were right that this exemption

---

[204] *Id.* at 20–24.

[205] *Serafine v. Branaman*, 810 F.3d 354, 364–65 (5th Cir. 2016) (citing *Vill. of Hoffman Estates*, 455 U.S. at 496–97); *see also Bates v. State Bar of Arizona*, 433 U.S. 350, 380–81 (1977).

[206] *See McKinley v. Abbott*, 643 F.3d 403, 407–08 (5th Cir. 2011).

[207] *Netherland v. Eubanks*, 302 Fed. Appx. 244, 247 (5th Cir. 2008); *see also Hansen*, 599 U.S. at 781 n.3 (finding "no support for th[e] proposition" that the canon of constitutional avoidance "has less force in the context of an overbreadth challenge").

[208] *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2398 (2024).

[209] *See id.* at 2409 ("The need for NetChoice to carry its burden on those issues is the price of its decision to challenge the laws as a whole.").

[210] *Supra*, 20–32.

triggers strict scrutiny for all of HB 18, their call for HB 18's entire invalidation is not the proper remedy. *Barr v. Am. Ass'n of Political Consultants, Inc.* highlights this point. There, the Supreme Court found that an exemption to the Telephone Consumer Protection Act created a content-based distinction and chose to sever that exemption rather than invalidate the entire act.[211] *Barr's* severance analysis would apply here.

**Prior Restraint:** Plaintiffs call HB 18 a "prior restraint," trying to sneak into the exacting level of scrutiny applied to such speech restrictions.[212] Yet their claims do not fall within the small class of cases that can properly be called "prior restraints."

As the Supreme Court stated in *Alexander v. United States,* "[t]he term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur."[213] The Court also recognized a "solidly grounded" distinction "between prior restraints and subsequent punishments."[214] Put simply, a law that "penalize[es] past speech," as opposed to "barring speech in the future," is not considered a prior restraint.[215]

HB 18 is not a prior restraint under this standard. At most, HB 18 merely penalizes past speech—via a civil fine if a digital service provider violates its provisions.[216] The Fifth Circuit has found that laws like HB 18 that merely penalize past speech are not "prior restraints."[217] And Plaintiffs identified no cases analyzing statutes akin to HB 18 and finding them to be prior restraints. Indeed, many of their cited cases on this point did not even find the alleged speech restriction to be a "prior

---

[211] *See Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 616–36 (2020).
[212] ECF 17, 14–18.
[213] 509 U.S. 544, 550 (1993) (quotations and emphasis omitted).
[214] *Id.* at 549–50.
[215] *Id.* at 553–54.
[216] *See* Tex. Bus. & Com. Code § 509.151; *see also id.* at § 17.47(a).
[217] *See Gibson v. Tex. Dep't of Ins.--Div. of Workers' Comp.*, 700 F.3d 227, 234–35 (5th Cir. 2012); *United States v. Inv. Enterprises, Inc.*, 10 F.3d 263, 275–76 (5th Cir. 1993).

36

restraint."[218]

**Other Preliminary Injunction Factors:** The remaining preliminary injunction factors will not meaningfully impact this case. The only notable point is Plaintiffs' lengthy delay in filing suit.[219] This Court has found shorter delays to weigh against issuing a preliminary injunction.[220]

### CONCLUSION

This Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: September 11, 2024                    Respectfully submitted,

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

BRENT WEBSTER
FIRST ASSISTANT ATTORNEY GENERAL

RALPH MOLINA
DEPUTY FIRST ASSISTANT ATTORNEY GENERAL

JAMES LLOYD
DEPUTY ATTORNEY GENERAL FOR CIVIL
LITIGATION

KIMBERLY GDULA
CHIEF, GENERAL LITIGATION DIVISION

*/s/ Todd Dickerson*
TODD DICKERSON
Attorney-in-charge
Assistant Attorney General
Texas State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station

---

[218] *See* ECF 17, 14–18.

[219] *See Legislative Record for HB 18*, TEX. LEG. ONLINE (showing that HB 18 was signed by Governor Abbott on June 13, 2023), https://tinyurl.com/52wy9tr4.

[220] *See Digerati Distribution & Marketing, LLC v. Sarl*, No. 1:22-CV-01302-DII, 2023 WL 5687040, at *3 (W.D. Tex. Aug. 2, 2023); *Career Colleges & Sch. of Tex. v. United States Dep't of Educ.*, No. 1:23-CV-433-RP, 2023 WL 4291992, at *5 (W.D. Tex. June 30, 2023).

Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I certify that a copy of the document above was served on all counsel of record who have

entered an appearance on September 11, 2024, using the Federal Court CM/ECF system.

*/s/ Todd Dickerson*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS, M.F., by and through next friend, VANESSA FERNANDEZ, AMPERSAND GROUP LLC, and BRANDON CLOSSON, <br>     Plaintiffs, <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas, <br>     Defendant. | § § § § § § § § § § § § | Civil Action No. 1:24-cv-945-RP |

---

### ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

On this day the Court considered the Plaintiffs' Motion for a Preliminary Injunction (ECF 17), and all responses and replies thereto.

The Court hereby **DENIES** Plaintiffs' motion.

So **ORDERED**.


SIGNED on _____, 2024.


                                          _____

                                          Hon. Robert Pitman
                                          United States District Judge