**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS, M.F., by and through next friend, VANESSA FERNANDEZ, AMPERSAND GROUP LLC, and BRANDON CLOSSON,<br><br>*Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as the Texas Attorney General,<br><br>*Defendant*. | Civil Action No. 1:24-cv-00945-RP |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

`

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE JUSTICIABLE ........................... 1

    A.  Plaintiffs Have Standing To Challenge Each Provision ...................................... 1

    B.  Plaintiffs' First Amendment Claims Are Ripe........................................................ 8

    C.  SEAT Has Associational Standing ........................................................................ 9

III.  PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS .................................... 9

    A.  The Challenged Regulations Restrict Protected Speech ...................................... 10

    B.  The State Has Not Carried Its First Amendment Burden .................................... 12

        1.  The challenged regulations are subject to strict scrutiny. ......................... 12

        2.  The challenged regulations fail any level of First Amendment review. .... 15

        3.  The challenged regulations are overbroad and facially invalid. ............... 19

    C.  The Act Is Void for Vagueness............................................................................ 20

IV.  THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION ............... 20

V.  CONCLUSION.................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AAPS, Inc. v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ...................................................................................9

*Air Evac EMS, Inc. v. Tex. Dept. Ins.*,
  851 F.3d 507 (5th Cir. 2017) ...................................................................................3

*Alexander v. United States*,
  509 U.S. 544 (1993)................................................................................................13

*Am. Acad. of Implant Dentistry v. Parker*,
  860 F.3d 300 (5th Cir. 2017) .................................................................17, 18, 19

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)...................................................................................7, 11, 20

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)................................................................................................20

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) .................................................................................13

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963)......................................................................................... passim

*Barilla v. City of Houston*,
  13 F.4th 427 (5th Cir. 2021) ...................................................................................2

*Bd. of Educ. v. Pico*,
  457 U.S. 853 (1982).................................................................................................5

*Bennett v. Spear*,
  520 U.S. 154 (1997).................................................................................................3

*Block v. Meese*,
  793 F.2d 1303 (D.C. Cir. 1986) ..............................................................................3

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ...................................................................... passim

*Boos v. Barry*,
  485 U.S. 312 (1988).................................................................................................14

*Braidwood Mgmt., Inc. v. EEOC*,
  70 F.4th 914 (5th Cir. 2023) ...............................................................8, 9

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)..............................................................................5

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ..................................................................... passim

*CCIA v. Paxton*,
  2024 WL 4051786 (W.D. Tex. 2024)............................................. passim

*Citizens United v. FEC*,
  558 U.S. 310 (2010).............................................................................2

*Corner Post, Inc. v. Bd. of Governors*,
  144 S. Ct. 2440 (2024).......................................................................12

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
  78 F.3d 920 (5th Cir. 1996) ..................................................................3

*FEC v. Cruz*,
  596 U.S. 289 (2022)...........................................................................16

*FEC v. Wis. Right To Life, Inc.*,
  551 U.S. 449 (2007)..............................................................................9

*Free Speech Coal., Inc. v. Rokita*,
  2024 WL 3228197 (S.D. Ind. 2024) ....................................................12

*Free Speech Coal. v. Paxton*,
  95 F.4th 263 (5th Cir.), *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024) ......................12

*Fund Tex. Choice v. Paxton*,
  2023 WL 2558143 (W.D. Tex. 2023).....................................................7

*Gerlich v. Leath*,
  861 F.3d 697 (8th Cir. 2017) .................................................................5

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949)...........................................................................11

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972).............................................................................6

*Legal Aid Soc'y v. City of N.Y.*,
  114 F. Supp. 2d 204 (S.D.N.Y. 2000)....................................................3

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001)................................................................................................16

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000) .............................................................................3, 6

*McCullen v. Coakley*,
    573 U.S. 464 (2014)................................................................................................15

*Media Matters for Am. v. Paxton*,
    2024 WL 1773197 (D.D.C. 2024) ...........................................................................7

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024).....................................................................................16, 19

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024).............................................................................................6

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) ....................................................................................2

*NetChoice, LLC v. Fitch*,
    2024 WL 3276409 (S.D. Miss. 2024)................................................................12, 18

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. 2023)......................................................................18

*NetChoice, LLC v. Reyes*,
    2024 WL 4135626 (D. Utah 2024) ......................................................3, 8, 12, 17

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................................................11

*Novak v. City of Parma*,
    932 F.3d 421 (6th Cir. 2019) .................................................................................13

*NRA of Am. v. Vullo*,
    602 U.S. 175 (2024)................................................................................................14

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)....................................................................................................7

*Penthouse Int'l LTD. v. Putka*,
    436 F. Supp. 1220 (N.D. Ohio 1977).......................................................................3

*PFLAG Inc. v. Off. of the Att'y Gen.*,
    No. D-1-GN-24-001276 (Tex. Dist. Ct. Travis Cty. Mar. 1, 2024)..........................7

*Piazza's Seafood World, LLC v. Odom*,
  448 F.3d 744 (5th Cir. 2006) ..........................................................................15

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*,
  906 F.2d 25 (1st Cir. 1990) .......................................................................7, 15

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................................14, 15

*Reno v. ACLU*,
  521 U.S. 844 (1997) .......................................................................................20

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995) .......................................................................................18

*SBA List v. Driehaus*,
  573 U.S. 149 (2014) .........................................................................................8

*Sec. of State of Md. v. J.H. Munson Co.*,
  467 U.S. 947 (1984) .........................................................................................7

*Serafine v. Branaman*,
  810 F.3d 354 (5th Cir. 2016) ...............................................................9, 11, 12

*Silva-Trevino v. Holder*,
  742 F.3d 197 (5th Cir. 2014) .........................................................................10

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .......................................................................................12

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ....................................................................2, 5, 9

*Supreme Inv. Corp. v. United States*,
  468 F.2d 370 (5th Cir. 1972) .........................................................................10

*Texas v. Johnson*,
  491 U.S. 397 (1989) .......................................................................................17

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ..................................................................................15, 18

*Twitter, Inc. v. Paxton*,
  56 F.4th 1170 (9th Cir. 2022) ..........................................................................7

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) .........................................................................................9

*United States v. Miselis*,
　　972 F.3d 518 (4th Cir. 2020) ...............................................................................11

*United States v. Playboy Ent. Grp., Inc.*,
　　529 U.S. 803 (2000) ..............................................................................12, 14, 19

*United States v. Stevens*,
　　559 U.S. 460 (2010) ...............................................................................11

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Couns., Inc.*,
　　425 U.S. 748 (1976) .................................................................................2

*Vance v. Universal Amusement Co.*,
　　445 U.S. 308 (1980) ...............................................................................13

*Virginia v. Am. Booksellers Ass'n, Inc.*,
　　484 U.S. 383 (1988) .............................................................................2, 10

*Yelp Inc. v. Paxton*,
　　2024 WL 413464 (N.D. Cal. 2024) ......................................................7

**STATUTES**

Tex. Bus. & Com. Code

　　§ 509.051 ...............................................................................................19, 20
　　§ 509.052(2)(D) ...................................................................................... passim
　　§ 509.053 ................................................................................................. passim
　　§ 509.055 ................................................................................................. passim
　　§ 509.056(1) ............................................................................................ passim
　　§ 509.057 ...............................................................................1, 11, 13, 14, 19
　　§ 509.102 .....................................................................................................19
　　§ 509.101 .....................................................................................................19

Tex. Penal Code §§ 7.02 ...............................................................................10

**CONSTITUTIONAL PROVISIONS**

United States Constitution
　　amend. I ...................................................................................................... passim

## I.    INTRODUCTION

The State offers neither evidence nor substantial argument that the challenged provisions of the SCOPE Act survive First Amendment scrutiny. This Court's order preliminarily enjoining Tex. Bus & Com. Code §§ 509.053 and 509.056(1)—the content exposure restrictions—held that *all* the Act's speech regulations are presumptively unconstitutional and subject to strict scrutiny. *See CCIA v. Paxton*, 2024 WL 4051786, at *12 (W.D. Tex. 2024) ("*NetChoice II*"). The State observes *NetChoice II* "impacts this case," Opp. 1, but misunderstands why. It does not "foreclose" Plaintiffs' facial challenge to the targeted advertising restrictions, *cf. id.*, as Plaintiffs challenge *only* Tex. Bus & Com. Code §§ 509.052(2)(D) and 509.055, not the data collection, privacy, or transaction provisions elsewhere in § 509.052 that the Court suggested unlikely to regulate speech. Nor does it bar Plaintiffs' challenge to the Act's content-monitoring and age-verification regime in Tex. Bus. & Com. Code § 509.057(a), which *NetChoice II* did not address. Contrary to the State's take, *NetChoice II reaffirmed* that the First Amendment protects users' rights to receive and transmit information using social media, joining courts in California, Arkansas, Mississippi, Ohio, and Utah that have barred enforcement of similar regulations. Plaintiffs have standing to enjoin the challenged restrictions on digital services (DSPs); their facial challenges are ripe because they present pure legal issues; and withholding review would cause irreparable injuries.

## II.    PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE JUSTICIABLE

### A.    Plaintiffs Have Standing To Challenge Each Provision

Standing requires (1) an injury in fact, (2) fairly traceable to the defendant (3) likely to be redressed by a favorable decision. *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024). It is enough that "any one plaintiff" have "standing to pursue injunctive relief." *Id.* at 329.

Plaintiffs satisfy the injury-in-fact requirement by showing a threat of future injury to at least one plaintiff for each challenged provision. Specifically, Plaintiffs show they (1) intend to

engage in a course of conduct arguably affected with a constitutional interest, (2) that conduct is arguably proscribed by the challenged policies, and (3) the threat of future enforcement is substantial. *See id.* "[In] pre-enforcement challenges to recently enacted … statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution" unless there is "compelling contrary evidence," *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (collecting cases)—which Defendant has not provided.

"[S]tanding rules are relaxed for First Amendment cases." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (quotation omitted). "[C]hilled speech or self-censorship," therefore, "is an injury sufficient to confer standing." *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (collecting cases); *see Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (same principle). It is "not hard to sustain standing for a pre-enforcement challenge" to speech regulations. *Speech First*, 979 F.3d at 330-31.

Under this framework, speakers and listeners may challenge regulations of intermediaries that disseminate speech, even though the speakers and listeners are not directly regulated. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963); *Va. State Bd. of Pharm. v. Va. Citizens Consumer Couns., Inc.*, 425 U.S. 748, 756-57 & 757 n.15 (1976). This principle reflects the reality that "[l]aws enacted to control or suppress speech may operate at different points in the speech process" and restrict expression at many levels. *Citizens United v. FEC*, 558 U.S. 310, 336 (2010).

Thus, in *Bantam Books*, book publishers that distributed through local bookstores had standing to challenge a Rhode Island regime restricting how those bookstores—which would not have self-censored otherwise—could sell books to young adults. 372 U.S. at 64 n.6. So, too, in *Virginia State Board of Pharmacy*, consumers not subject to regulation had standing to challenge advertising restrictions on companies that were willing to provide the information prohibited. 425

2

U.S. at 756-57 & 757 n.15. This is no "indirect injury." *Cf.* Opp. 1. *Bantam Books* held that the publishers were "not in the position of mere proxies arguing another's constitutional rights" to circulate their speech; they were asserting their own right to publish.  372 U.S. at 64 n.6; *see, e.g.*, *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1153-54 (9th Cir. 2000) (standing to challenge restriction on intermediary); *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) (similar); *Penthouse Int'l LTD. v. Putka*, 436 F. Supp. 1220, 1225 (N.D. Ohio 1977) (similar); *Legal Aid Soc'y v. City of N.Y.*, 114 F. Supp. 2d 204, 216 (S.D.N.Y. 2000) (similar).

The Fifth Circuit applied this principle in *Book People*, 91 F.4th 318, holding that booksellers had standing to challenge a law restricting purchases by school districts. Even though the injury "depend[ed] upon the decision of an independent third party," booksellers had standing because "the school districts' purchasing decisions" were "coerced by the State." *Id.* at 329-33. Plaintiffs alleged school districts would "react in predictable ways" to the law that would have the effect of chilling booksellers' speech.  *Id.* at 332; *see also, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (finding standing for injuries traceable to government action against third parties); *Air Evac EMS, Inc. v. Tex. Dept. Ins.*, 851 F.3d 507, 513 (5th Cir. 2017) (same even where provision was "not directly 'enforced' against" plaintiffs); *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926-27 (5th Cir. 1996) (same involving orders restraining speech).

Unlike *NetChoice, LLC v. Reyes*, where the court dismissed with leave to add formal allegations already made here, 2024 WL 4135626 at *20 (D. Utah 2024), Plaintiffs have standing to challenge the provisions at issue.  *See* Compl. ¶¶ 85-90.

***Content exposure restrictions.*** Plaintiffs intend to engage in and receive protected speech prohibited by § 509.053(a).  *See* Compl. ¶ 88; Janeway Decl. ¶¶ 5-7; Closson Decl. ¶¶ 10-12, 14; Samuels Decl. ¶¶ 6-8.  Their ability to do so is arguably affected with a constitutional interest.

*See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (recognizing right to produce and disseminate protected content to minors and minors' rights to receive it).

Plaintiffs need not identify specific future instances of speech that the Act will proscribe. *See* Opp. 14. They need only aver that they generally intend to engage in the type of speech the Act regulates. *See Book People*, 91 F.4th at 327 (booksellers averred they "have sold and would like to continue selling library material to public-school libraries").[1] Here, Plaintiffs have done just that. Two of SEAT's recent Instagram posts (one authored by a minor) concern bullying, human trafficking, sexual assault, and suicide. *See* Samuels Decl. ¶¶ 7-8; Compl. ¶ 57. The Ampersand Group has and intends to run ads helping teens recognize sex trafficking, and intends to engage in future campaigns touching on restricted topics, like substance abuse. *See* Janeway Decl. ¶¶ 5-7; Compl. ¶ 60. Closson fears posting humorously and irreverently about bipolar disorder, including links with other issues like eating disorders and substance abuse, will be deemed "promot[ing], glorif[ying], or facilitat[ing]" these topics. *See* Closson Decl. ¶¶ 11, 12, 14; Compl. ¶ 59.

These concerns are concrete. Platforms have testified that the Act's filtering and keyword requirements under § 509.053(b) would require blocking productive discourse. *See* Compl. ¶ 81 (citing platform declarations). The State's claim that Plaintiffs' speech is likely "already restricted by the provider's terms of service," Opp. 14, is belied by posts Plaintiffs identified that the Act would require blocking. *See* Samuels Decl. ¶¶ 7-8; Closson Decl. ¶¶ 11-12. And if platforms implement technical changes to block such content, it would be because of the Act. *See, e.g.*, Compl. ¶ 86; CCIA Dkt., ECF No. 6-2, Schruers Decl. ¶ 21 (warning of "*increased* use of filtering"); *id.*, ECF No. 6-4, Veitch Decl. ¶ 33 (YouTube may "alter" policy and take

---

[1] *See* Koehler Decl., *Book People, Inc. v. Wong et al.*, No. 1:23-cv-00858, ECF 6-3 at ¶ 27 (W.D. Tex.) (stating "inten[t] to continue selling books and other library materials to Texas school districts for use in school libraries in the future"); *id.* Rejsek Decl., ECF No. 6-5 at ¶ 7 (same).

"overinclusive approach to content moderation"). The restrictions on Plaintiffs' speech are thus fairly traceable to the "coercive effect" of the Act on DSPs. *Book People*, 91 F.4th at 331.

**Targeted advertising restrictions.** Distributing and receiving targeted ads, including on unlawful topics, is affected with a constitutional interest. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (First Amendment protects "right to distribute literature, and necessarily protects the right to receive it"); *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (First Amendment protects advocacy and education, even on criminal topics); *Gerlich v. Leath*, 861 F.3d 697, 710 (8th Cir. 2017) (speech about illegal drugs is protected). Plaintiffs need not provide the level of detail the State seeks, *supra* at 4, although they have in any event done so.

The Act's ad restrictions especially affect The Ampersand Group by restricting and burdening its ability to run ad campaigns that will "reach teen audiences." Compl. ¶ 66. Beyond requiring minors to seek consent to receive such ads, the Act prohibits ads promoting subject matter the Act forbids for minors, like PSAs about sex trafficking and substance abuse, or ads advocating decriminalizing certain activities. Janeway Decl. ¶¶ 5-7, 12. Absent parental consent, the Ampersand Group would even be blocked from using social media to distribute to minors purely educational resources about vaccine access, illness prevention, and participation in the U.S. Census. Janeway Decl. ¶¶ 3-4. This "is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Speech First*, 979 F.3d at 330-31 (citation omitted) (collecting cases).

These provisions also block minors from receiving wanted ads. *See* M.F. Decl. ¶ 17. Just as the Act stops The Ampersand Group from distributing advertisements about decriminalization, § 509.055 would also "prevent SEAT members from receiving advertisements over social media about campaigns to decriminalize certain activity that we do not believe should be criminalized—such as reading banned books or participating in a drag queen read-aloud in a school library."

5

Samuels Decl. ¶ 13. Plaintiffs have thus also sufficiently alleged a concrete and impending "right to listen" injury, *cf.* Opp. 13, because Texas has *ex ante* barred DSPs from publishing ads based on their content. This is unlike *Murthy v. Missouri*, where plaintiffs' injuries could not be traced to content decisions that the government had *not yet* coerced. 144 S. Ct. 1972, 1984 (2024).

Plaintiffs' injuries *are* traceable to the across-the-board advertising restrictions and thus redressable by a preliminary injunction. Even for DSPs that arguably do not allow "targeting" minors, the term "targeted" is undefined and could reach efforts to direct information to minors even by proxy, like targeting "content or topics already frequented by teens." Janeway Decl. ¶ 10. That is how DSPs have stated they will respond to the Act: "overinclusive moderation." CCIA Dkt., Veitch Decl. ¶ 34; *id.*, Szabo Decl. ¶ 21, ECF No. 6-3 (same).  This aligns with judicial experience: "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up).

Plaintiffs accordingly have shown that DSPs "will likely react in predictable ways" to the targeted advertising provisions' coercive effects by restricting content.  *Book People*, 91 F.4th at 332 (citation omitted).  This is enough to show standing.  *See, e.g.*, *Stroh*, 205 F.3d at 1156 (plaintiff not required to show any forum "in fact refused" to host plaintiffs' speech; enough that "threat of enforcement" of ordinance against fora "was likely to impede" it).

***Content monitoring and age verification.*** These provisions harm plaintiffs by (i) incentivizing DSPs to over-moderate non-adult content Plaintiffs wish to send and receive to avoid having to verify their users' ages; or (ii) causing DSPs to verify their users' age to avoid liability.  *See* Compl. ¶ 90; Sieff Decl. Ex. 24 at 1-2, 4; Br. 9 (citing DSPs' sworn statements). As for over-moderation of content, Plaintiffs fear Defendant Paxton—who broadly construes Texas

law to take action against speech he opposes[2]—will use the law to pressure DSPs to censor protected content, including content related to sexuality and LGBTQ+ issues. *See, e.g.*, Janeway Decl. ¶ 13; Compl. ¶¶ 72, 90; *see also Bantam Books*, 372 U.S. at 64 n.6, 67 (publishers had standing to challenge "informal censorship" of bookstores). Other DSPs will avoid the burden of "reviewing and categorizing content" and "opt to age verify regardless." Compl. ¶ 72. Janeway would not submit to such an identity screen for privacy reasons, meaning they would be restricted from accessing protected speech. Janeway Decl. ¶ 14; *see also* Closson Decl. ¶ 17. *See Ashcroft v. ACLU*, 542 U.S. 656, 667, 673 (2004) (age verification burdens First Amendment rights); *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (right to access social media).

Plaintiffs also have "third-party" standing under the overbreadth doctrine to challenge the content-monitoring and age-verification provisions. In *NetChoice II*, the Court ruled that First Amendment plaintiffs may have standing "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that [a] statute's very existence may cause others … to refrain from constitutionally protected speech[.]" 2024 WL 4051786, at *9 (citation omitted). This doctrine allows a First Amendment plaintiff to "assert the rights of another." *Sec. of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 954-58 (1984) (fundraiser had standing to challenge fee regulation as a restriction on his clients' First Amendment right to hire him). The availability of third-party standing is especially important where, as here, directly regulated parties may be "reluctant to raise their own rights in the face of … official sanctions" and stigma. *Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 38-39 (1st

---

[2] *See, e.g.*, *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022); *Fund Tex. Choice v. Paxton*, 2023 WL 2558143 (W.D. Tex. 2023); *Yelp Inc. v. Paxton*, 2024 WL 413464 (N.D. Cal. 2024); *PFLAG Inc. v. Off. of the Att'y Gen.*, No. D-1-GN-24-001276 (Tex. Dist. Ct. Travis Cty. Mar. 1, 2024); *Media Matters for Am. v. Paxton*, 2024 WL 1773197 (D.D.C. 2024).

Cir. 1990) (adult content channel had standing to challenge regulatory change that affected rights of cable operators who carried their content). Because these provisions pressure DSPs to over-censor and/or age-verify in violation of *their* rights, Plaintiffs have standing to defend them.

*Vagueness.* Plaintiffs have standing to show the above provisions are vague for the same reasons. *See, e.g.*, *Bantam Books*, 372 U.S. at 64 n.6, 71 (standing for vagueness argument). This is not third-party standing as in the State's cases. *Cf.* Opp. 17. Rights in the speech process are indivisible, and each participant has standing to challenge government intrusions. *Supra* 1-3.

### B. Plaintiffs' First Amendment Claims Are Ripe

Ripeness is a prudential—not constitutional—inquiry. *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930 n.28 (5th Cir. 2023). The Supreme Court has repeatedly expressed doubt that a federal court may refuse jurisdiction on such grounds, given the "virtually unflagging" duty to "hear and decide cases within its jurisdiction." *SBA List v. Driehaus*, 573 U.S. 149, 167 (2014) (citations omitted). If the "prudential ripeness doctrine" has any "continuing vitality," *id.*, it requires only that a plaintiff show (1) its claims are fit for judicial decision, and (2) withholding adjudication would impose hardship. *See Book People*, 91 F.4th at 333 (citation omitted).

Both elements are met here. "A claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Braidwood*, 70 F.4th at 930 (citation omitted). A facial First Amendment challenge presents such a question. *See, e.g.*, *SBA List*, 573 U.S. at 167-68 (challenge to law restricting political advertising). It makes no difference that Plaintiffs' injuries turn on the Act's coercive effect on third parties; the Act injures them directly. *See Book People*, 91 F.4th at 334. More factual development is unnecessary, and the Court already ruled on parallel claims in *NetChoice II* with a less developed record. 2024 WL 4051986, at *9.

Withholding review of Plaintiffs' claims would cause not just hardship but irreparable constitutional injury. *See* Opp. 37 (effectively conceding irreparable harm, *see also infra* § IV).

Plaintiffs thus suffer hardship for the same reasons they suffer injury in fact.  *See Braidwood*, 70 F.4th at 931 (inquiry "tracks the Article III standing injury analysis").  The law is especially sensitive to the chilling effects of protracted litigation, such that First Amendment challenges "must entail minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation."  *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 469 (2007).  Withholding adjudication would compound these constitutional injuries.

### C.    SEAT Has Associational Standing

Associational standing exists when (i) a plaintiff's members would have standing, (ii) it seeks to protect interests related to its purpose, and (iii) member participation is not needed. *See AAPS, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). SEAT meets these requirements.

*First*, SEAT's members would have standing to challenge these restrictions because, but for the Act, the services they use would continue to disseminate their speech and provide them information. *See* Compl. ¶¶ 85-90; *Book People*, 91 F.4th at 330 ("plaintiffs have standing to sue government entities that injure them through another entity"); *supra* § II.A.  *Second*, the interest SEAT seeks to protect is germane to mobilizing students. Compl. ¶¶ 2, 7.  *Third*, member participation "is not normally necessary" in actions for injunctive relief.  *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citation omitted); *see NetChoice II*, 2024 WL 4051786, at *9 (same).

The State does not contest SEAT has satisfied the second or third requirements. On the first, the State asserts, without reasoning, that "SEAT did not show that one of its members would have standing to sue in his or her own right." Opp. 18. The State is wrong.  *See* Samuels Decl.

## III.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

The State contorts the Act to avoid the First Amendment.  *See* Opp. 20-24, 25-32. But courts cannot "rewrite a law to conform it to constitutional requirements." *Serafine v. Branaman*,

810 F.3d 354, 369 (5th Cir. 2016) (citation omitted). Putting the State's legislative editing aside, each challenged regulation restricts protected speech and each is facially invalid.

### A.    The Challenged Regulations Restrict Protected Speech

The State admits the subset of targeted advertising restrictions in § 509.052(2)(D) restricts protected speech. *See* Opp. 22-23. And it does not dispute that the content exposure restrictions, targeted advertising restrictions in § 509.055, and content monitoring and age verification provisions restrict speech in general. *See id.* at 8, 31 (content exposure restrictions); *id.* at 7, 8, 22 (targeted ad restrictions in § 509.055); *id.* at 8, 31-32 (content monitoring and age verification). The State argues only that these regulations escape scrutiny because they solely or predominantly regulate *unprotected* speech that incites or is integral to "unlawful" conduct. *Id.* at 7-8, 22, 31-32.

The Court squarely rejected this argument in *NetChoice II*, holding the ***content exposure restrictions*** in Section 509.053 and 509.056(1) were not susceptible to this manufactured construction because the words "'[g]lorify' and 'promote' taint the understanding of 'facilitate' beyond direct criminal advocacy" and cause the regulation to reach more "than criminal assistance." 2024 WL 4051786, at *18 (citing *Am. Booksellers*, 484 U.S. at 397). In fact, the Court concluded the State "deliberately sought a broader definition" that—the State admits, Opp. 30— "also proscribes speech related to *lawful* conduct, such as having an eating disorder." *Id.* This makes sense, as criminal advocacy is already a crime, *e.g.*, Tex. Penal Code §§ 7.02(a)(1)-(2), and "courts will not construe a statute to make it redundant, absent a clear legislative purpose to the contrary." *Supreme Inv. Corp. v. United States*, 468 F.2d 370, 381 (5th Cir. 1972) (Wisdom, J.); *e.g.*, *Silva-Trevino v. Holder*, 742 F.3d 197, 203-04 (5th Cir. 2014) (rejecting redundant interpretation). Texas knows how to write criminal advocacy laws. If it "intended to proscribe only speech 'integral to unlawful conduct,' it could have[.]" *NetChoice II*, 2024 WL 4051786, at *18.

So too with respect to the other provisions. Just as the words "glorify" and "promote" taint

the construction of Section 509.053(a), "offer" and "promote" expand Section 509.055's ***targeted advertising*** ban beyond criminal advocacy. *See United States v. Miselis*, 972 F.3d 518, 530, 535 (4th Cir. 2020) (Br. 8) ("encourage" and "promote" reached protected speech). The provision is also not susceptible to a narrower interpretation because it encompasses speech that promotes activities that violate *civil* laws, not just "speech integral to *criminal* conduct." *United States v. Stevens*, 559 U.S. 460 (2010) (emphasis added); *see Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (exception limited to speech "used as an integral part of conduct in violation of a valid *criminal* statute") (emphasis added). Nor does the unlawful transaction exception (Opp. 23) apply because "advertisements" include any speech—paid or not—that provides "public notice" or "call[s] something to the attention of the public." *See Advertising*, Merriam-Webster (2024); *Advertisement*, Merriam-Webster (2024).

This definition is not limited to speech that solely "*proposes* a commercial transaction," *Serafine*, 810 F.3d at 365 (citation omitted), but reaches political ads, paid advocacy, or material encouraging attendance at events, participation in boycotts, or other forms of civil disobedience. The landmark decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 256-58 (1964), involved such an advertisement (joined with a fundraising appeal) purchased by the Committee to Defend Martin Luther King and Struggle for Freedom in the South. Could Texas have restricted that ad's publication to minors without implicating the First Amendment? Hardly.

Same with Section 509.057's ***content monitoring and age verification requirement***. Although the State contends rational-basis review applies because the provision intends to block only *unprotected* content, Opp. 32, the Supreme Court treats such age-verification regimes as content-based regulations of protected speech. *See Ashcroft*, 542 U.S. at 667, 673; *see also* Br. 10 & n.2 (citing cases). District courts nationwide continue to do the same despite the decision in

*Free Speech Coalition v. Paxton*, 95 F.4th 263 (5th Cir.), *cert. granted*, 2024 WL 3259690 (U.S.

July 2, 2024).  *See, e.g.*, *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at \*11 (S.D. Miss. 2024).[3]

The State's repeated invocation of the canon of constitutional avoidance changes nothing.

*See* Opp. 23, 24, 25, 27, 28, 33, 35. That canon has no purchase "in the overbreadth context[,]"

and courts may not give a law's text "an additional extra-textual limiting construction in a frantic

attempt to rescue it." *Serafine*, 810 F.3d at 369 & n.34 (citing cases). Giving the Act "the ordinary

meaning of the text that actually applies," *Corner Post, Inc. v. Bd. of Governors*, 144 S. Ct. 2440,

2454 (2024), the challenged provisions regulate a wide and significant amount of protected speech.

**B.    The State Has Not Carried Its First Amendment Burden**

"When the Government restricts speech, the Government bears the burden of proving the

constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

The State has not tried to carry this burden, so Plaintiffs are likely to prevail under whatever form

of "heightened judicial scrutiny" applies. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011).

**1.    The challenged regulations are subject to strict scrutiny.**

Resting primarily on its meritless arguments that the challenged regulations do not restrict

protected speech at all, the State only hints at opposing strict scrutiny.

***Content-based coverage formula.*** All of the challenged provisions are subject to strict

scrutiny because, as this Court already held, they rest upon a content-based coverage formula. *See*

*NetChoice II*, 2024 WL 4051786, at \*10-12. The State reiterates its arguments only to preserve

them.  *See* Opp. 4 & n.12, 18-22.  Strict scrutiny applies to every provision for this reason alone.

***Prior restraint.*** The State does not dispute that the challenged regulations conscript DSPs

into censoring Plaintiffs' speech and access to information based on its content; prevent the

---

[3] *See also Reyes*, 2024 WL 4135626 at \*16 & n. 169; *Free Speech Coal., Inc. v. Rokita*, 2024 WL
3228197, at \*8-12 (S.D. Ind. 2024).

distribution of targeted ads based on its audience and content subject only (in some instances) to state-ordered parental preclearance; and force DSPs to monitor and classify their published content and erect additional preconditions to speech (age verification) based on its mix. *See* Tex. Bus & Com. Code §§ 509.053, 509.052(2)(D), 509.055, 509.056(1), 509.057. These restrictions impose a system of prior restraint because they prevent communication before it can occur without adjudication of the First Amendment's application to the censored expression. *See, e.g.*, *Bantam Books*, 372 U.S. at 70. "Threatening penalties for future speech goes by the name of 'prior restraint.'" *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235-36 (7th Cir. 2015) (invalidating prior restraint executed through threats to third-parties) (citation omitted) (Br. 7).

The State claims prior restraints are limited to "administrative and judicial orders" prohibiting speech. Opp. 36 (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)). But the Supreme Court has "not confined the application of the prior restraint doctrine to its simpler forms" and "extend[s] prior restraint protection with some latitude" to statutory restrictions and even informal action that *has the effect* of preventing speech. *Id.* at 569-70 (Kennedy, J., dissenting); *accord Novak v. City of Parma*, 932 F.3d 421, 433 (6th Cir. 2019) (classic forms "sufficient" but not "necessary" for prior restraint). In *Vance v. Universal Amusement Co.*, 445 U.S. 308, 311 (1980) (Br. 8), for example, the Court invalidated a statute permitting the government to block exhibition of films without prior adjudication. And in *Bantam Books*, 372 U.S. at 70, the Court found a prior restraint even where a state commission had *no enforcement powers at all* and could only warn booksellers against carrying disfavored titles.

The State tries to distinguish the Act because it only punishes past speech. *See* Opp. 36. But that *is* a prior restraint under cases like *Bantam Books*. *See* Br. 7-11. The Supreme Court this Term reaffirmed *Bantam Books*'s central holding that threatening civil liability "against a third

party 'to achieve the suppression' of disfavored speech violates the First Amendment." *NRA of Am. v. Vullo*, 602 U.S. 175, 180-81, 188-91 (2024). That is precisely how the challenged regulations operate: they threaten DSPs with civil penalties if they allow users to engage in speech forbidden by the Act. *See NetChoice II*, 2024 WL 4051786, at *15 & n.12 (noting the content-exposure restrictions operate "akin to prior restraints"). DSPs that Plaintiffs use have testified this threat will require them to enforce the State's censorship against users like Plaintiffs. *See supra* § II. This kind of collateral censorship that indirectly "suppress[es] speech … through private intermediaries" before it can occur is presumptively unconstitutional. *Vullo*, 602 U.S. at 198.

      ***Each challenged regulation is content-based.*** The State concedes the content-exposure and content-monitoring and age-verification regulations in §§ 509.053, 509.056(1), and 509.057 are content-based and subject to strict scrutiny if determined, as they should be, to regulate protected speech. *See* Opp. 32 (admitting these provisions "realistically share[] the same fate"). For good reason: restricting speech because of its subject matter or topic is "the essence of content-based regulation." *Playboy*, 529 U.S. at 811-12; *see* Br. 11, 12. Requiring DSPs to "identify discrete categories of speech" they publish and take state-specified actions in response "is as content based as it gets." *NetChoice II*, 2024 WL 4051786, at *14.

      Although the State asserts the targeted ad restrictions in §§ 509.052(2)(D) and 509.055 are content-neutral because they restrict all ads "regardless of their viewpoint or subject matter," Opp. 22 n.134, the provisions are content-based and subject to strict scrutiny because they regulate based on the "function or purpose" of speech, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and cannot be justified without reference to "the direct impact that speech has on its listeners," *Boos v. Barry*, 485 U.S. 312, 321 (1988); *see* Br. 12. The State has no response. Nor does it respond to Plaintiffs' arguments that § 509.055 is content-based because it imposes obligations on DSPs

depending on the content they publish, *Reed*, 576 U.S. at 163, or that § 509.052(2)(D) is subject to strict scrutiny because it requires parental consent to access protected speech, *Brown*, 564 U.S. at 795 n.3. *See* Br. 12. The State contends only that these provisions are "commercial speech restrictions" subject to intermediate scrutiny. *See* Opp. 22. But these provisions regulate *more* than commercial speech, as they regulate "advertising" whether or not it proposes a transaction. *See supra* § III.A. Strict scrutiny applies.

### 2. The challenged regulations fail any level of First Amendment review.

The government makes no serious attempt to show that the challenged regulations provide the least restrictive means to achieve a compelling government interest, as strict scrutiny requires, *see Playboy*, 529 U.S. at 513, or even that they satisfy intermediate scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-64 (1994); *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). *See* Br. 12-17. Sidestepping its burden, the State baldly asserts the content-exposure and age-verification and content-monitoring regulations "overcome[] strict scrutiny" because they are "narrowly tailored to the content most likely to cause harm to minors," Opp. 32, and that Section 509.052(2)(D) of the targeted ad regulations survives intermediate scrutiny because it is "aimed directly" at eliminating "the financial incentive to collect and sell personal information." Opp. 22. The State does not even defend Section 509.055 of the targeted ad regulations under the First Amendment at all—arguing only that the provision "does not restrict any" protected speech. *Id.* at 24. *Cf. Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006) (law unconstitutional where government "made no effort to defend" it under applicable scrutiny). The contentions the State does make—taken at face value—are meritless.

***No evidence the regulations achieve a compelling government interest.*** At the outset, the State does not show how *any* of the challenged regulations actually achieves—or even under intermediate scrutiny "in fact" advances in a "direct and material way," *Turner*, 512 U.S. at 662-

64—the solution to an actual problem. *See Brown*, 564 U.S. at 799 ("direct causal link" required). Although the State claims interests in "protecting children from abuse and their privacy," Opp. 21, 26, it cites no *evidence* that the provisions address these issues. The few cited reports suggest only that social media *may* have *some* adverse mental health effect on *some* young people. *Id.* 4-7.

Even if the State's interest were the well-being of minors generally and not their privacy or exposure to abuse, *see NetChoice II*, 2024 WL 4051786, at *14, restricting *protected* speech because of its supposedly harmful effects is *directly* related to the suppression of speech and an invalid justification for censorship. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001) (speech restriction intended to protect minors failed intermediate scrutiny since the "attempt to regulate directly the communicative impact" of the suppressed speech was not "unrelated to expression"); *see also Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024) (altering mix of protected speech impermissible justification for its restriction under any standard) (Br. 15).

In any case, the State's sparse evidence is the definition of "ambiguous proof." *Brown*, 564 U.S. at 800. The Surgeon General's Advisory, for example, finds social media positively affects many young people, and has varied effects that cannot be generalized—let alone causally linked—to any particular outcomes. *See* Dep't of Health & Hum. Servs., *Social Media and Youth Mental Health* 4, 6, 11 (2023) (Opp. 6); *see also* Ferguson Decl. ¶¶ 41-46 (reviewing research showing benefits). The State's other reports rest on "weak correlational data" that conflict with "large-scale preregistered studies" finding no "sizeable or practically meaningful associations between adolescents' digital technology usage and well-being." Sieff Decl. Ex. 21; *see* Ferguson Decl. ¶¶ 10-40 (describing flaws in State's sources). "[M]ere conjecture" that posits the existence of a problem is not "adequate to carry a First Amendment burden," and the government may not restrict speech just because it *might* prevent *some* subsequent "anticipated harm." *FEC v. Cruz*,

596 U.S. 289, 307 (2022); *see Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) ("presumption" that restricted speech would otherwise "necessarily" invite harm failed intermediate scrutiny).  It is far from sufficient to provide the required "direct causal link."  *Brown*, 564 U.S. at 799.

The State also does not address Plaintiffs' evidence, including the "largest long-term study of adolescent brain development" in the nation, finding "no consistent or measurable associations between well-being and the roll-out of social media" to minors.  Sieff Decl. Ex. 20 at 29-30; *see also, e.g.*, *id.* Exs. 22-23.  As Dr. Ferguson explains, "there is no evidence establishing a cause-and-effect relationship."  Ferguson Decl. ¶ 10.  The State "ignores that mental health data for less-technology adopting older generations is actually *worse* than for teens" and that the same trends "are not observed for other high-technology adopting countries." *Id.* ¶¶ 10-32 (reviewing data); *see also id.* ¶¶ 34-40 (finding inconsistent evidence of correlation).

Even had the State shown that social media directly causes the harms it asserts, it never shows how *any* of the challenged regulations do anything to "in fact alleviate them to a material degree." *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 309 (5th Cir. 2017) (intermediate scrutiny) (Br. 16-17); *see also Brown*, 564 U.S. at 799 (strict scrutiny requires law "be actually necessary to the solution"). The State submits no evidence showing how restricting the content teenagers may send and receive using just one class of online services ameliorates the alleged harms.  *Cf.* Opp. at 4-7; *see Reyes*, 2024 WL 4135626, at *15 (enjoining similar law where Utah failed to "offer any evidence that these specific measures will alter the status quo to such an extent that mental health outcomes will improve and personal privacy risks will decrease").

Restricting teens' access to social media will, for many, do more harm than good. *See* Ferguson Decl. ¶¶ 41-46; Sieff Decl. Exs. 2, 9, 20-23; M.F. Decl. ¶¶ 2-9, 11; Samuels Decl. ¶¶ 2-4; Closson Decl. ¶¶ 5-9. Courts do not resort to "common sense," Opp. 23, moreover, where the

government offers only "its unsupported assertion[.]"  *Parker*, 860 F.3d at 310.  And the State never responds to its underinclusivity problem, *see* Br. 14-15, 16, which is "alone enough to defeat it."  *Brown*, 564 U.S. at 802 (Br. 14); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (underinclusivity fatal under intermediate scrutiny) (Br. 16); *e.g.*, *NetChoice II*, 2024 WL 4051786, at \*15 (content exposure provisions underinclusive).

**No evidence of narrow tailoring.** The State decrees the content-exposure and content-monitoring and age-verification requirements "narrowly tailored to the content most likely to cause harm to minors." Opp. 32. It similarly baldly asserts that § 509.052(2)(D) of the targeted advertising restrictions survives scrutiny because it is purportedly "aimed directly" at preventing the collection and sale of minors' personal information.  *Id.* at 22.

But the State never shows how these regulations restrict no more speech than needed. *See Turner*, 512 U.S. at 662. The content-exposure restrictions use vague and overbroad terms that require suppressing "far more material than needed to achieve Texas's goal," or that Texas can lawfully regulate. *NetChoice II*, 2024 WL 4051786, at \*15. The content-monitoring and age-verification regime—which shares the same fate, Opp. 32—likewise compels over-moderation and intrusive age-verification that burdens protected speech. *See, e.g.*, *Fitch*, 2024 WL 3276409, at \*12 & n.6; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at \*21 (W.D. Ark. 2023).

Far from just protecting minors' personal information, § 509.052(2)(D) presumptively bans targeted advertising, doing nothing to restrict the collection or sale of user data.  *See Brown*, 564 U.S. at 802 (doubting that "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech" is ever narrowly tailored); *Fitch*, 2024 WL 3276409, at \*11 (same).[4]  The State fails to rebut any of the less restrictive household-based

---

[4] The same would apply to Section 509.055, if the State defended it.  *See* Br. 13-14, 16.

alternatives Plaintiffs identified, or even the other less-restrictive portions of the Act that Plaintiffs do not challenge. *See* Br. 13-14. That is dispositive. *See Playboy*, 529 U.S. at 816, 825-26 (failure to rebut voluntary measures fatal); *Parker*, 860 F.3d at 311 (same under intermediate scrutiny).

### 3. The challenged regulations are overbroad and facially invalid.

The State claims Plaintiffs failed to "perform the two-step analysis *Moody* requires for facial challenges." Opp. 35. Not so. *See* Br. 17-19. Plaintiffs showed (i) the Act's scope regulates speech disseminated through and by DSPs, and (ii) the challenged regulations' only potentially legitimate applications were limited to the rare instances where they happen to restrict *unprotected* speech, making their unconstitutional applications substantial compared to their hypothetically legitimate sweep. *See id.* The Court already held that the content-exposure restrictions in §§ 509.053 and 509.056(1) are facially invalid, *NetChoice II*, 2024 WL 4051786, at *15-16, and the same holds here. *See also* Opp. 3 n.9 (less than 1% of content on large DSPs is unprotected).

Although the Court held that the *NetChoice II* plaintiffs failed to show how some of the other provisions *there* burdened protected speech in a substantial number of applications, 2024 WL 4051786, at *13, the provisions *here*—restrictions in §§ 509.052(2)(D), 509.055, and 509.057—only regulate speech, and do not include data privacy or transaction restrictions. Nor do Plaintiffs challenge the parental control provisions, § 509.101-02, in isolation from their incorporation into § 509.052(2)(D)'s "verified parent" provision, or the age-registration provision, § 509.051, in isolation from its incorporation into other challenged provisions that turn on whether a user is a registered minor. Thus the targeted ad restrictions Plaintiffs challenge *only* restrict or prevent the display of targeted ads to certain users based on its content and audience, while the content-monitoring and age-verification regime *only* imposes obligations related to restricting access to content, based on the mix a covered DSP publishes. *See* Br. 18.

These regulations are akin to the content-exposure restrictions the Court held facially

invalid, since they "exclusively target speech, only a small portion of which"—less than 1%, the State admits, Opp. 3 n.9—"falls outside First Amendment coverage." *NetChoice II*, 2024 WL 4051786, at *16. Where the government admits 99% or more of the speech it restricts is protected, and purports to do so to regulate the less than 1% of unprotected speech that remains, that is the definition of facial overbreadth. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) (CPPA facially overbroad) (Br. 19). The State may not "torch a large segment of the Internet" to protect teenagers from a finite subset of unprotected speech. *Reno v. ACLU*, 521 U.S. 844, 882 (1997) (CDA facially overbroad); *Ashcroft*, 542 U.S. at 666-70 (COPA facially overbroad); Br 19.

### C. The Act Is Void for Vagueness.

The Court already found that the content-exposure restrictions are unconstitutionally vague. *See NetChoice II*, 2024 WL 4051786, at *17-18. And the targeted advertising restriction in § 509.055 rests upon the same term, "promote," which the Court held "vague when regulating First Amendment activity" because it "will result in wide-ranging censorship." *Id.* at *17 (Br. 19).

The State claims "commercially reasonable methods" in §§ 509.051, 509.055, 509.056(1), 509.057, and 509.101 is well-defined because it applies to the sale of goods under the UCC, in bankruptcy cases, and in contracts requiring "best efforts." *See* Opp. 33-34 & nn. 200-01. But *none* of these examples involve protected speech. *See NetChoice II*, 2024 WL 4051786, at *16. Without clarity as to what counts as a verified parent, verified adult, or sufficient effort to screen content under that standard, the "predictable tendency" will be censorship. *See* Br. 20.

## IV.   THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION

The State argues only that Plaintiffs' "delay" may negate a finding of irreparable harm. Opp. 37. The Court rejected this claim in *NetChoice II*, 2024 WL 4051786, at *20.

## V.   CONCLUSION

Plaintiffs respectfully request an order granting their motion.

Dated: September 20, 2024                    Respectfully submitted,


/s/ Adam S. Sieff_____          /s/ Robert Corn-Revere_____
AMBIKA KUMAR*                              ROBERT CORN-REVERE*
  ambikakumar@dwt.com                        bob.corn-revere@thefire.org
CAESAR KALINOWSKI IV*                      FOUNDATION FOR INDIVIDUAL
  caesarkalinowski@dwt.com                 RIGHTS AND EXPRESSION
DAVIS WRIGHT TREMAINE LLP                  700 Pennsylvania Avenue SE, Suite 340
920 Fifth Avenue, Suite 3300              Washington, DC  20003
Seattle, WA  98104                        Telephone: (215) 717-3473
Telephone: (206) 622-3150

                                          DAVID RUBIN*
ADAM S. SIEFF*                              david.rubin@thefire.org
  adamsieff@dwt.com                        FOUNDATION FOR INDIVIDUAL
DAVIS WRIGHT TREMAINE LLP                  RIGHTS AND EXPRESSION
865 South Figueroa Street, 24th Floor     700 Pennsylvania Avenue SE, Suite 340
Los Angeles, CA  90017                    Washington, DC  20003
Telephone: (213) 633-6800                 Telephone: (215) 717-3473


DAVID M. GOSSETT*                          J.T. MORRIS (TX Bar. 29094444)
  davidgossett@dwt.com                       jt.morris@thefire.org
CHELSEA T. KELLY*                          FOUNDATION FOR INDIVIDUAL
  chelseakelly@dwt.com                     RIGHTS AND EXPRESSION
MARIETTA CATSAMBAS*                        700 Pennsylvania Avenue SE, Suite 340
  mariettacatsambas@dwt.com                Washington, DC  20003
DAVIS WRIGHT TREMAINE LLP                  Telephone: (215) 717-3473
1301 K Street NW, Suite 500 East
Washington, DC  20005
Telephone: (202) 973-4200


*Attorneys for Plaintiffs*

                                                              * pro hac vice

## CERTIFICATE OF SERVICE

I certify that on September 20, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

/s/    *Adam S. Sieff*
Adam S. Sieff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS, M.F., by and through next friend, VANESSA FERNANDEZ, AMPERSAND GROUP LLC, and BRANDON CLOSSON, <br><br> *Plaintiffs*, <br><br> v. <br><br> KEN PAXTON, in his official capacity as the Texas Attorney General, <br><br> *Defendant*. | Civil Action No. 1:24-cv-00945-RP |

## DECLARATION OF CHRISTOPHER FERGUSON IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Christopher Ferguson, declare as follows:

I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.

### *Background*

1.  **Title***: Professor of Psychology, Stetson University.  Psychologist licensed in Florida and Texas (inactive in Texas).*

2.  **Education***: B.A. in psychology, Stetson University. M.S. developmental psychology, Florida International University. Ph.D. in clinical psychology, University of Central Florida.*

3.  **Previous positions***: Associate Professor, Texas A&M International University; Assistant Professor, University of Wisconsin - Whitewater*

4.  **Research focus***: Media effects on youth including video games, social media, etc.*

5.  **Author or co-author of***: 7 non-fiction books, approximately 268 scientific journal articles, book chapters, reviews, or reports.*

6.  **Most relevant publications:**

### Books:

Ferguson, C. J.  (2023).  *Catastrophe! How Psychology Explains Why Good People Make Bad Situations Worse.*  New York: Rowman & Littlefield.

Ferguson, C. J.  (2020).  *How Madness Shaped History.* New York: Rowman & Littlefield.

Ferguson, C. J.  (2018).  *Video game influences on aggression, cognition and attention.*  New York: Springer.

Markey, P.M., & Ferguson, C.J.  (2017)  *Moral combat: Why the war on video games is wrong.*  Dallas, TX: BenBella Books.

Ferguson, C. J. (2016).  *Media psychology 101.*  New York, NY: Springer.

Ferguson, C. J. (2013). *Adolescents, crime, and the media: A critical analysis*. New York, NY, US: Springer Science + Business Media. doi:10.1007/978-1-4614-6741-0

### Research Publications:

Ferguson, C.J., Kaye, L.K., Branley-Bell, D., & Markey, P.  (in press).  There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis.  *Professional Psychology: Research and Practice.*

Ferguson, C.J. (in press).  Do social media experiments prove a link with mental health: A methodological and meta-analytic review.  *Psychology of Popular Media.*

Ferguson, C.J. (in press). Longitudinal associations between social media use and mental health outcomes in sample of Irish youth: A brief report. *Communication Reports.*

Ferguson, C.J. (in press). Cyberbullying and its relation to right and left authoritarianism, Trait victimhood, and mental illness. *Psychology of Popular Media.*

Ferguson, C.J. (in press). Does the internet make the world worse? Depression, aggression and polarization in the social media age. *Bulleting of Science, Technology, & Society.*

Ferguson, C.J., Jeong, E.J., & Wang, J.C.K. (2023). rkthological gaming: A longitudinal study from the perspectives of mental health problems and social stress model. *The Journal of General Psychology, 150,* 323-343.

Ferguson, C.J. (2022). Does exposure to sexualized media lead to boys' objectification of girls and women?: A preregistered, longitudinal reanalysis of Rousseau et al. (2019). *Adolescent Psychiatry, 12,* 60-66.

Garcia, S., Ferguson, C.J., & Wang, C.K.J. (2022). Prosocial video game content, empathy and cognitive ability in a large sample of youth. *Journal of Youth and Adolescence, 51,* 62-73.

Ferguson, C.J., Kaye, L., Branley-Bell, D., Markey, P., Ivory, J., Klisanin, D., et al. (2022). *Like* This Meta-analysis: Screen Media and Mental Health**.** *Professional Psychology: Research and Practice, 53,* 205-214.

Ferguson, C.J., & Heene, M. (2021). Providing a lower-bound estimate for psychology's "crud factor": The case of aggression. *Professional Psychology: Research and Practice, 52,* 620-626.

Ferguson, C.J., & Wang, C.K.J. (2021). Aggressive video games are not a risk factor for mental health problems in youth: A longitudinal study. *Cyberpsychology, Behavior and Social Networking 24*(1), 70-73.

Ferguson, C.J. (2021). One less reason why: Viewing of suicide-themed fictional media is associated with lower depressive symptoms in youth. *Mass Communication and Society, 24*(1), 85-105.

Ferguson, C.J. (2021). Links between screen use and depressive symptoms in adolescents over 16 years: Is there evidence for increased harm? *Developmental Science, 24*(1) e13008.

Turel, O., & Ferguson, C.J. (2021). Excessive use of technology: Can tech-providers be the culprits? *Communications of the ACM, 64*(1), 42-44.

Drummond, A., Sauer, J.D., & Ferguson, C.J. (2020). Do longitudinal studies support long-term relationships between aggressive game play and youth aggressive behavior? A meta-analytic examination. *Royal Society Open Science.* https://doi.org/10.1098/rsos.200373

Lindner, D., Trible, M., Pilato, I., & Ferguson, C.J. (2020). Examining the effects of exposure to a sexualized female video game protagonist on women's body image. *Psychology of Popular Media Culture, 9*(4), 553-560.

Ferguson, C. J. (2019). 13 reasons why not: A methodological and meta-analytic review of evidence regarding suicide contagion by fictional media. *Suicide and Life-Threatening Behavior, 49*(4), 1178-1186.

Berryman, C., Ferguson, C. J., & Negy, C. (2018). Social media use and mental health among young adults. *Psychiatric Quarterly, 89*(2), 307-314.

Ferguson, C. J., Munoz, M. E., Garza, A., & Galindo, M. (2014). Concurrent and prospective analyses of peer, television and social media influences on body dissatisfaction, eating disorder symptoms and life satisfaction in adolescent girls. *Journal of Youth and Adolescence, 43*(1) 1-14.

3

7.    **Prior Expert Testimony and Compensation**: I provided a declaration in support of the plaintiffs in *Zoulek v. Hass* in the U.S. District Court for the District of Utah, Case No. 2:24-cv-31-RJS-CMR. I also consulted with the prosecution in the Nicholas Cruz case in Broward County, FL approximately 1 year ago. I am offering this declaration pro bono.

8.    In past generations, society has experienced repeated moral panics over new media and technology, ranging from novels to the radio, to comic books, to various forms of music (jazz, rock, rap, etc.), to video games and the role-playing game Dungeons and Dragons. In each case, politicians and scholars worried about the potentially pernicious effects of these media, often pushing for censorship/regulation.  In many instances, some scholars (for instance, psychiatrist Fredric Wertham in the case of comic books) and even professional guild organizations such as American Psychological Association have been revealed as vastly overstating the evidence for harmful effects (Elson, M., Ferguson, C. J., Gregerson, M., Hogg, J. L., Ivory, J., Klisanin, D., Markey, P. M., Nichols, D., Siddiqui, S., & Wilson, J.  (2019).  Do policy statements on media effects faithfully represent the science? *Advances in Methods and Practices in Psychological Science 2*(1), 12-25.) in some cases based on very poor quality and ultimately unreplicable meta-analyses (Ferguson, C.J., Copenhaver, A. & Markey, P.  (2020). Re-examining the findings of the APA's 2015 task force on violent media: A meta-analysis. *Perspectives on Psychological Science 15*(6), 1423-1443.)  The question before us is whether current concerns about social media are a repetition of this moral panic pattern, or whether the scientific data support that social media pose a unique problem for youth.  I will consider this in relation to the data on youth mental health in society, experimental data, survey data of youth and families and, lastly, an examination of Moral Panic Theory.

9.    In preparing this declaration, I reviewed Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction (Opp.), focusing on the State's contention at pp. 4-7 that

Social Media Can Hurt Children.  I am familiar with the social science sources cited by the State and discuss key examples below.  I have reviewed societal data regarding mental health (including research on suicide rates), experimental studies, and correlational/longitudinal studies regarding hypothesized effects of social media.  Overall, the State's claims regarding social media effects are overly generalized and not supported by the sources it cites.  The State does not account for research that reached contrary conclusions, and even in the studies it cites, overlooks statements that contradict its claims.

**Societal Data**

10.    In its opposition brief, Texas suggests that a proliferation of social media is directly tied to an increase in youth mental health problems.  (Opp. at 4–7.) However, there is no evidence establishing a cause-and-effect relationship between these time trends.  And the analysis that the State cites ignores that mental health data for less-technology adopting older generations is actually *worse* than for teens, that these trends in youth mental health are not observed for other high-technology adopting countries in Europe or the Anglophone sphere (Canada, UK, Australia, etc.), and that other factors within the US actually provide better explanations for youth mental health trends than does social media use.

11.    First, we must understand the reliability of varying data sources.  Unreliable data can come from problems with self-report, as well as reporting changes in official statistics.  For instance, an oft-discussed increase in the number of hospital admissions for self-injury is now understood to mainly be a function of reporting standards which changed in the 2010s (Corredor-Waldron,A. & Currie, J.  (2024).  To what extent are trends in teen mental health driven by changes in reporting? The example of suicide-related hospital visits.  *The Journal of Human Resources, 59,* S14-S40.)  Similarly diagnostic changes in the American Psychiatry Association's Diagnostic and Statistical Manual in 2013 broadened criteria for many mental

illnesses, making diagnosis for these conditions easier.  Further, as noted in one recent book (Shrier, A., (2024). *Bad Therapy: Why Kids Aren't Growing Up.*  Penguin), the 2010s saw the growth of a therapeutic industry within K12 schools, within parenting, and within the general culture.  As a positive, this may have destigmatized the reporting of mental health symptoms (a point also made by Corredor-Waldron & Currie, *ibid.*), but as a negative may also have led to youth redefining minor worries and sadnesses as mental illness.  As such, any trends in youth self-reported mental health or hospital admissions are likely due to changes in diagnosis, reporting standards and cultural perceptions of mental illness, all of which shifted rapidly during the 2010s.

12.     As such, the most reliable data appear to be suicide data which, for the United States, is reported in the Centers for Disease Control (CDC) WISQARS database.  Suicide data is not immune to reporting standards changes, but put rather bluntly, at least a body is a body and, as such, easier to count.  We see from such data that teen suicides remain rare compared to other age categories, though did rise through the 2010s, only to fall in 2022.  If we take the example of teen girls, often the specific focus on debates on social media effects, teen girl suicide remains the lowest, by far, of any demographic, though their absolute numbers did rise through 2022, falling that year (CDC.  (2024).  *Vital Statistics Rapid Report.*  Retrieved from: https://www.cdc.gov/nchs/data/vsrr/vsrr034.pdf.)  For instance, suicides among middle-aged Caucasian men and suicides among mid-20s Native American men are roughly 3-5 times the rate for teen girls.  The numbers for middle aged adults are particularly striking, given such individuals are less tech-adopting than teens.  Thus, the State's first mistake is to consider teen mental health in isolation of that of their parents, and in doing so falsely equate it as having been caused by something unique to teens (social media) rather than something systemic to families.



13.    Again, it worth nothing that suicides among teens and young adults declined in 2022 without the intervention of the state although suicides among older adults continued to increase (CDC, *ibid.*).

14.    Further, rates of teen suicide are directly correlated to rates of middle-aged adult suicide, suggesting these phenomena are occurring in concert with each other.  Note the trend is similar for teen boys as teen girls.  The correlation between these phenomena survives time series analysis (suggesting it is not an ecological fallacy or frivolous correlation).



15.     Scholar Mike Males has analyzed other CDC data to pinpoint potential causes for this relationship between teen and adult suicide.  In his data (Males, M.  (2024).  Why do authorities who claim "concern" for bullied teenagers lie shamelessly about who's bullying them?  Retrieved from: https://mikemales.substack.com/p/why-do-authorities-who-claim-concern), he finds that social media use is not correlated to teen self-reported suicidal depression.  However, emotionally and physically abusive parenting behaviors are.  This suggests that, to the extent youth are experiencing a mental health crisis in the United States, this is due to a trickle-down from their parents' mental health crisis, which can take the form of abuse or, alternatively, deaths of despair of parents due to drug overdoses or suicide.  Parental mental health problems and poor family environment are well-known predictors of youth suicide (e.g., King, R., Schwab-Stone, M., Flisher, A., et al. (2001).  Psychosocial and risk behavior correlates of youth suicide attempts and suicidal ideation. *Journal of the American Academy of Child & Adolescent Psychiatry, 40*, 837-846.)

16.     By contrast, we have no data to suggest changes in teens' screen or social media use are predictive of US youth suicide trends.  In fact, time series analyses have specifically ruled out social media as a cause of youth suicide trends (Padmanathan, P., Bould, H., Winstone,

L., Moran, P., & Gunnell, D. (2020). Social media use, economic recession and income

inequality in relation to trends in youth suicide in high-income countries: A time trends

analysis. *Journal of Affective Disorders*, *275*, 58–65. https://doi-

org.stetson.idm.oclc.org/10.1016/j.jad.2020.05.057).  Changes in youth screen use do not appear

to have affected youth mental health on a global scale (Vuorre, M., Orben, A., & Przybylski,

A.K. (2021). There is no evidence that associations between adolescents' digital technology

engagement and mental health problems have increased. (*Clinical Psychological Science, 9* (5),

823-835. https://doi.org/10.1177/2167702621994549.)

   17. The State's own sources demonstrate this.  The study it cites for the proposition

that there are "distinct developmental windows of sensitivity to social media in adolescence"

notes in its very first paragraph that "there is still considerable uncertainty about how social

media use relates to well-being," "[m]eta-analyses have identified small or negligible negative

links between social media use and well-being, while experimental evidence is mixed," and

"[t]he lack of concrete evidence is an issue routinely highlighted by academics, medical

professionals, and policy makers."  (Amy Orben, et al., Windows of Developmental Sensitivity

to Social Media, NATURE COMMC'N (Mar. 28, 2022), https://tinyurl.com/536jkx52) (Opp. at 5,

n.23).  Furthermore, results from the study suggest only tiny relationships, possibly within the

threshold of statistical noise, for correlations between social media and life satisfaction.  And the

Royal College of Psychiatrists' study the State cites to establish how "undesired behavior

spreads" on social media explains that "[m]uch of the current data is concerned with screen time

and data at a population level has not consistently identified any large detrimental effects."

(Technology Use and the Mental Health of Children and Young People, ROYAL COLL. OF

PSYCHIATRISTS, 31 (Jan. 2020), available at https://tinyurl.com/yv9cvu6w) (Opp. at 5, n.24).

The study, which the state uses to claim "[r]esearch suggests that direct exposure to suicidal

behaviors and acts of self-harm through social media may increase suicidality through imitation and modeling, particularly in more vulnerable populations" (Opp. at 5), provides no actual data to support this claim, the quote merely being a speculation in the abstract. (Amro Khasawneh, et al., Examining the Self-Harm and Suicide Contagion Effect of the Blue Whale Challenge on YouTube and Twitter: Qualitative Study, JMIR PUBL'N (June 2020), https://tinyurl.com/yc23y54d.)

18.    Advocates for the belief that social media has driven changes in US teens' suicide or mental health use only vague goalposts to describe when this may have occurred. Social media initially became available in roughly 2004 with Facebook, with smartphones becoming available around 2009, etc. We are led to believe that *some* change in youth screen use during that time is responsible for *any* change in youth mental health during that same time period from 2004-2024. However, with no clear guidelines for evidence, *any* change in youth wellness between 2004 through the present could have been attributed to changes in technology. In other words, rises in youth suicide which began in the early 2010s has been attributed to social media, but had youth suicides increased in 2004, or 2009, or 2019 or 2024, the same argument could have been made. This lacks any scientific rigor and amounts to post-hoc reasoning. It is worth noting that similar arguments were once made both by politicians (including the Surgeon General) and scholars about movie and television violence and violent crime, and these proved to be false once violent crime began to plummet in frequency in the 1990s (Markey, P. M., French, J. E., & Markey, C. N. (2015). Violent movies and severe acts of violence: Sensationalism versus science. *Human Communication Research*, *41*(2), 155–173. https://doi-org.stetson.idm.oclc.org/10.1111/hcre.12046). This represents, overall, a very poor standard of evidence on which to base public policy.

19.     People might reasonably ask what other factors in US society might explain youth mental health suicide increases.  As noted before some data suggest that reporting standards changes may be responsible for some data such as hospital reported self-injuries (Corredor-Waldon & Currie, *ibid.*).  Further Shrier (*ibid.*) has offered an explosion of a therapeutic industry both in K12 education and in the general public as a potential explanation.  Both of these occurred within the relevant timeframe.  Other changes occurring within US society in a similar timeframe are myriad and, tragically, in our focus on social media, many have been poorly explored.  I offer two examples, both of which hold up in time-series analyses, suggesting more than mere ecological fallacies.

20.     For instance, fatherlessness as indicated by births to unwed mothers (data provided by kidscount.org) is associated strongly with youth suicide.



21.     So too is income inequality related to youth suicide (a finding also supported by Padmanathan et al., *ibid.*).



22.     Other studies have pointed toward other factors such as a decline in childhood independent activities as a source of youth mental illness (Gray et al., (2023).  Decline in independent activity as a cause of decline in children's mental well-being: Summary of the evidence. *Journal of Pediatrics, 260,* 113352).  Opportunities for autonomous, reasonably unsupervised play tend to be associated with healthier child development (van der Kaap-Deeder, J., Vansteenkiste, M., Soenens, B., & Mabbe, E. (2017). Children's daily well-being: The role of mothers', teachers', and siblings' autonomy support and psychological control. *Developmental Psychology*, *53*(2), 237–251. https://doi-org.stetson.idm.oclc.org/10.1037/dev0000218), although the trend in parenting in recent decades has been toward risk-aversion, and the suppression of autonomy.  "Helicopter parenting" is generally correlated with worse mental health outcomes for youth, though more longitudinal research would be welcome (Vigdal, J.S., & Brønnick, K.K. (2022). A Systematic Review of "Helicopter Parenting" and Its Relationship With Anxiety and Depression. *Frontiers in Psychology, 13*.)  This suggests a larger issue with shifting parenting practices, often motivated by shame, guilt and heightened perception of environmental risk, that may be impacting youth mental health in the US in a way that has nothing to do with social media. There are many other potential variables and, undoubtedly, no single explanation is

sufficient. But in our rush to judge social media, this is causing harm by distracting policy makers from other, better supported risk factors for youth mental health issues, many of which originate from struggling families.

23.    It is worth also looking at cross-national data on youth suicide. Were social media to blame for youth mental health/suicides, we would expect to see similar youth suicide trends in other high technology adopting countries. But according to official statistics (e.g., Eurostat) on violent deaths, this does not appear to be the case. For example, across European countries, though there is between-country variance, the overall trend in youth suicides has been for a slight *reduction* in youth suicide in recent decades.



24.    Similarly for Anglophone countries (Ireland, Australia, Canada, etc.), there is no trend in youth suicides that would indicate a consistent cross-national trend in youth suicides:



25.     Here we can note the rising US rate (this data do not include the 2022 decline reported by the CDC).  Teen suicides in New Zealand are particularly high but show no trend. Overall, across nations, there is no consistent trend in youth suicide.  UK data provided by the Royal College of Pediatricians and Child Health ((2021), *State of Child Health.*  Retrieved from: https://stateofchildhealth.rcpch.ac.uk/evidence/mental-health/suicide/) report a decline in youth suicides through 2018 when reporting standards changed making further tracking of data confounded.

26.     In conclusion, data within US society and cross-nationally do not support either that there is a consistent trend in youth mental health cross-nationally, nor that the specific issue regarding mental health in the US is limited to teens, nor due to social media.  No good data is on offer to suggest that social media use in society is well-associated with teen suicide trends, and what good data is available, if anything, suggests that social media is a red herring.  By contrast, the data we have suggests that youth mental health and suicide is linked to systemic issues within struggling families which are also affecting youth's parents.  Rather than indulging yet another

14

media moral panic, it would be more fruitful to examine real family systems risk factors for mental health problems across generations.

**Experimental Studies: Is There Evidence For Causality?**

27.     Experimental studies of social media effects typically randomize participants (most often young adults) to either restrict their social media use for some period of time, or to continue using social media as normal.  Typically, both before and after the allotted time (some studies may only do so after), participants are asked to rate their own mental health.  Such studies have an obvious weakness in that it is fairly obvious to participants what the hypotheses of the study are.  When this occurs, participants are likely to report their behavior closer to what they think they experimenters want and, as such, give responses that do not indicate their true feelings or behavior.  This obviously limits the degree to which studies are informative.

28.     Nonetheless, the results of individual studies vary widely.  Some suggest that restricting social media may help mental health, others find no effect, and some find that restricting social media is detrimental to mental health.  A recent meta-analysis of experimental studies concluded that, across studies, they provided no evidence for the belief that restricting social media improves mental health (Ferguson, C.J. (in press).  Do social media experiments prove a link with mental health: A methodological and meta-analytic review.  *Psychology of Popular Media.*)  Effects were higher in studies where researchers failed to note prior inconsistencies in the literature (a phenomenon called citation bias), which can indicate researcher bias.  This means that, in some studies, researcher bias against social media resulted in what were likely artificially inflated results.

29.     Critics of social media also regularly fail to acknowledge many studies that did not conclude social media restrictions improved mental health (e.g., Przybylski, A.K., Nguyen, Tv.T., Law, W. *et al.* (2021). Does Taking a Short Break from Social Media Have a Positive

Effect on Well-being? Evidence from Three Preregistered Field Experiments. *Journal of Technology and Behavioral Sciences.* 6, 507–514. https://doi.org/10.1007/s41347-020-00189-w; Mitev, K., Weinstein, N., Karabeliova, S., Nguyen, T., Law, W., & Przybylski, A. (2021). Social Media Use Only Helps, and Does Not Harm, Daily Interactions and Well-Being. *Technology, Mind, and Behavior*, *2*(1). https://doi.org/10.1037/tmb0000033).

30.     Overall, methodological quality of studies was quite poor, few used open or transparent research practices, and results of some studies are also often misrepresented, sometimes by the study authors themselves.  For example, the study Allcott et al., (Allcott, H., Braghieri, L., Eichmeyer, S., & Gentzkow, M. (2020). The Welfare Effects of Social Media. *American Economic Review*, *110* (3), 629-76**.**), which is cited in both the U.S. Surgeon General's Advisory (cited by State in Opp. at 6, n.35) and the Royal College of Psychiatrists' study (cited by State in Opp. at 5, n.24), concluded that reducing social media time improved wellness.  However, the magnitude of effect was a miniscule .09 standard deviation units, with .00 being no effect at all.  This is important because standard deviation units below .21 are unreliable, often due to methodological noise (Ferguson, C.J., & Heene, M.  (2021).  Providing a lower-bound estimate for psychology's "crud factor": The case of aggression.  *Professional Psychology: Research and Practice, 52,* 620-626.)  An effect of such small magnitude is simply too small to reliably distinguish from methodological noise.  Even if that were not the case, such an effect would account for less than 1% of the variance in mental health.

31.     This is a wide problem for social science where, too often, noise results are misinterpreted as evidence for a hypothesis, when they should not be.  Put simply, the Allcott et al. study (*ibid*.) should never be interpreted as evidence that reducing social media time improves mental health.  Unfortunately, it is a statistical quirk that noise outcomes can become "statistically significant" when sample sizes are large. (as was the case for Allcott et al.)  Too

few scholars carefully note this problem in social science and adjust their interpretations appropriately.

32.     Other studies are also more complicated than often indicated.  For instance, take one study by Lepp and Barkley (Lepp, A., & Barkley, J. E. (2023). The experimental effect of social media use, treadmill walking, studying, and a control condition on positive and negative affect in college students. *Current Psychology, 42*, 26331–26340.)  Although it is true that this experiment (which, like most, is limited by its hypotheses being overly obvious to participants, which may have caused them to artificially alter their behavior to please the experimenters, a common phenomenon) found people who exercised were happier than those who used social media, those who used social media were happier than those who did not use social media (the actual control group).  It is a very different question to ask whether exercise makes people happier than social media, than to ask whether social media causes harm relative to not using social media.  Lepp and Barkley provide no good evidence for the latter concern.

33.     In conclusion to this section, experimental studies are severely limited by major methodological weaknesses likely to create false positive results.  Further, some studies evidence clear researcher bias as indicated by citation bias.  Nonetheless, as a group, they do not provide evidence for causal impacts of social media use on mental health.

### Correlational/Longitudinal Studies

34.     If the evidence for causal effects is poor, we might ask whether at least there is correlation between social media use and youth mental health.  Of course, correlational evidence is not evidence for causal effects or harm.  Even if a correlation did exist, for instance, it could be that youth who are more distressed use social media either to distract themselves or seek information or support regarding their mental illness.

35.    There are a great number of correlational studies, many of which are not done with youth, although a fair number are.  Studies are generally inconsistent in results, with some finding correlations, some finding no correlations and some even finding that social media use predicts good outcomes.

36.    Even meta-analyses of correlational studies come to different conclusions.  For example, one recent meta-analysis concluded that social media use did not predict mental health once other factors were controlled (Yang, Q., & Feng, Y.  (2024).  Relationships between social Networking Site (SNS) use and subjective well-being----- A meta-analysis and meta-analytic structural equation model, *Heliyon*, https://doi.org/10.1016/j.heliyon.2024.e32463).  Similarly, a recent meta-analysis which focused specifically on youth mental health outcomes concluded that there was no predictive relationship between social media use and youth mental health (Ferguson, C.J., Kaye, L.K., Branley-Bell, D., & Markey, P. (in press).  There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis.  *Professional Psychology: Research and Practice.*)  This fits with some of the best longitudinal studies of youth wellness which generally find no to weak associations between social media use and teen mental health (e.g., Heffer, T., Good, M., Daly, O., MacDonell, E., & Willoughby, T. (2019). The longitudinal association between social-media use and depressive symptoms among adolescents and young adults: An empirical reply to Twenge et al (2018). *Clinical Psychological Science*, *7*(3), 462–470. https://doi-org.stetson.idm.oclc.org/10.1177/2167702618812727; Jensen, M., George, M. J., Russell, M. R., & Odgers, C. L. (2019). Young adolescents' digital technology use and mental health symptoms: Little evidence of longitudinal or daily linkages. *Clinical Psychological Science*, *7*(6), 1416–1433. https://doi-org.stetson.idm.oclc.org/10.1177/2167702619859336

37.    It is important to recognize that some studies find that social media use is associated with *better* mental health outcomes.  For instance, one study found that using social media such as Instagram was associated with decreased loneliness (Pittman, M., & Reich, B. (2016). Social media and loneliness: Why an Instagram picture may be worth more than a thousand Twitter words. *Computers in Human Behavior*, *62*, 155–167. https://doi-org.stetson.idm.oclc.org/10.1016/j.chb.2016.03.084).  Similarly, another study found that Facebook use was associated with improved life satisfaction (Valenzuela, S., Park, N., & Kee, K. F. (2009). Is there social capital in a social network site?: Facebook use and college students' life satisfaction, trust, and participation. *Journal of Computer-Mediated Communication*, *14*(4), 875–901. https://doi-org.stetson.idm.oclc.org/10.1111/j.1083-6101.2009.01474.x).  The key takeaway is that there is simply no clear consistency to indicate a correlation between social media use and mental health.  Effects across all studies are generally very weak, whether positive or negative and the extent to which such studies rely on self-report or may not control adequately for relevant confounding variables, often do not present state-of-the-art science.

38.    Effects in meta-analyses may also be miscommunicated in several other ways. Some meta-analyses may find effects that are very close to zero and well within the level of effects expected by methodological noise.  Yet authors may focus on "statistical significance". But almost all meta-analyses produce "statistically significant" effects due to the massive power of such analyses…even for relationships that are trivial or due to chance.  This is, again, one unfortunate quirk of social science which too many scholars have been slow to recognize. Further, some meta-analyses may focus on bivariate correlations which do not adequately control for confounding variables such as biological sex, family stress, prior mental health, etc.  This will inadvertently overestimate the true size of correlations.

39.    The State also refers to an internal Facebook/Instagram study which received considerable notoriety in the general press (Opp. at 5).  However, there are several points to be made about this.  First, the data was based on self-report by a relatively small number of girls. This study and its approach has been widely criticized by scholars for poor methodology (e.g., Ritchie, S.  (2021).  Is Instagram really bad for teenagers? The quality of the company's secret research into mental health is abysmal.  *Unherd*.  Retrieved from: https://unherd.com/2021/09/facebooks-bad-science/).  People regularly misattribute the cause of their own feelings or behavior, and the questions were poorly worded.  One can certainly conclude that this was an unforced error on Facebook's part, but few scholars think of this internal data as being of high scientific quality.  Secondly, the State fails to note (as did much of the news media coverage…seldom a reliable source), that higher proportions of girls felt that Instagram either had no effect on them or made them feel *better*.  Very likely if we asked youth about how, say, school made them feel, school would get worse results.  It is simply not possible to make any kind of informed conclusion from the study, both because of its poor quality and because the results were mixed, and inconclusive.

40.    In conclusion, correlational and longitudinal studies vary widely in quality and outcomes.  However, between them the evidence they provide for a relationship between social media use and mental health remains weak.

**Potential Benefits of Social Media for Teens**

41.    During times of moral panic, it is common to view new media or technology as inherently dangerous and ignore potential benefits.  This appears to be reflected in the social science literature which, overwhelmingly, concerns itself with risks (whether evidence is found for them or not), rather than potential benefits.  However, some evidence does also point to potential benefits for youth on social media.  Of course, this evidence should be subjected to the

same scrutiny as that for harms and, at present, I conclude that the evidence here is more "proof of concept" than definitive.

42.     Even the State cites a study that explains "many types of content and forms of interaction among adolescents sharing images of self-harm on social networks may have supportive effects through recovery-oriented content."  (Vania Martinez, et al., *Social Contagion, Violence, and Suicide Among Adolescents*, CURR OPIN PSYCHIATRY (May 2023), https://tinyurl.com/ye252na8) (Opp. at 5, n.24)).  Moreover, social media may be an effective way of communicating health information to teens (Plaisime, M., et al., (2020).  Social media and teens: A needs assessment exploring the potential role of social media in promoting health. *Social Media and Society,* https://doi.org/10.1177/2056305119886025).  Youth with chronic health conditions may be able to use social media to find social connections and support (Daniels, S., & Willard, V. W. (2023). Social media interactions after diagnosis: Social experiences of adolescents and young adults (aya) with cancer. *Journal of Psychosocial Oncology*. https://doi-org.stetson.idm.oclc.org/10.1080/07347332.2023.2249876). Social media may be of particularly benefit to LGBT youth, who can use it to find connections and support (Berger M.N. et al., (2022).  Social media use and health and well-being of lesbian, gay, bisexual, transgender, and queer youth: Systematic review.  *Journal of Medical Internet Research, 24*(9), e38449, doi: 10.2196/38449).

43.     One recent large-scale review found there is evidence for multiple areas of benefit for teens in using social media (Haddock, A., Ward, N., Yu, R., & O'Dea, N. (2022).  Positive effects of digital technology use by adolescents: A scoping review of the literature. *International Journal Environmental Research in Public Health, 19*(21):14009. doi: 10.3390/ijerph192114009.).  For social media specifically, the authors concluded there are potential benefits related to social communication and reciprocity, information gathering and

creative thinking, and developing real-life relationships.  My own personal read is that much of this evidence remains correlational, has similar weaknesses as with the "harm" literature and should be interpreted with some caution.  However, it does provide an important counterpoint to the current exclusive focus on "harm" to the exclusion of all else.

44.    A Pew Research Center analysis of survey data found that "[t]eens are more likely to report positive than negative experiences in their social media use."  (Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media; Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023) (Ex. 4 to Declaration of Adam S. Sieff, ECF No. 22-4).). Specifically, Pew found that 80% of teens reported "feeling more connected to what is going on in their friends' lives," 71% of teens reported feeling "like they have a place where they can show their creative side," and 67% of teens reported feeling "like they have people who can support them through tough times" on social media.  (*Ibid.*)

45.    Underscoring the benefits minors derive from social media is evidence that disconnecting adolescents from social media would be even more harmful than heavy social media use. (Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, SOC. SCI. COMP. REV. 41:2 (Aug. 5, 2022) (Ex. 5 to Declaration of Adam S. Sieff, ECF No. 22-5).)

46.    My point is not that this research on benefits is any more definitive than that on harms, but rather that any crude policy decisions made in the midst of moral panic may have more deleterious effects than positive.

**Moral Panic Theory**

47.    Both politicians and scholars have a long history of indulging moral panics as relate to new media and technology.  Moral Panic Theory is well-established in the sociological

and criminal justice literature (Cohen, S. (1972). *Folk devils and moral panics*. London: MacGibbon and Kee.) Put briefly, moral panics occur typically when older adults in society become concerned about new media or technology that youth are using and ascribe the use of that media and technology to some social problem, real or imagined. This creates incentives for news media, politicians and scholars to cater to the moral panic in order to garner news headlines, votes, and research funding. During times of moral panic, data which supports the panic may be given far more attention than that which calls it into question. Moral panics tend to last until the generation of older adults who believe in the panic begin to die. Thus, we can look back on panics over everything from Greek plays, to going to the theater, to books, to the radio, to television, to comic books, to video games, to rock music, etc., with something akin to disdain, yet fail to learn from this historical pattern.

48.     As noted in this declaration, there is a wide gulf between the rhetoric used by some politicians and scholars in support of the censorship or regulation of social media and the actual research evidence to support such claims. In fact, the evidence is, at best, weak and inconsistent. Yet many politicians and even scholars fail to report this faithfully. This does not imply bad faith, merely that such behavior is common to moral panics.

49.     In its opposition brief, the State cites the US Surgeon General's Advisory on Social Media and Youth Mental Health to paint social media as a hotbed of "(1) sexual exploitation; (2) financial extortion; and (3) attempts to sell illegal drugs" (Opp. at 6, n.35). But the State omits the Advisory's findings that "[s]ocial media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests" and that "[i]t can provide access to important information and create a space for self-expression." (Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory, U.S. DEP'T OF HEALTH AND HUMAN SERV., 6 (2023).) According to the Surgeon General, this is

especially true for "youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." (*Ibid.*)  In fact, "[s]tudies have shown that social media may support the mental health and well-being of lesbian, gay, bisexual, asexual, transgender, queer, intersex and other youths by enabling peer connection, identity development and management, and social support." (*Ibid.*)  And unsurprisingly, the Advisory cautions that "[d]espite this widespread use among children and adolescents, robust independent safety analyses on the impact of social media on youth have not yet been conducted." (*Id.* at 4.)

50.     Moreover, the Surgeon General has been something of an engine of moral panics, having promoted moral panics in the past over television, video games and other forms of media. Most notably, during the early 1980s, then-Surgeon General C. Everett Koop described video games as addictive, dangerous both physically and mentally and hazardous "body and soul" (see Associated Press.  (1982).  Around the Nation; Surgeon General Sees Danger in Video Games. *New York Times.*  Retrieved from: https://www.nytimes.com/1982/11/10/us/around-the-nation-surgeon-general-sees-danger-in-video-games.html).  It is important to recognize that he was discussing video games such as *Pac Man* or *Space Invaders* which no one today believes to be dangerous in the slightest.  Interestingly, in his advisory on social media, the US Surgeon General both acknowledges that social media may have benefits for many youths, but also that there are significant gaps in the research literature.  Nonetheless, the Advisory appears to lean into moral panic language with classic reversed burden of proof stating "Nearly every teenager in America uses social media, and yet we do not have enough evidence to conclude that it is sufficiently safe for them."  This framing that the harm hypothesis is *true* until it is proven false is exactly the inverse of how science actually works.  Nor does the Surgeon General provide any guidelines for what they would consider evidence social media is "safe" despite significant evidence that social media is not harmful. Is there a "perfect" study the Surgeon General would

24

consider definitive?  Is there a certain ratio of null to "statistically significant" studies they would find convincing?  Is there a certain minimal effect size below which we could safely conclude any social media effects are trivial?  Without such clear scientific guidelines any public statements are politicized and unfalsifiable rather than helpful.

**Conclusions**

51.    To summarize:

1) There is no clear evidence that there is an international trend in mental health impacting youth whether due to access to social media or due to any other cause (see supra paragraphs 10-25).

2) To the extent that a mental health crisis exists specifically in the US, this is not isolated in teens, but appears to be inter-generational, impacting less-tech adopting older adults more than teens (see supra paragraphs 12-13).

3) Mental health in older generations appears to be deeply entwined with mental health in younger generations likely due both to parental suicide, as well as parental emotional and physical abuse (see supra paragraphs 14-15).

4) There is no good evidence that restricting social media time is a panacea for mental health (see supra paragraphs 17, 27-33).

5) Nor does time spent on social media appear to be a useful predictor of which youth are likely to develop mental health problems in the future (see supra paragraphs 34-40).

6) Current concerns over social media are fitting a well-known and established pattern of moral panic which has been witnessed in prior generations over other forms of media and technology, often with identical sounding language (see supra paragraphs 45-48).

52.     Put simply, there is no reason to believe Texas H.B. 18 will help children, may even harm children by preventing children who would benefit from social media from accessing it, and opens pernicious doors in the restriction of free speech during a period of moral panic.

53.     Such is the course of moral panics.  What can appear to be a pressing moral threat today is often clearly harmless with the hindsight of history.  However, during moral panics, scientific evidence suggesting we should be more cautious in attributing blame to media and technology is often brushed aside or ignored.  This has clearly happened with the state's case regarding social media.  This can, itself, become dangerous given the precedent that can be set in using an incomplete and flawed reading of the scientific evidence in support of policies that erode the core value of free speech.  Censorship often comes in the guise of "protecting" some ostensibly vulnerable group.  This time appears to be no different.


**DECLARATION UNDER PENALTY OF PERJURY**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based upon my personal knowledge.

Executed on September 18, 2024.

_____
            Christopher J. Ferguson